**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES,<br><br>1101 Connecticut Avenue, NW<br>Suite 900<br>Washington, D.C. 20036,<br><br>Plaintiff, | |
| v. | Civil Action No. ________ |
| ARNE DUNCAN, in his official capacity as Secretary of the Department of Education,<br><br>Office of the Secretary<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202, and<br><br>THE DEPARTMENT OF EDUCATION,<br><br>400 Maryland Avenue, SW<br>Washington, D.C. 20202,<br><br>Defendants. | |

**COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES (“APSCU”) for its complaint against Defendants, SECRETARY OF THE DEPARTMENT OF EDUCATION ARNE DUNCAN (“Secretary”) and THE DEPARTMENT OF EDUCATION (the “Department”) alleges, by and through its

attorneys, on knowledge as to Plaintiff, and on information and belief as to all other matters, as follows:

**Preliminary Statement**

1. This is an action under the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706 ("APA"), challenging certain final regulations promulgated by the Department on October 29, 2010, *see* 75 Fed. Reg. 66,832 (Oct. 29, 2010), under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq*. ("Title IV"), which governs federal financial assistance for postsecondary education.

2. APSCU's members are private sector colleges and universities that educate both traditional and nontraditional students—such as working adults and single parents—who are underserved by conventional public and non-profit schools. APSCU's member schools annually educate more than 1.5 million students, helping them learn the skills necessary to become productive members of the nation's workforce. As explained below, the challenged regulations are beyond the Department's authority and seek to impose on APSCU's members and other schools, including public and non-profit schools, restrictions that are unlawful and arbitrary and capricious. APSCU has filed this lawsuit to prevent these unlawful regulations from harming students and the schools that serve them.

3. APSCU and its members fully support lawful, rational regulations implementing Title IV. Over the past year and a half—including the negotiated rulemaking sessions and the public comment period that preceded the final regulations—APSCU and its member schools have attempted to engage the Department to work toward regulations that serve Title IV program integrity goals in a lawful manner, without harming students and the law-abiding private sector schools that serve them. Instead of responding meaningfully to those efforts, the Department

chose to proceed with a regulatory process that was rushed, unfair, and structured from the beginning to implement a desired result irrespective of the concerns of stakeholders and the public.

4. This lawsuit challenges three of the Department's regulations that are particularly harmful to students, school employees, and schools and that are well beyond the Department's regulatory authority under the Higher Education Act ("HEA") and, in some cases, the Constitution. The challenged regulations are: (i) regulations governing compensation for persons engaged in student recruiting, admissions activities, or in making decisions regarding the award of student financial assistance ("Compensation" regulations); (ii) regulations defining what constitutes a "substantial misrepresentation" and specifying the procedures for assessing violations of the regulations and associated penalties ("Misrepresentation" regulations); and (iii) regulations requiring particular forms of "State authorization" as a prerequisite for participating in Title IV student aid programs ("State Authorization" regulations) (collectively, the "final regulations").

5. The final regulations, among other things, (i) undermine the ability of all postsecondary educational institutions—including public and non-profit schools—to pay their employees merit-based compensation, even for helping students persevere in their studies to graduation, which is an ultimate goal of Title IV programs; (ii) subject schools to severe penalties for misstatements that are neither material nor made with an intent to deceive, including statements made by remote third parties and statements that have a mere "tendency" to confuse; and (iii) make the availability of student financial assistance dependant upon States adopting specified regulatory regimes for licensing schools, creating significant economic and

administrative burdens for schools that operate in multiple States that could adversely affect students' ability to use Title IV funds to pursue their higher education goals.

6. The regulations are scheduled to go into full effect on July 1, 2011, but they are already harming schools and students by changing the way schools hire, recruit, advertise and deploy their programs and shape their student bodies. In addition, they are causing schools to divert significant time and money from student education to implement policies and procedures that attempt to comply with the new regulations. In short, the mere promulgation of the challenged regulations in the *Federal Register* has limited the operations of all schools that participate in Title IV programs, including private sector schools, and significantly impairs the interests of students served by those schools.

7. As schools take steps to try to comply fully with the challenged regulations by the July 1, 2011 effective date, it will become increasingly difficult for them to attract and retain the best possible employment and educational talent; their student recruitment and outreach efforts will suffer; and their efforts to provide online and other beneficial programs across State lines will be hindered. In addition, because the challenged regulations are both broadly and imprecisely worded, schools face significant regulatory and operational uncertainty, which makes compliance extremely difficult and costly, diverts valuable resources from educating and training students, and exposes schools to increased third-party and departmental litigation.

8. The consequences to the students served by private sector schools are and will be particularly severe. As recognized by the Department, "[m]any of the institutions offering these programs have recently pioneered new approaches to enrolling, teaching, and graduating students." 75 Fed. Reg. 43,616, 43,617 (July 26, 2010). Low-income, minority, first-generation college attendees, as well as other traditionally underserved student populations such as working

adults and single parents, benefit most from these programs. The student populations at private sector schools have the following breakdown: 76 percent live independently without parental support, 63 percent are over 24 years old, 54 percent delayed postsecondary education after high school, 46 percent have parents who did not go to school beyond high school, 47 percent have dependent children, 40 percent are minorities, and 31 percent are single parents. Yet, the Department's new regulations take aim at private sector schools' ability to offer their highly effective services to these students.

9. In so doing, the regulations will leave many potential students who would benefit from private sector schools' "pioneer[ing] new approaches" with fewer opportunities for professional advancement in an increasingly competitive and skills-driven labor market. This places the regulations directly at odds with President Obama's goal of "leading the world in the percentage of college graduates by 2020," a goal the Department has recognized as being impossible to achieve "without a healthy and productive higher education for-profit sector." 75 Fed. Reg. at 43,617.

10. Following the Department's failure to obtain consensus for its proposed regulations during negotiated rulemaking sessions in late 2009 and early 2010, the Department issued them as proposed rules in a June 18, 2010 Notice of Proposed Rulemaking ("NPRM"). 75 Fed. Reg. 34,806 (June 18, 2010). The Department signaled its continued unwillingness to deviate significantly from its preferred regulations by providing for an abbreviated 45-day comment period instead of the standard 60-day period.

11. Even under this compressed schedule, many of APSCU's members explained to the Department in detailed written comments how the proposals would harm students who prefer the flexible, hands-on, and innovative educational programs that are provided at private sector

schools. They also informed the Department that many of the proposals violated the Constitution of the United States, the HEA, and the APA. In total, approximately 1,180 commenters submitted comments to the Department, underscoring the significant public concern over the proposed regulations.

12. Instead of carefully examining these widely shared concerns, the Department rushed to publish a final rule by November 1, 2010—the deadline under the HEA for promulgating regulations of this kind that are to go into effect for the following academic school year. *See* 20 U.S.C. § 1089(c). The hurried and predetermined nature of the rulemaking process is evident in the final regulations—sent to the Office of Management and Budget for review pursuant to Executive Order No. 12,866 a mere 64 days after the close of the comment period—which reflect only minor, largely cosmetic, changes from the proposals published in the NPRM and reject without significant discussion the substance of most commenters' critiques, challenges, and proposed regulatory alternatives.

13. The final regulations that emerged out of the Department's flawed and rushed process violate the HEA and the APA in multiple respects. In addition, the Misrepresentation regulations violate the Constitution of the United States.

14. The Compensation regulations unlawfully restrict forms of compensation that Congress did not subject to government control in the HEA, including merit-based salaries, graduation-based payments, senior management compensation, and revenue-sharing plans. The regulations are also the product of an unreasoned decisionmaking process that, among other things, ignored pertinent legislative and regulatory history surrounding the underlying statutory provision.

15. The Misrepresentation regulations violate the HEA by omitting materiality and intent requirements that are essential to ensuring that the regulations do not reach statements not covered by the statutory prohibition, which specifically only punishes "substantial misrepresentation[s]." 20 U.S.C.§ 1094(c)(3). The Misrepresentation regulations also violate the HEA and the Due Process Clause of the Constitution by depriving schools of their rights to prior notice and opportunity for a hearing before losing their ability to participate in Title IV programs. The regulations violate the First Amendment to the Constitution by impermissibly restricting and chilling legitimate and truthful speech. The regulations are also the product of an unreasoned decisionmaking process that, among other things, rejected out-of-hand valid concerns raised by commenters.

16. The State Authorization regulations exceed the bounds of the HEA's State authorization provision by prohibiting a school's students from receiving Title IV funds unless the State in which it operates adopts and implements new and burdensome licensing requirements. Congress could not have intended the Department to distort the State authorization requirement in the HEA to impinge so severely upon State prerogatives. Under this approach, all students who are eligible for and entitled to Title IV funds could be denied such aid for their education at schools in States that do not meet these new regulatory requirements. In addition, the requirement under the State Authorization regulations' that schools offering distance learning programs meet licensing requirements in every State where their students happen to be found is also contrary to the HEA. The HEA requires only that an institution be authorized in the State where it is located. These regulations implicate the "nexus" requirement that governs State regulation of the Internet and alter the Federal-State balance in a way Congress could not have intended by imposing significant burdens on online and other

innovative educational programs that operate across State lines. Finally, the State Authorization regulations are the product of an unreasoned decisionmaking process that, among other things, failed to identify any rational basis in the administrative record for subjecting schools and their students to these additional regulatory burdens.

17. APSCU does not challenge the underlying statutory limitations on compensation and misrepresentations or the requirement that schools obtain State authorization. But in promulgating the challenged regulations, the Department has strayed beyond its statutory mandate and employed unlawful proceedings to adopt regulations that are both contrary to law and arbitrary and capricious. The Court should vacate the challenged regulations, and the Department should reconsider its approach to these important matters.

## I. PARTIES

18. Plaintiff APSCU is an association of the private sector education industry, incorporated under the provisions of the District of Columbia Non-Profit Corporation Act, D.C. Code Ann. §§ 29-301.01-.114, with its principal place of business located at 1101 Connecticut Avenue, NW, Suite 900, Washington, D.C. 20036. APSCU represents more than 1,500 private sector schools that annually provide educational opportunities for more than 1.5 million students for employment in some 200 occupational fields. APSCU's members qualify as "institution[s] of higher learning" under the HEA and are eligible to participate in Title IV student aid programs. 20 U.S.C. § 1002. Many of APSCU's member schools will be subject to the Department's regulations on their effective date, July 1, 2011, or at some point thereafter. Those members have already begun or will soon begin taking steps to bring their operations into compliance with the challenged regulations, to the extent compliance is even possible. The interests APSCU seeks to protect in filing this lawsuit are germane to the organization's purpose to promote access to career education and to emphasize the importance of workforce

development. Neither the claims asserted nor the relief requested in this lawsuit requires the participation of individual APSCU members.

19. Defendant Arne Duncan is the Secretary of the Department of Education. His official address is 400 Maryland Avenue, SW, Washington, D.C. 20202. He is being sued in his official capacity. In that capacity, Secretary Duncan has overall responsibility for the operation and management of the Department. Secretary Duncan, in his official capacity, is thus responsible for the Department's unlawful promulgation of the final regulations and for related acts and omissions alleged herein.

20. Defendant Department of Education is, and was at all times relevant hereto, an executive agency of the United States Government subject to the APA. *See* 5 U.S.C. § 551(1). The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668 (1979). The Department is located at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## II. JURISDICTION AND VENUE

21. This action arises under the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-06. Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper in this Court under 28 U.S.C. § 1391(e)(1), (2), and (3) because this is an action against officers and agencies of the United States, Defendant Department of Education resides in this judicial district, Defendant Secretary Duncan performs his official duties in this judicial district, a substantial part of the events or omissions giving rise to this action occurred in this judicial district, and Plaintiff resides in this judicial district and no real property is involved in the action.

## III. FACTUAL ALLEGATIONS

### A. BACKGROUND

22. The Department of Education oversees the administration of Title IV funds. The Department carries out this role by subjecting all schools that accept students who pay for their education with Title IV funds—public, nonprofit, and private alike—to stringent regulatory requirements. Title IV programs—and the Department's implementation of them—are meant to foster Americans' access to higher education and the possibility of professional advancement.

23. Private sector education will play an important role in trying to meet the challenges of producing a better educated and more skilled population that will enable the United States to continue to thrive in a globalized economy. In fact, the Department has recently recognized that the private sector "has long played an important role in the nation's system of postsecondary education." 75 Fed. Reg. 66,665 at 66,671 (Oct. 29, 2010) (to be codified at 34 C.F.R. pt. 600). Private sector education expanded primarily to fill educational needs of nontraditional students—low-income, minority, first-generation, working-adult, and single-parent students—that traditional schools have been unable to meet.

24. Private sector schools have the required infrastructure in place—both on the ground and online—to cater to nontraditional students. And each year, hundreds of thousands of prospective students vote with their feet and choose to enroll in programs offered by private sector schools. They do so to prepare for and advance their careers and to improve their quality of life and that of their families. Although reasons for their choices vary, students are often attracted by private sector schools' flexible, innovative, and hands-on programs as well as their demonstrated commitment to graduation and career placement.

25. Private sector schools have consistently delivered quality education to those students who choose to enroll in their programs. Private sector schools now account for 31

percent of Certificates and Associate's Degrees awarded, and a substantial percentage of the technically trained workers who enter the American workforce each year are educated at private sector schools. Private sector schools also meet increased demand for retraining displaced workers and upgrading skills for a wide variety of public and private employers. Notably, graduation rates are substantially higher at two-year private sector schools than at two-year public sector schools even though, compared to their public and non-profit sector counterparts, private sector schools' student populations are weighted more heavily toward nontraditional students who are, historically, less likely to graduate than traditional students.

26. Private sector schools are indispensible to meeting the goal, endorsed by President Obama, that the United States have the highest proportion of college graduates in the world by 2020. *See* 75 Fed. Reg. at 43,617. Achieving that goal will require approximately 8 million new students—including millions of nontraditional students—to graduate from college over the next decade. Without private sector schools—which are increasing their capacity at higher rates than their public sector counterparts—to help meet rising demand, it would be exceedingly difficult, and perhaps impossible, to meet that goal. In fact, in light of State budget difficulties, the Governor of California recently proposed more than $1.4 billion in cuts to higher education. At California community colleges alone, that proposal could reduce educational capacity by 350,000 students. At the same time, private sector schools, using far fewer taxpayer dollars than their public and non-profit counterparts, are investing their own funds to contribute to the necessary expansion of the nation's postsecondary educational opportunities.

27. The Federal Government, States, and private accreditation bodies closely regulate all schools, including private sector schools. By the Department's own account, this regulatory scheme has ensured and verified that the vast majority of private sector schools are good

corporate citizens that take seriously their regulatory obligations and their responsibilities to students.

28. The final regulations impose significant new regulatory obstacles to private sector schools' ability to participate in Title IV programs. These obstacles will impede private sector schools from continuing to provide the benefits of their innovative educational programs to those traditionally ignored and often rejected by more conventional schools.

**B. THE PROCEDURALLY FLAWED RULEMAKING PROCESS**

29. On May 26, 2009, the Department published a notice in the *Federal Register* of its intention to establish a negotiated rulemaking committee, as required by 20 U.S.C. § 1098a, to develop new regulations regarding Title IV eligibility. *See also* Negotiated Rulemaking Act, 5 U.S.C. §§ 561-570a. Pursuant to 20 U.S.C. § 1098a, unless impracticable, unnecessary, or contrary to the public interest, the Department must subject all regulations pertaining to student financial aid programs to public negotiated rulemaking sessions before publishing any proposed regulations. By requiring such negotiations, Congress intended to guide the Department to produce final rules that are workable and free of significant conflict.

30. The Department appointed sixteen individuals as primary non-federal representatives to the negotiated rulemaking committee. Although it was known that the committee's sessions would (and did) focus on issues that significantly affect private sector schools, private sector schools received only one of the sixteen seats on the committee, while other stakeholders had multiple seats. Private sector schools requested additional representation; but given the committee's composition, those requests unsurprisingly failed to achieve the necessary consensus for approval. In short, the regulatory process was flawed from the beginning.

31. After forming the negotiation committee, the Department held three negotiated rulemaking sessions—November 2-6, 2009, December 7-11, 2009, and January 25-29, 2010. The Department undermined the negotiations from the start by putting forth proposals to which certain negotiators would never agree and from which other negotiators would never deviate. Accordingly, negotiators failed to reach consensus in several areas.

32. Instead of pursuing additional negotiations to reach consensus, the Department pressed forward on its own and issued proposed regulations on June 18, 2010. 75 Fed. Reg. at 34,806. The Department's rushed process glossed over several deficiencies with its proposals. For example, the Department acknowledged that regulations—such as those proposed—that have an annual impact on the economy of more than $100 million must be accompanied by rigorous economic analysis. Nevertheless, in the NPRM, the Department admitted that it did not have a firm grasp of the costs and benefits of its proposals. *See id.* at 34,855. Indeed, the Department utterly failed to account for the increased costs schools will incur—and in some cases have already begun to incur—in attempting to comply with certain of its provisions, like the Compensation regulations. In place of the required analysis, the Department stated that costs were "difficult to quantify" and asked interested parties to fill in the gap themselves by providing "more rigorous analysis." *Id.*

33. In connection with the NPRM, the Department required interested parties to provide comments within 45 days—by August 2, 2010—instead of employing the standard 60-day period contemplated by Executive Order 12,866. *See* Executive Order 12,866, 58 Fed. Reg. at 51,735 (Sept. 4, 1993). Even with the short 45-day comment period, approximately 1,180 commenters submitted comments on the Department's proposals; some comments even answered the Department's call for more rigorous economic analysis of its proposals.

34. On October 5, 2010, the Department sent its final regulations to the Office of Management and Budget for final review, which necessarily implies that the Department read, analyzed, considered, and meaningfully responded to each of the more than one thousand comments it received over the course of 64 days. The Department acknowledged that the 1,180 parties who had commented on the regulations had identified many alleged deficiencies. Yet, instead of meaningfully responding, the Department often simply dismissed those concerns as invalid or otherwise without merit. For example, the Department made no attempt to bolster its economic analysis despite comments explaining that the Department had dramatically underestimated the costs and overestimated the benefits of its proposals. Bringing its rushed and ill-considered process to a close—without fulfilling its obligations to address public comments, explain its reasoning, or account for the economic impact of its actions—the Department issued a final rule that is unlawful in several respects.

## C. THE CHALLENGED REGULATIONS

35. This action seeks declaratory and injunctive relief as to three provisions of the Department's final rule published in the *Federal Register* on October 29, 2010. The regulations challenged in this action are: (i) the Compensation regulations, which change the regulations governing compensation for persons engaged in student recruiting or admissions activities or in making decisions regarding the award of student financial assistance, (ii) the Misrepresentation regulations, which expand the meaning of a substantial misrepresentation, alter the penalties for violating the provision, and dramatically reduce the process afforded to schools charged with violating the provision, and (iii) the State Authorization regulations, which implement overly broad and burdensome State authorization requirements.

36. The final regulations violate the congressionally defined bounds of the HEA and in some cases, the requirements of the Due Process Clause of the Fifth Amendment and the First Amendment to the Constitution of the United States.

37. In addition, the Department's process and reasoning in adopting the final regulations violated the requirements of the APA. Contrary to the procedures set forth in the APA, the Department entered the rulemaking proceedings with an unalterably closed mind and ultimately failed to consider adequately comments submitted in response to its proposed regulations.

38. The final regulations also violate the APA because they are arbitrary and capricious. The final regulations are not the product of a reasoned decisionmaking process; their adoption dramatically affects private sector schools and their students, yet they are unsupported by factual evidence or logical reasoning. Among other things, the promulgation of the challenged regulations, which lack clarity in many respects, significantly increases regulatory and operational uncertainty for schools and students, making compliance more difficult and costly and facilitating more lawsuits against schools. In effect, the added uncertainty created by the regulations requires schools to divert resources from educating and training students to compliance and litigation related activities.

**1. COMPENSATION REGULATIONS**

39. In 1992, Congress amended the Higher Education Act to prohibit educational institutions that wished to participate in Title IV programs from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20).

40. Initial implementation of this statutory provision caused confusion within the Department and among public, non-profit, and private sector schools about which types of compensation were permitted and which were prohibited.

41. During the 1990s, the Department provided informal letter guidance on these points, which while sometimes useful, was often contradictory. For example, most of the Department's guidance stated that payment of merit-based *salaries* was permissible but did not consistently explain the extent to which non-enrollment factors had to be considered in order for merit-based salaries to be acceptable to the Department. In addition, the Department at times stated that salaries paid to recruiters were permissible provided they were only adjusted once per year; at other times the Department stated that adjustments twice per year were acceptable.

42. In 2000, the Department, prompted by a private *qui tam* action, issued a Final Program Review Determination to a private sector school, finding that it had violated the compensation provision and requiring the school to return more than $180 million in Title IV funds. The Department determined that the school had paid salaries to its student recruiters that did not take into account "other substantial performance factors" unrelated to enrollment. Alarmingly, this "other substantial performance factors" test had not appeared in any of the Department's previous guidance letters. Ultimately, the Department's actions forced the school to declare bankruptcy, leaving thousands of employees and students without a school and taxpayers responsible for paying their loan debts.

43. In 2002, the Department acknowledged its deficiencies in implementing the statutory bonus prohibition without formal guidance, concluding that its informal approach had proved "problematic" and resulted in "unclear guidance" to schools. Accordingly, the Department recognized that more uniform standards were necessary to allow educational

institutions to carry out their missions effectively. Letter from Jeffrey R. Andrade, Dep't of Educ., to Leigh M. Manasevit and Jonathan D. Tarnow, Brustein and Manasevit (Dec. 4, 2002). To that end, the Department conducted negotiated rulemaking sessions that resulted in the promulgation of a series of twelve regulations (the "Clarifying regulations"). Each of those regulations, which gave a "purposive reading" to the statute and provided the regulated community with much-needed guidance, were approved by all negotiators as well as by Department of Education lawyers. *See also* 67 Fed. Reg. 67,048, 67,049 (Nov. 1, 2002) (noting that the regulations "clarify the statutory program participation agreement provision concerning incentive payment restrictions").

44. The Clarifying regulations outlined twelve non-exhaustive types of payment arrangements that had never violated, and would not in the future be considered to violate, the statute. *See* 34 C.F.R. § 668.14(b)(22)(ii)(A)-(L) (2002). Among other things, the Clarifying regulations stated that merit-based adjustments to pay made no more than twice in any twelve-month period were permissible, provided that such adjustments were not "based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." *Id.* § 668.14(b)(22)(ii)(A) (emphasis added). The Clarifying regulations also specified that compensation based upon students' successful completion of their programs of study was permissible. *Id.* § 668.14(b)(22)(ii)(E). And they clarified that the statutory prohibition does not apply to "managerial or supervisory employees who do not directly manage or supervise employees who are directly involved in recruiting or admissions activities, or the awarding of Title IV, HEA program funds." *Id.* § 668.14(b)(22)(ii)(G). In short, the bright-line rules embodied in the Clarifying regulations were easy for regulated parties to understand and enabled the Department and courts to quickly and easily distinguish between schools that improperly

used commissioned salespeople to drive up enrollments and schools that properly paid their recruiting, admissions, and financial aid employees competitive salaries, appropriately adjusted to reflect their on-the-job performance.

45. The Clarifying regulations allowed schools to provide competitive compensation to attract qualified and professional recruiting, admissions, and financial aid staffs without fear of being credibly accused of violating the HEA's compensation restriction. Employing a professional and motivated workforce, in turn, enabled schools to provide prospective students with accurate and useful information to use in making decisions about their educational goals.

46. On June 18, 2010, ignoring the clear history of regulatory confusion and the regulatory guidance provided by the Clarifying regulations, the Department issued an NPRM that proposed to repeal the Clarifying regulations and define statutory terms in ways that would extend the statutory compensation restriction well beyond its congressionally defined scope.

47. The Department received numerous comments responding to its proposed regulations. Among other things, commenters explained to the Department that its proposed regulations violated the HEA and the APA in several ways, would lead to significant increased regulatory uncertainty similar to the pre-2002 regulatory regime, and failed to consider the regulatory costs and burdens that would be imposed on affected students and schools. In fact, confusion over the scope and meaning of the Compensation regulations ran so deep that one commenter sought clarification by posing a series of thirteen questions to the Department regarding various compensation practices whose legality could not be determined on the basis of either the regulation or the self-described "two-part test" the Department offered schools as a tool to assess the permissibility of various compensation arrangements. Those questions asked, for example, whether under the new regulations compensation for recruiting, admissions, and

financial aid employees can be based on student grades, job placement, student satisfaction surveys, or loan default rates; whether diversity program directors are subject to the regulations; whether career counselors can be compensated for successful career outcomes; and whether professors can be compensated based on academic achievement.

48. On October 29, 2010, the Department issued the Compensation regulations, which adopted the proposed regulations with minimal changes and strongly implied that the Clarifying regulations—which had been approved by Department lawyers and had never been successfully challenged in court—sanctioned illegal compensation practices. For the most part, the Department ignored commenters' concerns and, instead of answering the questions posed to it, simply referred commenters, again, to its "two-part test."

49. Notwithstanding the minor changes, the final Compensation regulations—like the proposed Compensation regulations—impermissibly regulate salaries, in particular by prohibiting schools from paying covered employees merit-based salaries. The HEA does not regulate salaries in any way and cannot be construed as restricting schools' ability to provide covered employees with merit-based salaries and salary adjustments. The HEA only prohibits "bonus[es]" and "commissions"—neither of which are salaries—and the related category of "other incentive payment[s]." 20 U.S.C. § 1094(a)(20). Basic principles of statutory construction require that the term "other incentive payment" must be read only to include payments that are in the nature of bonuses or commissions and not to encompass salaries and merit-based salary adjustments made in the normal course of business.

50. To be merit-based, salaries must be based on employees' on-the-job performance. Thus, for a recruiter, merit-based salaries must reward recruiting performance. The Compensation regulations, however, forbid any payment that is "based in any part, directly or

indirectly, upon success in securing enrollments or the award of financial aid." 75 Fed. Reg. at 66,950; *see also id.* (defining "commission, bonus, or other incentive payment"). In fact, the Compensation regulations prohibit all payments that are based in any part on *any activity* engaged in "for the purpose of the admission or matriculation of students . . . or the award of financial aid to students." *See id.* (defining "securing enrollments"). In other words, the regulations prohibit all payments made to recruiters that are based in any part upon recruiting activities, *i.e.*, job performance. Therefore, although the Compensation regulations purport to permit merit-based salaries, such payments are impermissible under the regulations' plain terms.

51. The Department has claimed that several "standard evaluative factors" exist upon which schools could permissibly base merit-based salaries and salary adjustments under the Compensation regulations. Both during and after the public comment period, several schools and organizations pressed the Department to identify even one such permissible factor. Notably, the Department has been unable to do so.

52. The Department's "two-part test" also classifies merit-based salaries and salary adjustments as impermissible commissions, bonuses, or other incentive payments. Under that test, payments are impermissible if they are "an award of a sum of money or something of value paid to or given to a person or entity for services rendered" that is "based directly or indirectly upon success in securing enrollments or the award of financial aid." 75 Fed. Reg. at 66,873. Recruiters' salary adjustments are sums of money paid for services rendered, and if they are merit-based, they could be deemed based directly or indirectly upon success in securing enrollments. The Clarifying regulations in conformity with the plain text of the HEA allowed for such adjustments; the Department's new Compensation regulations do not.

53. In addition, the Compensation regulations violate the HEA by prohibiting other forms of compensation such as revenue-sharing payments that are not encompassed by the statutory restriction. Because schools' revenues are at least "in part" a function of enrolling students, such payments could be deemed to be based "in . . . part, directly or indirectly, upon success in securing enrollments or the award of financial aid." *Id.* at 66,950. Accordingly, although the Compensation regulations purport to permit revenue-sharing payments, in reality no such payments appear to be permissible under the regulations' terms. At a minimum, there exists such severe and significant regulatory uncertainty over their permissibility that many schools will eliminate this common form of employee compensation to avoid the attendant regulatory and legal risks. Whether other forms of merit-based compensation which are not encompassed by the HEA, such as matching 401(k) employer contributions, are permissible under the regulations is unclear; such payments could arguably be read to fall under the regulatory prohibition.

54. The Compensation regulations also violate the HEA by improperly extending the compensation restriction to people not covered by the statutory terms, including college presidents and other top officials at all types of schools. *See* 75 Fed. Reg. at 66,874 (noting that "the actions of a college president could potentially come within the HEA's prohibition on the payment of incentive compensation"). The HEA applies only to "persons or entities *engaged in* any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20) (emphasis added). The Compensation regulations, however, run contrary to the statutory text by impermissibly extending the ban on bonuses to include schools' senior management, reaching any "higher level employee *with responsibility for* recruitment or admission of students, or making decisions about awarding title

IV, HEA program funds." 75 Fed. Reg. at 66,951 (emphasis added). Senior management officials with broad oversight duties over a school's operations could be deemed to have "responsibility" for recruiting or admissions functions; it does not follow, however, that they are "engaged in" those recruiting activities or "in making decisions regarding the award" of financial aid as required by the HEA.

55. The Compensation regulations also contravene the HEA and the APA by prohibiting payments based on student retention and graduation. According to the Department, such payments must be prohibited because students cannot graduate unless they first enroll, meaning that such payments are indirectly related to success in securing enrollments. 75 Fed. Reg. at 66,874. The illogic of the Department's reasoning is self-evident for several reasons. For example, such reasoning would justify prohibiting payments based on anything—such as a student's satisfaction with her educational choices—that becomes possible as a result of that student's enrollment. Additionally, prohibiting graduation-based payments does not disincentivize harmful over-recruiting; it prohibits schools from incentivizing the recruitment of *successful*, *qualified* students who do not add to the school's cohort default rate, which is precisely the type of behavior and outcomes the statutory prohibition was intended to encourage. *See* 67 Fed. Reg. at 67,053 (the purpose of the statute is to prevent "an institution from providing incentives to its staff to enroll *unqualified students*" (emphasis added)).

56. The Compensation regulations also violate the APA in several additional respects.

57. The Compensation regulations fail to give regulated parties *any* guidance as to how they may safely—without regulatory or legal risk—compensate employees engaged in recruiting, admissions, and financial aid and senior management with responsibility over those activities. Schools are left to guess about which merit-based metrics are unrelated in any way to

success in securing enrollments. They are left to sort out the meaning of the Department's inconsistent guidance about what it means for compensation to be based indirectly on success in securing enrollments. For example, the Department has said that payments to recruiting employees based on graduation rates are indirectly based on success in securing enrollments because a student cannot graduate unless he enrolls, while at the same time saying that payments to athletic coaches based on successful seasons are not similarly based on success in securing enrollments even though the coach's team cannot be successful unless his players enroll. Additionally, the Compensation regulations leave schools in the dark about whether they can continue to match employees' contributions to their 401(k) retirement plans. Reasonable regulations give guidance to the regulated community; the Compensation regulations fail that basic test.

58. The Department impermissibly failed to provide a reasoned explanation for replacing the Clarifying regulations with the Compensation regulations. In so doing, the Department ignored the factual findings and legal conclusions that underlay the Clarifying regulations and disregarded the reliance interests engendered by those regulations. The Compensation regulations constitute a repudiation of eight years of legal and regulatory approval and a wholesale revision of the Department's understanding of the HEA's compensation restriction—which previously had been based on a "purposive reading" of the statute—without any intervening change in the statutory text or any other changes in the legal environment. In effect, through regulatory fiat, the Department has purported to make illegal what it had previously determined eight years earlier to be legal and fully compliant with the HEA even though there has been no intervening statutory change, no directive from Congress to do so, and no other identifiable basis for the change.

59. The Department's claims that the Compensation regulations are necessary to increase regulatory clarity surrounding compensation issues and to prevent unscrupulous private sector actors from evading the HEA's compensation restriction defy logic, history, and all available evidence. The Department did not explain how the Clarifying regulations led to any uncertainty about permitted and prohibited practices or explain how reverting to a regulatory regime similar to the one that existed before the Clarifying regulations could possibly increase clarity. Indeed, the Compensation regulations increase regulatory uncertainty even about decisions regarding employee retention and termination—which, as recognized by various courts, clearly fall outside the statutory prohibition relating to payment of "commission[s], bonus[es], or other incentive payment[s]." *See* 20 U.S.C. § 1094(a)(20).

60. The Department's concerns about widespread abuses are also unfounded. A recent study by the Government Accountability Office reports that substantiated violations of the statutory bonus prohibition—both before and after the adoption of the Clarifying regulations—have been infrequent and have involved private, non-profit, and public schools alike.

61. In any event, the Department disregarded the strong possibility that the Compensation regulations will exacerbate rather than solve whatever perceived problems exist regarding aggressive recruiting. For example, under the Clarifying regulations schools had strong incentives to assist admissions employees in enrolling students who would ultimately graduate from their programs. Under the Compensation regulations, however, if such counseling—by any measure the kind of thing a school should be doing—is followed by a salary adjustment, the school could be accused of making impermissible graduation-based payments. Because counseling subpar admissions employees is risky under the Compensation regulations, schools will have to either bear the burden of maintaining them on staff or the turnover costs of

terminating their employment. In either case, students, who benefit from discussing their educational options with experienced, knowledgeable personnel, will be harmed.

62. The Department also ignored the costs the Compensation regulations would impose on students and schools. The Department acknowledged that the Compensation regulations would force schools to reevaluate their compensation systems, but failed to note that doing so would be costly and difficult for schools. In addition, the Department failed to acknowledge that by severing the link between merit and salary determinations, schools' recruiting, admissions, and financial aid departments will be depleted of high-quality employees and managers who will seek out other employers capable of compensating them in accordance with their workplace contributions. This will be particularly harmful as these high-performing employees are the people most capable of reaching those prospective students who are the most likely to benefit from schools' programs. Similarly, the Department did not recognize that the Compensation regulations would force schools to divert substantial resources from education to compliance and litigation.

63. Commenters in response to the NPRM raised many of these concerns in their public comments to the record. In promulgating the final regulations, however, the Department failed to respond meaningfully to these concerns, as required by the APA.

64. Even before they become effective in July 2011, the Compensation regulations will harm schools, students, and the country. Once schools implement compensation regimes that de-link salaries from on-the-job performance—as they must before July 2011—high-performing employees will leave. As a result, both the size and composition of schools' workforces and student bodies will be irrevocably changed. Schools will also be forced to bear the high and unrecoverable costs of attempting to implement compensation regimes that

somehow comply with the Compensation regulations' vague and overly broad provisions. And they will likely have to divert educational resources to defend against increased pay discrimination, False Claims Act *qui tam*, and other lawsuits that will result as they alter their compensation regimes.

**2. MISREPRESENTATION REGULATIONS**

65. The HEA prohibits institutions that receive Title IV funds from engaging in "substantial misrepresentations" regarding their educational program(s), financial charges, or the employability of their graduates. 20 U.S.C. § 1094(c)(3)(A). Under the current regulations, a "misrepresentation" is narrowly defined to mean a "false, erroneous or misleading statement" and the scope of the prohibition is limited to statements "by [an] institution regarding the nature of its educational program, its financial charges or the employability of its graduates." 34 C.F.R. § 668.71(a). If a school is determined to have made a substantial misrepresentation, the Department may impose sanctions against the school—including revocation of the school's eligibility to participate in Title IV programs and imposition of civil penalties. *See id.* The HEA makes clear, however, that a determination that a school has made a substantial misrepresentation can occur only "after reasonable notice and opportunity for a hearing." The current regulations accordingly specify that any action by the Department "to fine or to limit, suspend or terminate the institution's eligibility to participate in the Title IV, HEA programs" will be taken "according to the procedures set forth in subpart G," 34 C.F.R. § 668.75(c)(1), which sets forth detailed procedures that ensure, among other things, that the Department provides schools with their statutory rights to notice and an opportunity to be heard, *id.* at §§ 668.81-.98.

66. If permitted to take effect, the Misrepresentation regulations will improperly eliminate all of these safeguards. As an initial matter, the Misrepresentation regulations will

permit the Secretary to impose potentially severe sanctions without first holding a hearing, adhering to the procedural requirements set forth in current regulations, or fully taking into account the accused institution's opposing arguments. Unlike the current regulations, the new regulations make adherence to the procedures set forth in Subpart G—including the crucial notice and hearing requirements—wholly optional. *See* 75 Fed. Reg. at 66,958. This assertion of authority is contrary to the HEA, which requires the Secretary to make penalty determinations only after providing the institution "notice and opportunity for hearing." 20 U.S.C. § 1094(c)(3)(A). It is also contrary to fundamental principles of constitutional due process.

67. In addition, the Misrepresentation regulations exceed the scope of the HEA by asserting authority over all statements "regarding the eligible institution," 75 Fed. Reg. at 66,958, not just over an institution's "educational program, its financial charges, or the employability of its graduates," as specified in the HEA, *see* 20 U.S.C. § 1094(c)(3)(A).

68. The Misrepresentation regulations also adopt overly broad definitions of the terms "misrepresentation" and "misleading statement" that violate the HEA, the APA, and the Constitution. The Misrepresentation regulations significantly expand the definition of "misrepresentation" to include statements that are neither inherently nor actually misleading, but instead merely have a "tendency" to confuse. Under that overly capacious new definition, a "misrepresentation" includes any "misleading statement"—which is defined to mean any "statement that has the likelihood or tendency to . . . confuse" regardless of the speaker's intentions—that is made "directly or indirectly" by "an eligible institution, one of its representatives, or any . . . entity with which it has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services." 75 Fed. Reg. at 66,959.

69. Finally, the Misrepresentation regulations do not adhere to the statutory requirement that punishable misrepresentations be "substantial." A "substantial misrepresentation" is defined to mean merely "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." 75 Fed. Reg. at 66,959. Thus, rather than specify that only important or significant misrepresentations are prohibited, the Misrepresentation regulations indicate that any misrepresentation can be "substantial" if relied upon. Combined with the sweeping definition of "misleading statement" adopted by the Misrepresentation regulations, the definition of "substantial misrepresentation" extends the scope of the prohibition far beyond what Congress intended.

70. Accordingly, under the Department's new approach, a school could lose its Title IV eligibility for statements that are immaterial, made by an agent, or made without any intent to deceive or mislead, if, in the view of the Department or a court, the statement has a "tendency" to confuse. Indeed, under the Misrepresentation regulations a school could be punished even if the offending statement is true and even if the person to whom the statement was made did not rely upon it.

71. These definitions violate the HEA by punishing *any* misrepresentation, instead of punishing only substantial misrepresentations. The statutory term "substantial misrepresentation," properly construed, includes elements of materiality and intent, yet both of those concepts are absent from the Department's regulations. In effect, the Misrepresentation regulations read the term "substantial" out of the statutory prohibition.

72. Many commenters expressed concern about the breadth of the Misrepresentation regulations' terms, particularly noting that the Department's proposed regulations lacked

materiality and intent requirements and expanded the scope of schools' liability by holding them accountable for the statements of remote third parties.

73. In violation of the APA, the Department failed to respond meaningfully to the commenters' concerns. Instead, the Department simply stated—without further explanation—that it "disagree[s] with commenters who claim that the regulations are legally deficient because they fail to establish the need for specific intent as an element of misrepresentation or do not define a requisite degree of harm before the Department may initiate an enforcement action." 75 Fed. Reg. at 66,914. In the place of these statutorily required elements, the Department stated that it will use a "rule of reasonableness" to consider factors relevant to whether a school has engaged in a "substantial misrepresentation," and that "in determining whether an institution has engaged in 'substantial misrepresentation' and the appropriate enforcement action to take, the Department will consider the magnitude of the violation and whether there was a single, isolated occurrence." *Id.* at 66,914-15. Moreover, according to the Department the regulations need not articulate materiality or intent elements because the Department "can be trusted to properly evaluate whether a claim is confusing to a degree that it becomes actionable." *Id.* at 66,917. Even if those reassurances were legally sufficient—they are not—the Department's promises to be reasonable and discerning do not constrain third-party litigants, and therefore, do not mitigate the regulations' harmful effects.

74. Indeed, the Department's reservation of enforcement discretion does not cure the regulations' underlying infirmities. To the contrary, the absence of limits in the regulations on the Department's policing of schools' statements exacerbates, rather than mitigates, the constitutional problems with this enforcement scheme. Notice and opportunity for a hearing are both statutorily and constitutionally required, yet the regulations eliminate those procedural

protections. Further, the statute—which punishes only substantial misrepresentations—requires explicit legal protection from liability for trivial statements, innocent statements, and statements by persons only tenuously connected to schools; vague assurances to enforce regulations in a reasonable manner do not ensure that the Department—or others—will not seek to hold schools liable for such statements. In any event, even if such protections were not statutorily required, the Department has not explained why it is reasonable to promise properly limited application of vague regulations instead of placing reasonable limitations in its regulations. Furthermore, *qui tam* relators may try to file False Claims Act cases against private sector institutions under an expansive theory of the regulations' scope. Schools have no assurance that such relators and the courts and juries hearing those cases will be bound by the Department's purported "rule of reason" rather than the clear text of the regulations.

75. The overly capacious definitions in the Misrepresentation regulations, which categorically prohibit statements that merely have a "tendency" to confuse, coupled with the possibility that schools could lose their ability to participate in Title IV programs for even inadvertently making such a statement, infringe First Amendment interests. By claiming the ability to punish schools for statements that are true yet confusing or otherwise innocent, the regulations chill and diminish schools' legitimate and constitutionally protected efforts to publicize their programs. In the process both schools—who have a strong interest in promoting their services—and prospective students—who will lose the opportunity to learn about how programs offered by private sector schools can fit their educational needs and benefit their career and life goals—will be harmed. The vagueness of the new standards coupled with the unfettered enforcement discretion they afford the Department further burden First Amendment rights.

76. APSCU and its members support proscription of false, deceptive, and inherently misleading statements. Intentional, material misrepresentations are serious concerns. Schools' Due Process and First Amendment rights, however, are also serious matters. Even before they officially become effective, the Misrepresentation regulations are chilling schools' constitutionally protected speech, harming both students and schools in the process. They are also forcing schools to bear unrecoverable compliance costs arising out of the need to update their marketing materials before July 2011; such costs will be even greater because of the uncertainty surrounding what types of statements the Department actually intends to punish under its regulations.

77. If they are allowed to be implemented, the Misrepresentation regulations will harm schools and students by jeopardizing schools' Title IV eligibility as a result of immaterial, innocent statements, and depending on the Secretary's unfettered discretion, without giving schools the benefits of notice and an opportunity to defend themselves guaranteed by the HEA and the Constitution of the United States. The Misrepresentation regulations also threaten schools' First Amendment rights and will harm schools and students by forcing schools to divert resources from educational programs to compliance and litigation to defend against the increase in False Claims Act *qui tam* litigation that will inevitably ensue.

**3. STATE AUTHORIZATION REGULATIONS**

78. The HEA defines the term "institution of higher education" to mean, in part, an "educational institution in any State" that is "legally authorized within such State to provide a program of education beyond secondary education." 20 U.S.C. § 1001(a)(1), (2). Under the HEA, proprietary institutions of higher education must be similarly authorized within a State. *See id.* § 1002(b)(1)(B) (referencing *id.* § 1001(a)(2)). Until now, the Department has never

defined or provided any additional interpretative gloss to the statutory requirement that an institution must be legally authorized in a State.

79. Under the State Authorization regulations, States that want schools that are eligible to participate in Title IV student aid programs to operate within their borders must have in place authorization regimes that can review and respond to complaints concerning schools and enforce applicable laws against schools. Such authorization regimes, moreover, must do more than simply authorize schools to do business within a State; they must expressly authorize schools, by name, to provide postsecondary educational programs. In some circumstances, States may exempt certain types of accredited schools and schools that have been in operation within the State for more than twenty years from the authorization requirements. Tribal and religious schools meeting certain requirements are also exempt from the regulations' requirements. *See* 75 Fed. Reg. at 66,861-62.

80. These new regulations impose significant and unnecessary burdens on institutions offering online education. For example, the regulations provide that "[i]f an institution is offering postsecondary education through distance or correspondence education to students in a State in which it is not physically located or in which it is otherwise subject to State jurisdiction as determined by the State, the institution must meet any State requirements for it to be legally offering postsecondary distance or correspondence education in that State." 75 Fed. Reg. at 66,947. This requires online programs to obtain approvals from every State in which their students live, which will prove to be costly and difficult.

81. If States choose not to institute compliant authorization regimes, schools within those States will lose their eligibility to participate in Title IV programs. In fact, the Department concedes that "[i]f a State declines to provide an institution with legal authorization to offer

postsecondary education in accordance with these regulations, the institution will not be eligible to participate in Federal programs." 75 Fed. Reg. at 66,859. If sanctions under these regulations are imposed, all students who are eligible for Title IV funds will be denied such aid for their education at schools in States which do not meet these new regulatory requirements.

82. The State Authorization regulations (i) interfere with States' authority to implement their own authorization polices and procedures for local institutions of higher education; (ii) create significant obstacles for online and other similar courses and programs that operate across State lines; and (iii) severely penalize students and educational institutions in States that choose not to or fail to comply.

83. The State Authorization regulations are contrary to the HEA. By redefining the requirement for an institution to be "authorized" and redefining what it means for an institution to be "in" a State, the regulations alter the allocation of responsibility for higher education oversight between the Federal Government and the States in ways that Congress did not intend. As the University of Michigan explained to the Department during the rulemaking process, the State Authorization regulations "appear to be an attempt to force the state of Michigan to create an entity to oversee the universities in the state and as such is an encroachment on the state's rights." Mem. from the Univ. of Mich. on NPRM dated June 18, 2010, Comments on Program Integrity Issues (July 6, 2010), *available at* http://www.regulations.gov/#!documentDetail;D=ED-2010-OPE-0004-0146.1.

84. Moreover, the State Authorization regulations impose a significant burden on providers of online and other innovative distance-learning programs, which will have to obtain multiple State approvals in order to offer their programs. As applied to those cross-border educational programs, the State Authorization regulations impose a particularly severe and

unnecessary burden on interstate commerce and threaten a reduction in the educational opportunities available to students.

85. The State Authorization regulations are arbitrary and capricious and therefore invalid under the APA. The State Authorization regulations could prevent students from using Title IV funds at institutions of their choosing through no fault of their own, but instead due merely to their home State's failure to comply with the State Authorization regulations. The Department has never acknowledged this obvious potential consequence of its rule, yet alone offered any explanation for how it is reasonable to craft a regulatory regime that subjects students' educational choices to the adoption of new regulatory regimes by budget-constrained States.

86. Even before they take effect in July 2011, the State Authorization regulations will harm students and schools. In States that currently lack a compliant authorization regime, schools that wish to continue to offer students the opportunity to use Title IV funds to pay for tuition must engage State officials to encourage them to implement such a regime. If they fail to convince State officials to implement a compliant regime, they will have to convince those officials to write a statement to the Department explaining the State's reasons for not implementing such a regime. All of this will require schools to expend time, money, and resources that they will never be able to recover. Moreover, if schools' efforts are unsuccessful, their Title IV funding will be in jeopardy, which will, at best, result in declining enrollments, and at worst, require schools to close their doors in certain States. In either case, students' educational opportunities will be disrupted as they are forced to change educational programs, attend less desirable programs, or forego postsecondary education altogether.

## IV. DECLARATORY RELIEF ALLEGATIONS

### FIRST CLAIM FOR RELIEF: DEFENDANTS PROMULGATED FINAL REGULATIONS THAT VIOLATE CONSTITUTIONAL RIGHTS

87. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

88. Defendants promulgated final regulations that violate the Constitution. Plaintiff is therefore entitled to have the regulations vacated and set aside pursuant to 5 U.S.C. § 706(2)(B).

89. The Misrepresentation regulations impermissibly revoke schools' constitutional Due Process rights, including their rights to prior notice and opportunity for a hearing, before the Department may terminate a school's ability to participate in Title IV programs or impose other sanctions.

90. The Misrepresentation regulations also violate schools' First Amendment right to free speech by prohibiting statements that are neither actually nor inherently misleading under a vague and ambiguous standard; by punishing schools for trivial misstatements, innocent, mistaken statements, and statements by third parties; by giving the Department unfettered discretion to impose unnecessarily severe penalties; and by accordingly chilling schools' legitimate speech.

### SECOND CLAIM FOR RELIEF: DEFENDANTS PROMULGATED FINAL REGULATIONS THAT ARE BEYOND ITS STATUTORY AUTHORITY AND NOT IN ACCORDANCE WITH LAW

91. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

92. Defendants promulgated and are implementing final regulations that exceed their statutory authority under the HEA and that are not in accordance with law. Plaintiff is therefore entitled to have the regulations vacated and set aside pursuant to 5 U.S.C. § 706(2)(C).

93. The Compensation regulations restrict forms of compensation that fall outside the scope of the HEA statutory provision, including merit-based salaries, revenue-sharing plans, and

graduation-based payments. They also impermissibly regulate senior management compensation.

94. The Misrepresentation regulations impermissibly deny schools' statutory rights under the HEA to notice and opportunity for a hearing before the Department may terminate their ability to participate in Title IV programs or impose other sanctions.

95. The Misrepresentation regulations also violate the HEA by expanding the subject matter covered by the statute's prohibition, by expunging the materiality and intent requirements necessary to substantiate a claim of "substantial misrepresentation," by broadly expanding the statutory prohibition to statements that merely have a "tendency" to confuse, and by holding schools strictly liable for statements made by third parties.

96. The State Authorization regulations misconstrue the requirement under the HEA that an "educational institution in any State" be "legally authorized within such State" to require States to adopt and subject schools to elaborate licensing requirements in order for the institutions to qualify for Title IV funds and to require schools providing online instruction to be approved in every State in which their students may be found.

97. The State Authorization regulations are contrary to well-accepted canons of statutory construction that require a clear statement from Congress before a statute may be construed to alter the allocation of responsibility between the Federal Government and the States. Congress did not intend the regulations' overly broad constructions of the statutory terms "legally authorized" and "in any State"; the regulations' constructions of those terms exceed the authority granted to the Department by Congress.

**THIRD CLAIM FOR RELIEF: DEFENDANTS FAILED TO ADHERE TO THE PROCEDURES REQUIRED BY LAW WHEN AN AGENCY PROMULGATES REGULATIONS**

98. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

99. Defendants promulgated final regulations that did not adhere to the procedural requirements in 5 U.S.C. § 553(c), and Plaintiff is therefore entitled to have the regulations vacated and set aside pursuant to 5 U.S.C. § 706(2)(D).

100. Defendants violated these requirements, for example, by undertaking a flawed and rushed rulemaking process that violated schools' rights to notice and opportunity to be heard by failing to provide an opportunity to meaningfully participate in the rulemaking process, and by failing to consider and respond meaningfully to the large number of comments, including regulatory alternatives and detailed economic analysis, submitted in response to the NPRM.

## FOURTH CLAIM FOR RELIEF: DEFENDANTS PROMULGATED FINAL REGULATIONS THAT ARE ARBITRARY AND CAPRICIOUS

101. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

102. Defendants issued final regulations that are arbitrary and capricious, and Plaintiff is therefore entitled to have the regulations vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

103. The Compensation regulations are arbitrary and capricious because they are directly contradictory to the regulatory history, significantly increase regulatory uncertainty for the regulated community, lack any reasoned basis for their adoption, are unsupported by any meaningful economic analysis of their expected effects on schools and the students they serve, and fail to consider other less harmful regulatory alternatives.

104. The Misrepresentation regulations are arbitrary and capricious because Defendants failed to provide a reasoned explanation for why schools' eligibility for Title IV funds should be placed in jeopardy—potentially without either notice or a hearing—for indirect statements made by third parties, for statements that merely have a "tendency" to confuse, or for statements that are neither material nor made with an intent to deceive.

105. The State Authorization regulations are arbitrary and capricious because they do not identify any tangible harm to be averted or benefit to be gained by forcing States to expressly authorize schools' operations within their borders, are not accompanied by any reasoned explanation for their adoption, provide no safety net for schools that lose their Title IV eligibility if and when the States in which they operate fail to enact or renew a compliant authorization and approval regimes, and fail to give adequate consideration to the effects on schools that offer educational programs online.

## V. ALLEGATIONS IN SUPPORT OF PRELIMINARY INJUNCTIVE RELIEF

106. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

107. Plaintiff and its members are now grievously and irreparably injured by the Compensation, Misrepresentation, and State Authorization regulations. There is no adequate legal remedy for those injuries. Plaintiff's and its members' injuries will be redressed only if this Court declares that the final regulations are unlawful and enjoins the Defendants from implementing them.

An actual and judicially cognizable controversy exists between Plaintiff and Defendants regarding whether the final regulations are unlawful. Defendants are presently implementing the final regulations to the detriment of Plaintiff and its members. Without injunctive relief, schools will begin to suffer from a variety of irreparable harms even before the final regulations become effective in July 2011. Either before or shortly after their effective date, the final regulations will alter the size and composition of schools' student bodies and workforces, inhibit schools' constitutionally protected speech, prevent prospective students from learning about the educational and financial aid opportunities available to them, block schools from operating in certain States, and impose significant and unrecoverable costs on schools.

## VI. PRAYER FOR RELIEF

108. WHEREFORE, Plaintiff prays for an order and judgment:

a. Declaring that the Department's Compensation, Misrepresentation, and State Authorization regulations were promulgated by Defendants without statutory authority within the meaning of 5 U.S.C. § 706(2)(C) and not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); that the Misrepresentation regulations are contrary to the Constitution within the meaning of 5 U.S.C. § 706(2)(B); that the Department failed to promulgate any of the three regulations in accordance with procedures required by law within the meaning of 5 U.S.C. § 706(2)(D); and that all three regulations are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

b. Declaring that any action previously taken by Defendants pursuant to the final regulations is null and void;

c. Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the final regulations;

d. Vacating the final regulations;

e. Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

f. Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: January 21, 2011

DOUGLAS R. COX, SBN 459668
DCox@gibsondunn.com
NIKESH JINDAL, SBN 200259
NJindal@gibsondunn.com
DEREK LYONS, SBN 995720

DLyons@gibsondunn.com
VERONICA S. ROOT, SBN 992717
VRoot@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

TIMOTHY J. HATCH, SBN 374694
THatch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7500
Facsimile: 213.229.7520

RANDOLPH D. MOSS, SBN 417749
Randolph.moss@wilmerhale.com
JAY P. URWITZ, SBN 229393
Jay.urwitz@wilmerhale.com
BRIAN M. BOYNTON, SBN 483187
Brian.boynton@wilmerhale.com
STEVEN P. LEHOTSKY, SBN 992725
Steven.lehotsky@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, District of Columbia 20006
Telephone: 202.663.6000
Facsimile: 202.663.6363

*Attorneys for Plaintiff Career College Association d/b/a Association of Private Sector Colleges and Universities*