**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES, | |
| Plaintiff, | |
| v. | Civil Action No. 1:11-cv-00138 (RMC) |
| ARNE DUNCAN, in his official capacity as Secretary of the Department of Education, | |
| and | |
| THE DEPARTMENT OF EDUCATION, | |
| Defendants. | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Career College Association d/b/a Association of Private Sector Colleges and Universities ("APSCU"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and LCvR 56.1, moves the Court for summary judgment in its favor "hold[ing] unlawful and set[ting] aside," 5 U.S.C. § 706(2), three recently promulgated regulations—the Compensation regulations, 75 Fed. Reg. 66,832, 66,950-51 (Oct. 29, 2010) (to be codified at 34 C.F.R. § 668.14), the Misrepresentation regulations, *id.* at 66,958-59 (to be codified at 34 C.F.R. § 668.71), and the State Authorization regulations, *id.* at 66,946-47 (to be codified at 34 C.F.R § 600.9). As set forth in the accompanying Memorandum of Law In Support Of Plaintiff's Motion For Summary Judgment, there are no genuine issues of material fact in dispute, and Plaintiff is entitled to judgment as a matter of law.

Pursuant to Local Rule 7(f), Plaintiff respectfully requests oral argument on this motion.

Dated:  February 25, 2011

Respectfully submitted,

/s/ Douglas R. Cox

RANDOLPH D. MOSS, SBN 417749
Randolph.moss@wilmerhale.com
JAY P. URWITZ, SBN 229393*
Jay.urwitz@wilmerhale.com
BRIAN M. BOYNTON, SBN 483187
Brian.boynton@wilmerhale.com
STEVEN P. LEHOTSKY, SBN 992725*
Steven.lehotsky@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, District of Columbia 20006
Telephone: 202.663.6000
Facsimile: 202.663.6363

DOUGLAS R. COX, SBN 459668
DCox@gibsondunn.com
NIKESH JINDAL, SBN 492008*
NJindal@gibsondunn.com
DEREK S. LYONS, SBN 995720
DLyons@gibsondunn.com
VERONICA S. ROOT, SBN 992717
VRoot@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

TIMOTHY J. HATCH, SBN 374694
THatch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7500
Facsimile: 213.229.7520

* Applications for admission pending

*Attorneys For Plaintiff Career College Association d/b/a Association of Private Sector Colleges
and Universities*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES,<br><br>        Plaintiff,<br><br>        v.<br><br>ARNE DUNCAN, in his official capacity as Secretary of the Department of Education,<br><br>and<br><br>THE DEPARTMENT OF EDUCATION,<br><br>        Defendants. | Civil Action No. 1:11-cv-00138 (RMC) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of February, 2011 true and correct copies of the

attached **MOTION FOR SUMMARY JUDGMENT** and the accompanying

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**

**SUMMARY JUDGMENT**, attached **DECLARATIONS AND EXHIBITS**, and **PROPOSED**

**ORDER** were filed and served pursuant to the Court's electronic filing procedures using the

Court's CM/ECF System.

/s/ Derek S. Lyons
DEREK S. LYONS, SBN 995720
DLyons@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorney for Plaintiff Career College Association*
*d/b/a Association of Private Sector Colleges and*
*Universities*

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ........................................................................................2

I.      STATUTORY BACKGROUND AND PROCEDURAL HISTORY OF
        THE CHALLENGED REGULATIONS. ..........................................................2

II.     THE CHALLENGED REGULATIONS. ..........................................................5

        A.      The Compensation Regulations. .......................................................5

        B.      The Misrepresentation Regulations. .................................................6

        C.      The State Authorization Regulations. ...............................................7

ARGUMENT .............................................................................................................8

I.      STANDARD OF REVIEW. .............................................................................8

II.     THE COMPENSATION REGULATIONS VIOLATE THE HIGHER
        EDUCATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT. ....................9

        A.      The Compensation Regulations Violate The Higher Education Act
                By Regulating Salaries And Merit-Based Salary Adjustments. ...........9

        B.      The Compensation Regulations Violate The Higher Education Act
                By Regulating Senior Management Compensation. ...........................13

        C.      The Compensation Regulations Arbitrarily And Capriciously Depart
                From Current Regulations. ...............................................................15

                1.      The Department Has Ignored Earlier Findings And Reliance
                        Interests Underlying The Clarifying Regulations. ...................15

                2.      The Compensation Regulations Do Not Increase Regulatory
                        Clarity. .............................................................................17

                3.      Hypothetical Circumvention Of The Higher Education Act Is
                        An Insufficient Rationale For The Compensation
                        Regulations. .......................................................................20

        D.      The Department's Decision To Prohibit Graduation- And Retention-
                Based Payments Is Arbitrary And Capricious. .................................23

**Table of Contents**
**(Continued)**

Page

E.   The Department's Failure To Respond To Relevant Comments Is
     Arbitrary And Capricious. ......................................................................26

III.  THE MISREPRESENTATION REGULATIONS VIOLATE THE HIGHER
      EDUCATION ACT, THE CONSTITUTION OF THE UNITED STATES,
      AND THE ADMINISTRATIVE PROCEDURE ACT. ................................28

      A.   The Misrepresentation Regulations Violate The Higher Education
           Act And Due Process By Eliminating Schools' Rights To Notice
           And Opportunity For Hearing.............................................................28

      B.   The Misrepresentation Regulations Violate The Higher Education
           Act By Permitting The Department To Punish Misrepresentations
           Not Prohibited By The Statute.............................................................29

      C.   The Misrepresentation Regulations Violate Schools' First
           Amendment Right To Free Speech.......................................................33

           1.   The Misrepresentation Regulations Regulate Noncommercial
                Speech At The Core Of The First Amendment. ........................33

           2.   The Misrepresentation Regulations Unconstitutionally
                Restrict Commercial Speech.....................................................35

      D.   The Department Acted In An Arbitrary And Capricious Manner By
           Failing To Respond To Relevant Comments........................................38

IV.   THE STATE AUTHORIZATION REGULATIONS VIOLATE THE
      HIGHER EDUCATION ACT AND THE ADMINISTRATIVE
      PROCEDURE ACT.........................................................................................39

      A.   The State Authorization Regulations Exceed The Higher Education
           Act's State Authorization Requirements. .............................................39

      B.   The State Authorization Regulations Are Arbitrary And Capricious....42

CONCLUSION.......................................................................................................45

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AFL-CIO v. FEC,*
  333 F.3d 168 (D.C. Cir. 2003) ........................................................................ 9

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
  522 U.S 359 (1998) ........................................................................................ 22

*ALLTEL Corp. v. FCC,*
  838 F.2d 551 (D.C. Cir. 1988) ...................................................................... 21

*Am. Mining Cong. v. EPA,*
  907 F.2d 1179 (D.C. Cir. 1990) .................................................................... 28

*Am. Petroleum Inst. v. EPA,*
  906 F.2d 729 (D.C. Cir. 1990) ...................................................................... 25

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................................ 8

* *AT&T v. FCC,*
  836 F.2d 1386 (D.C. Cir. 1988) ............................................................... 24, 42

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ...................................................................................... 37

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,*
  482 U.S. 569 (1987) ...................................................................................... 35

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ........................................................................................ 33

* *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) ...................................................................... 33, 35, 36, 37

*Chevron USA, Inc. v. Nat'l Res. Def. Council,*
  467 U.S. 837 (1984) ..................................................................................... 8, 9

*Citizens United v. FEC,*
  130 S. Ct. 876 (2010) .................................................................................... 34

*Comcast Corp. v. FCC,*
  600 F.3d 642 (D.C. Cir. 2010) ...................................................................... 30

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

Page(s)

*Cont'l Training Servs., Inc. v. Cavazos*,
    893 F.2d 877 (7th Cir. 1990) ............................................................. 29

*County of L.A. v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) ......................................................... 22

*Dart v. United States*,
    961 F.2d 284 (D.C. Cir. 1992) ........................................................... 13

\* *FCC v. Fox Television Stations, Inc.*,
    129 S. Ct. 1800 (2009) ........................................................ 15, 16, 22, 38

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) .......................................................................... 34

*Ga. Pac. Corp. v. OSHRC*
    25 F.3d 999 (11th Cir. 1994) ............................................................. 37

*Gas Appliance Mfrs. Ass'n v. Dep't of Energy*,
    773 F. Supp. 461 (D.D.C. 1991) ....................................................... 38

*Goldberg v. Sweet*,
    488 U.S. 252 (1989) .......................................................................... 42

*Greater New Orleans Broad. Ass'n v. United States*,
    527 U.S. 173 (1999) ..................................................................... 35, 36

\* *Gregory v. Ashcroft*,
    501 U.S. 452 (1991) .......................................................................... 40

*Hall St. Assocs., LLC v. Mattel, Inc.*,
    552 U.S. 576 (2008) .......................................................................... 12

\* *Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir.), *cert denied*, 434 U.S. 829 (1977) .................. 28, 38, 45

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) .......................................................................... 11

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*,
    512 U.S. 136 (1994) .......................................................................... 36

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

Page(s)

*Ill. Pub. Telecomms. Ass'n v. FCC,*
    117 F.3d 555 (D.C. Cir. 1997) ............................................................................ 22

*In re RMJ,*
    455 U.S. 191 (1982) ................................................................................... 35, 36

*Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ................................................................................... 37, 39

*Little v. Keystone Continuum, LLC,*
    No. 3:07-0241, 2008 WL 2901854 (M.D. Tenn. July 22, 2008) ...................................... 30

\* *Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ................................................................................... 36, 37

*McNally v. United States,*
    483 U.S. 350 (1987) ........................................................................................ 32

*Members of City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ........................................................................................ 35

\* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................... 9, 25

*Mullane v. Cent. Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) ........................................................................................ 29

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006) ........................................................................... 20

*NLRB v. Bell Aerospace Co.,*
    416 U.S. 267 (1974) ........................................................................................ 23

*Peel v. Attorney Registration & Disciplinary Comm'n of Ill.,*
    496 U.S. 91 (1990) ......................................................................................... 36

*Reytblatt v. U.S. Nuclear Regulatory Comm'n,*
    105 F.3d 715 (D.C. Cir. 1997) ....................................................................... 28, 39

*Sea-Land Serv., Inc. v. Dep't of Transp.,*
    137 F.3d 640 (D.C. Cir. 1998) ............................................................................ 9

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

Page(s)

\* *SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)..................................................................................... 22

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)..................................................................................... 34

*TRW, Inc. v. Andrews*,
    534 U.S. 19 (2001)....................................................................................... 24

*TSC Indus. Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)..................................................................................... 32

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)..................................................................................... 34

\* *United States ex rel. Bott v. Silicon Valley Colls.*,
    262 F. App'x 810 (9th Cir. 2008) ........................................................... 10, 18

*United States ex rel. Lee v. Corinthian Colls., Inc.*,
    No. 07-1984, 2009 WL 4730890 (C.D. Cal. Dec. 4, 2009)............................ 11

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001)..................................................................................... 33

*Va. Dep't of Medical Assistance v. Johnson*,
    609 F. Supp. 2d 1 (D.D.C. 2009) ................................................................... 8

\* *Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001)................................................................................. 15, 18

*Wieczorek v. Volkswagenwerk, A.G.*,
    731 F.2d 309 (6th Cir. 1984) ....................................................................... 30

*Wyeth v. Levine*,
    129 S. Ct. 1187 (2009)................................................................................. 41

**Table of Authorities**
**(Continued)**

Page(s)

**Statutes**

20 U.S.C. § 1001 ................................................................................................ 3, 40

\* 20 U.S.C. § 1001(a)(2) ......................................................................................... *passim*

20 U.S.C. § 1002 ................................................................................................ 3, 7

20 U.S.C. § 1002(b)(1)(B) .................................................................................. 3, 7

20 U.S.C. § 1085(a)(2)(A)-(B) .......................................................................... 25

\* 20 U.S.C. § 1094(a)(20) ...................................................................................... 3, 5

\* 20 U.S.C. § 1094(c)(3)(A) ................................................................................... *passim*

20 U.S.C. § 1099a ............................................................................................. 40

26 U.S.C. § 401(k)(3)(A) ................................................................................... 18

5 U.S.C. § 706(2)(A) ......................................................................................... 9

5 U.S.C. § 706(2)(B) ......................................................................................... 8

5 U.S.C. § 706(2)(C) ......................................................................................... 8

\* Higher Education Act of 1965, as amended, tit. IV, 20 U.S.C. §§ 1070–1099e ................ *passim*

Higher Education Opportunity Act,
   Pub. L. No. 110-315, 122 Stat. 3078 (reauthorizing Title IV) ......................... 23

**Regulations**

34 C.F.R. § 668.14(b)(22)(ii)(A) ....................................................................... 17

\* 34 C.F.R. § 668.14(b)(22)(ii)(A)-(L) ................................................................. 5

34 C.F.R. § 668.14(b)(22)(ii)(G) ....................................................................... 17

34 C.F.R. § 668.14(b)(22)(iii)(C)(2) .................................................................. 14

34 C.F.R. § 668.71(a) ........................................................................................ 6

34 C.F.R. § 668.71(b) ........................................................................................ 30

**Table of Authorities**
**(Continued)**

**Regulations**
**(Continued)**

Page(s)

34 C.F.R. § 668.71(d).......................................................................................... 28

34 C.F.R. § 668.75(b).......................................................................................... 31

34 C.F.R. § 668.75(c)(1) ...................................................................................... 7

\* 67 Fed. Reg. 67,048 (Nov. 1, 2002).............................................................. *passim*

74 Fed. Reg. 24,728 (May 26, 2009) ................................................................. 3

\* 75 Fed. Reg. 34,806 (June 18, 2010) ............................................................. *passim*

\* 75 Fed. Reg. 66,832 (Oct. 29, 2010).............................................................. *passim*

Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) .................................. 4

Executive Order 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011) .................................... 4

**Rules**

Fed. R. Civ. P. 56 ................................................................................................ 8

Fed. R. Civ. P. 56(a) ........................................................................................... 8

**Other Authorities**

*Black's Law Dictionary* (6th ed. 1990) ............................................................ 30, 31

GAO, *Higher Education: Information on Incentive Compensation Violations
    Substantiated by the U.S. Department of Education*, Feb. 23, 2010) .............................. 21

H.R. Rep. No. 102-630, pt. G (1992), *reprinted in* 1992 U.S.C.C.A.N. ............................. 13, 14

H.R. Rep. No. 94-1086 (1976) .......................................................................... 32

Letter from Terry W. Hartle, ACE, to Secretary Arne Duncan, Dep't of Educ. (Dec.
    22, 2010), *available at*
    http://www.acenet.edu/AM/Template.cfm?Section=Search&template=/CM/
    ContentDisplay.cfm&ContentID=39488 .................................................................. 11, 19

*Merriam Webster's Collegiate Dictionary* (10th ed. 1999) ...................................... 14

**Table of Authorities**
**(Continued)**

**Other Authorities**
**(Continued)**

Page(s)

Watson Scott Swail, *Graduating At-Risk Students*, Imagine Am. Found. (2009),
*available at* http://www.imagine-america.org/pdfs/Graduating-At-Risk-Students-
Web.pdf.................................................................................................... 26

*Webster's Third New International Dictionary* (4th ed. 1976)...................................... 11, 12, 14

**Treatises**

2A Norman J. Singer, *Sutherland Statutes & Statutory Construction* (7th ed. 2007) ......... 12, 13

Laurence Tribe, *American Constitutional Law* (2d ed. 1998) ................................................... 40

\* Denotes the cases and authorities principally relied upon.

**INTRODUCTION**

Plaintiff Career College Association d/b/a Association of Private Sector Colleges and Universities ("APSCU") respectfully requests that this Court grant its motion for summary judgment and set aside three regulations recently adopted by the Department of Education (the "Department"):  the Compensation regulations, 75 Fed. Reg. 66,832, 66,950-51 (Oct. 29, 2010) (to be codified at 34 C.F.R. § 668.14), the Misrepresentation regulations, *id.* at 66,958-59 (to be codified at 34 C.F.R. § 668.71), and the State Authorization regulations, *id.* at 66,946-47 (to be codified at 34 C.F.R. § 600.9).

The challenged regulations are unlawful in several significant respects.  The regulations violate key constitutional provisions, the statute under which the Department operates federal student aid programs, and the requirements of the Administrative Procedure Act ("APA").  Schools of all types—public, private sector, and non-profit—have expressed their concerns and objected to the regulations throughout the regulatory process.  Undeterred, the Department conducted a rushed rulemaking process; failed to respond meaningfully to comments; and produced a final rule with serious and undeniable failings.

In defiance of the law, the Department has unjustifiably and unreasonably abandoned the current regulatory scheme and contravened the express terms of the statute enacted by Congress.  The Department's new regulations would prohibit schools from paying merit-based salaries to their employees based on, among other things, success in recruiting students who persevere and obtain college degrees; prohibit college presidents from receiving raises based on improving the graduation rate at their institutions; deter schools from speaking on questions of public interest, debating policy, and informing their students; and impose significant, and in many instances insurmountable, regulatory burdens on online and other innovative learning programs.  These are not unintended or incidental consequences of an otherwise well considered and well supported

regulatory program.  Rather, they are the very heart of the Department's regulations.  The

consequences of these regulations are already severe, both for the regulated community and for

the students it serves; and if the regulations are not vacated, that harm will be compounded in the

years ahead.  The Court should stop these unlawful regulations.

<strong>STATEMENT OF FACTS</strong>

**I.      STATUTORY BACKGROUND AND PROCEDURAL HISTORY OF THE CHALLENGED REGULATIONS.**

Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq*.

("HEA"), sets up several types of student aid programs administered by the Department, each

with the aim of fostering access to higher education.[1]  These programs are critically important

for both students and schools.  According to the Department, every year Title IV programs

provide more than $150 billion in new aid to nearly 14 million postsecondary students and their

families.  APSCU's member-schools educate and help more than 1.5 million of those students

pursue their higher education and professional goals.

---

[1]   The facts set forth in this Memorandum are supported by the rulemaking record.  Further, the exhibits attached to the declaration of Derek S. Lyons ("Lyons Decl.") (Executed on Feb. 25, 2011) (attached hereto as Exhibit 1) detail the Department's past correspondence on compensation issues with schools and other interested parties.  These letters were cited in public comments submitted to the Department.  *See, e.g.*, Administrative Record 3373, 3387-90 (hereinafter "A.R.").

In addition, attached hereto are the declarations of Harris N. Miller ("Miller Decl.") (Executed on Feb. 25, 2011) (attached hereto as Exhibit 2); Clark D. Elwood ("Elwood Decl.") (Executed on Jan. 28, 2011) (attached hereto as Exhibit 3); William M. Ojile, Jr. ("Ojile Decl.") (Executed on Jan. 28, 2011) (attached hereto as Exhibit 4); Stan A. Mortensen ("Mortensen Decl.") (Executed on Jan. 31, 2011) (attached hereto as Exhibit 5); and Diane L. Thompson ("Thompson Decl.") (Executed on Jan. 31, 2011) (attached hereto as Exhibit 6).  These declarations are not part of the administrative record; they are included only to confirm and illustrate the real-world consequences of the regulations' deficiencies as evident from the administrative record and described more fully below.

To participate in Title IV programs, schools must meet certain requirements that are relevant in this lawsuit.  First, schools must be "institution[s] of higher education," which means that they are "an educational institution in any State that is legally authorized within such State to provide a program of education beyond secondary education."  20 U.S.C. § 1001(a)(2); *id.* § 1002(b)(1)(B).[2]  Second, schools must execute Program Participation Agreements with the Department, in which schools commit that they will "not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance."  *Id.* § 1094(a)(20).  Third, schools are also held to account under Title IV for "substantial misrepresentation[s] [regarding] the nature of [their] educational program[s], [their] financial charges, [and] the employability of [their] graduates."  *Id.* § 1094(c)(3)(A).  If, "after reasonable notice and opportunity for a hearing," the Secretary determines that a school has engaged in a covered substantial misrepresentation, the Secretary may, among other penalties, "suspend or terminate the [Title IV] eligibility status for any or all [of an institution's] programs."  *Id.*

On May 26, 2009, the Department initiated a negotiated rulemaking process to develop new regulations regarding, among other things, these three elements of Title IV eligibility. 74 Fed. Reg. 24,728 (May 26, 2009).[3]  These sessions failed to achieve consensus in several important areas, but the Department nevertheless pressed forward and issued a Notice of

---

[2]    The HEA defines three types of institutions of higher education for most purposes of Title IV: institutions of higher education, proprietary institutions of higher education, and postsecondary vocational institutions.  20 U.S.C. §§ 1001, 1002.  Schools from all of these categories are subject to the three challenged regulations at issue in this case.

[3]    This process was flawed for several reasons, as set forth in the Complaint at ¶¶ 29-34.

Proposed Rulemaking ("NPRM") on June 18, 2010.  75 Fed. Reg. 34,806 (June 18, 2010) (A.R. 147).  The Department acknowledged that, because its proposed regulations would have an annual impact on the economy of more than $100 million, it was required to conduct a rigorous economic analysis in support of the NPRM and subject it to public comment.  *See* Exec. Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).  Instead of fulfilling that duty, the Department issued the NPRM without a firm grasp of its costs and benefits.  *See* 75 Fed. Reg. at 34,855 (A.R. 196) ("It is difficult to quantify the benefits related to the new institutional and other third-party requirements, as there is little specific data available on the effect of the provisions.").  Most notably, the Department failed to account for the increased costs schools will incur—and have already begun to incur—in attempting to comply with the new regulatory requirements.  *See* A.R. 3126; *see also* Ojile Decl. ¶¶ 11, 17-18; Mortensen Decl. ¶ 8; Elwood Decl. ¶¶ 19, 26.

      The Department also cut short the comment period to 45 days instead of providing for the standard 60-day period contemplated by Executive Order 12,866.  *See* 58 Fed. Reg. at 51,735; *see also* Exec. Order 13,563, 76 Fed. Reg. 3,821, 3,821-22 (Jan. 18, 2011) (to "afford the public a meaningful opportunity to comment," a "comment period . . . should generally be *at least 60 days*" (emphasis added)).  Even under this compressed schedule, there was overwhelming public reaction to the proposed regulations, as evident by the approximately 1,180 commenters who made written public submissions to the record.  *See* 75 Fed. Reg. at 66,833 (A.R. 3).

      On October 29, 2010, 88 days after the close of the comment period, the Department published its final regulations in the *Federal Register*.  The final regulations that emerged from this process largely failed to address the deficiencies and concerns commenters identified in the NPRM.  The Department made only a few cosmetic changes in response to these concerns and made no attempt to bolster the NPRM's admittedly inadequate economic analysis:  the

Department chose to regulate without first conducting the necessary research into the real-world effects of its actions.

## II.     THE CHALLENGED REGULATIONS.

### A.     The Compensation Regulations.

The Compensation regulations purport to implement the HEA's restriction on paying "persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance" "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. § 1094(a)(20).

The current regulations, set forth at 34 C.F.R. § 668.14(b)(22)(ii)(A)-(L) (the "Clarifying regulations"), were the Department's considered response to a long history of confusion engendered by its own inconsistent implementation of the HEA.  *See* 67 Fed. Reg. 67,048, 67,049 (Nov. 1, 2002) (noting that the regulations "*clarify* the statutory program participation agreement provision concerning incentive payment restrictions" (emphasis added)); *see also* Lyons Decl., Exs. A-F.  Employing a "purposive reading" of the HEA, 67 Fed. Reg. at 67,053, the Clarifying regulations set forth twelve non-exhaustive compensation practices that were permitted under the statute and enabled schools to compensate their employees effectively.

The new Compensation regulations completely jettison the Clarifying regulations.  The Compensation regulations prohibit merit-based salaries for school employees engaged in recruiting, admissions, or financial aid, even though the statute, by its plain terms, applies only to "commission[s], bonus[es], [and] other incentive payment[s]."  Although the Compensation regulations define the phrase "commission, bonus, or other incentive payment" to exclude fixed salaries and wages, the regulations in fact prohibit all "merit-based adjustments to employee compensation"—without limitation as to the type of compensation—that are "based *in any part,*

*directly or indirectly*" on success in securing enrollments or the award of financial aid.  75 Fed. Reg. at 66,950-51 (A.R. 120-21) (emphasis added).  In other words, the regulations permit "merit-based" salary adjustments only so long as such adjustments do not reward job performance, *i.e.*, merit.  The regulations also cover the compensation for all senior management with any "*responsibility for*" recruiting, admissions, or financial aid—up to and including college deans and presidents—even though the HEA's compensation restriction applies only to persons "engaged in" those activities.  *Id.* at 66,950-51 (A.R. 120-21); *see also id.* at 66,874 (A.R. 44). The Compensation regulations also prohibit graduation- and retention-based payments, *id.* at 66,874 (A.R. 44), even though the Department had previously determined that graduation and retention are goals that should be encouraged under the statute.  *See* 67 Fed. Reg. at 67,056 ("[A] student who successfully completes an educational program in which he or she was enrolled means . . . that the student was qualified to attend the institution.").

B.      **The Misrepresentation Regulations.**

The Misrepresentation regulations purportedly implement the HEA's provision concerning "substantial misrepresentation[s]."  20 U.S.C. § 1094(c)(3)(A).  Under the current regulations, a "misrepresentation" is defined to mean a "false, erroneous or misleading statement," and the scope of the prohibition, in line with the statute, is limited to statements made "by [an] institution regarding the nature of its educational program, its financial charges or the employability of its graduates."  34 C.F.R. § 668.71(a).  The HEA provides that a school can be fined or have its Title IV eligibility suspended or terminated for making a covered substantial misrepresentation only "after reasonable notice and opportunity for a hearing," 20 U.S.C. § 1094(c)(3)(A), and current regulations require the Secretary to take such action "according to the

procedures set forth in subpart G," 34 C.F.R. § 668.75(c)(1), which describes how the Department will provide for those rights, *id.* at §§ 668.81-.98.

The new regulations dramatically expand the definition of "misrepresentation" to include misstatements that have a "likelihood or tendency to deceive or confuse." 75 Fed. Reg. at 66,959 (A.R. 129). They also enlarge the scope of actionable misrepresentations to include any statement "regarding [an] eligible institution," rather than only statements regarding "the nature of its educational program, its financial charges, [and] the employability of its graduates," as specified in the HEA. *Compare id.* at 66,958 (A.R. 128), *with* 20 U.S.C. § 1094(c)(3)(A). Finally, the Misrepresentation regulations purport to make the Department's adherence to the notice and opportunity to be heard provisions in the current regulations—which are required by the HEA—*optional*. *Compare* 75 Fed. Reg. at 66,959 (A.R. 129), *with* 20 U.S.C. § 1094(c)(3)(A).

### C. The State Authorization Regulations.

The HEA defines the term "institution of higher education" to mean, in part, an "educational institution in any State" that is "legally authorized within such State to provide a program of education beyond secondary education." 20 U.S.C. §§ 1001(a)(2), 1002. Under the HEA, proprietary institutions of higher education must be similarly authorized. *See id.* § 1002(b)(1)(B) (referencing *id.* § 1001(a)(2)). Since the enactment of the HEA in 1965, the Department has never adopted any regulatory interpretation of the statutory requirement that an institution be legally authorized in a State. Instead, the States have defined for themselves how to authorize schools to offer postsecondary educational programs within their borders.

No longer. Relying on the innocuous phrase "legally authorized," the new regulations impose various burdens on schools and States. Under these regulations, schools will not be

considered to be properly authorized unless States adopt the type of authorization regime now mandated by the Department.  Moreover, if States want Title IV-eligible schools to operate within their borders, they must have in place authorization regimes that can review and respond to complaints concerning schools and enforce applicable state laws against schools.  75 Fed. Reg. at 66,946 (A.R. 116).  Compliant authorization regimes must also do more than simply authorize schools to do business within a State; they must expressly authorize institutions, by name, to provide educational services.  *See id.* at 66,861-62.  The regulations also appear to require online programs to "meet any State requirements for [online programs] to be legally offering postsecondary distance or correspondence education," even if the school offering the program "is not physically located" in that State, and to "be able to document to the Secretary the State's approval upon request."  *Id.* at 66,947 (A.R. 117).

## ARGUMENT

### I.    STANDARD OF REVIEW.

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment" when "there is no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The parties agree that the issues presented in this litigation are ripe for resolution through dispositive cross-motions.  *See also Va. Dep't of Medical Assistance v. Johnson*, 609 F. Supp. 2d 1, 6 (D.D.C. 2009).

An agency action must be set aside if it is "contrary to constitutional right," 5 U.S.C. § 706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations,"  *id.* § 706(2)(C). When addressing questions of statutory interpretation (on, a court must give effect to the "unambiguously expressed intent" of Congress where it has spoken directly to the "precise question at issue."  *Chevron USA, Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

A court must "reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843, n.9.  An agency's interpretation of a statute is due no deference unless there is statutory ambiguity.  *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998).  And no deference is due when "regulations create 'serious constitutional difficulties.'" *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003).

Agency action must also be set aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Although the arbitrary and capricious standard involves "narrow" review, a court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted).

## II.  THE COMPENSATION REGULATIONS VIOLATE THE HIGHER EDUCATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT.

The HEA prohibits schools that accept Title IV funds from paying "persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance," "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid."  20 U.S.C. § 1094(a)(20).  The Compensation regulations impermissibly contravene this statutory provision.

### A.  The Compensation Regulations Violate The Higher Education Act By Regulating Salaries And Merit-Based Salary Adjustments.

The Compensation regulations unlawfully expand the HEA's restriction on the payment of "commissions," "bonus[es]," and other "incentive payment[s]" to include the payment of merit-based salaries and adjustments thereto.  The Compensation regulations purport to permit merit-based salary and wage adjustments and claim that the regulations leave schools with several "standard evaluative factors" they could use to make such adjustments, 75 Fed. Reg. at

66,877; in reality, however, the regulations prohibit all merit-based compensation adjustments. *See* A.R. 6706-07 (The University of Alaska explained that it was "not clear how" to evaluate the "performance of an employee" or determine "merit-based compensation" that was "not based directly or indirectly upon success in securing enrollments or the award of financial aid.").

Under the regulations, salary and wage adjustments are unequivocally prohibited if they are based "*in any part*, directly or indirectly, upon success in" performing "activities" engaged in "for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students"—*i.e.*, recruiting. 75 Fed. Reg. at 66,950-51 (emphasis added). Merit-based compensation, however, is compensation that is based on employees' performance of their job duties, and even the Department acknowledges that "a recruiter's job . . . is to recruit," which requires engaging in activities aimed at the matriculation of students. 75 Fed. Reg. at 34,818; *see also* A.R. 5154. Accordingly, to be merit-based, salary determinations for recruiters must be based, at least in part, on quantitative or qualitative measurements of how well recruiters engage in activities aimed at securing enrollments, which is precisely what the Compensation regulations prohibit. *See* A.R. 4541; *id.* at 5312. The regulations' notional endorsements of merit-based salaries and adjustments are entirely illusory; the regulations forbid any link between compensation and performance and therefore exceed the bounds of the HEA.

Restricting an employer's ability to determine employee wages and salaries based on performance-related considerations is antithetical to basic notions of workplace management. *See id.* 4540. Therefore, not surprisingly, the authority to regulate wages and salaries is nowhere to be found in the HEA. *See* 20 U.S.C. § 1094(a)(20); *see also United States ex rel. Bott v. Silicon Valley Colls.*, 262 F. App'x 810, 811 (9th Cir. 2008) (the HEA does not "prohibit salary

reviews generally"); *cf. United States ex rel. Lee v. Corinthian Colls., Inc.*, No. 07-1984, 2009

WL 4730890, at *4 (C.D. Cal. Dec. 4, 2009).[4]

Several well established principles of statutory interpretation confirm that the HEA does

not restrict schools' right to pay their employees salaries and wages, including salaries and

wages based on merit. Most importantly, the plain language of the statute compels that

conclusion. It is axiomatic that statutory interpretation "begins with the language of the statute"

and "ends there as well" where "the statutory language provides a clear answer." *Hughes

Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal citations omitted).

By their commonly understood meanings, the terms "commission, bonus, [and] other

incentive payment"—the forms of compensation that Congress has regulated—are quite distinct

from salaries and salary adjustments. 20 U.S.C. § 1094(a)(20). A bonus is "money or an

equivalent given *in addition* to [an employee's] usual compensation," *Webster's Third New

International Dictionary* 252 (4th ed. 1976) (emphasis added); and a commission is "a

percentage of the money received in a sale or other transaction paid to the agent responsible for

the business," *id.* at 457. An incentive payment is of the same nature. It is a payment that is

---

[4]   APSCU is not alone in expressing concern that the Compensation regulations prohibit merit-based salaries. The American Council on Education ("ACE"), an organization of approximately 1,800 schools from all sectors of the higher education community, wrote a letter to the Department, asking "[w]hat 'standard evaluative factors' other than seniority may an institution take into account in determining compensation of employees covered by the new rule?" Letter from Terry Hartle, ACE, to Sec'y Arne Duncan, Dep't of Educ. (Dec. 22, 2010), *available at* http://www.acenet.edu/AM/Template.cfm?Section=LettersGovt&CONTENTID= 39488&TEMPLATE=/CM/ContentDisplay.cfm ("ACE Letter"). In addition, many parties submitted comment letters objecting to the Compensation regulations. *See, e.g.*, A.R. 2137 (Michigan State University stated that it is not "reasonable to ask colleges and universities to ignore the effort of employees to meet recruitment and financial aid processing goals when determining merit compensation"); A.R. 5666 (ACE requested that the Department definitively state that the elimination of the Clarifying regulations does not mean that all of the activities previously permitted under the Clarifying regulations are now prohibited).

"designed to enhance or improve production." *Id.* at 1141. The HEA's restriction on "*other*" incentive payments demonstrates that the "incentive payments" that are prohibited are those that are akin to bonuses and commissions. Indeed, it is well established that where, as in the HEA, "general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated." 2A Norman J. Singer, *Sutherland Statutes & Statutory Construction*, § 47.17, at 358-60 (7th ed. 2007); *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).

By contrast, a salary is "fixed compensation paid regularly (as by the year, quarter, month, or week) for services." *Webster's*, *supra*, at 2003. Salary adjustments are relatively infrequent changes to the baseline of employees' fixed compensation. Once- or twice-yearly salary adjustments are not bonuses or commissions, nor are they akin to those forms of compensation because they are relatively durable and stable. For example, no one would characterize the adjustment of federal employees' salaries once per year as "bonuses." In short, salaries and salary adjustments are simply not "commission[s], bonus[es], or other incentive payment[s]"; hence the Department may not regulate them under the HEA.[5]

---

5   The Department's proposed "two-part test," which schools can allegedly use to "readily determine if a payment or compensation is permissible," confirms that merit-based salaries are forbidden. *See* 75 Fed. Reg. at 66,873. Under that test, schools first ask whether a payment is "an award of a sum of money or something of value paid to or given to a person or entity for services rendered." *Id.* If the answer is yes, schools then ask whether the payment is "provided to any person based in any part, directly or indirectly," for engaging in "activities . . . for the purpose of the admission or matriculation of students . . . or the award of financial aid." *Id.* Thus, giving a recruiter any "sum of money" for providing recruiting services—*e.g.*, a merit-based salary—is impermissible. That is not what Congress intended; that is contrary to law. *See* A.R. 5154.

Additionally, because salaries and wages are the most common forms of compensation, Congress's omission of either of those terms from the HEA further underscores its intent to avoid regulating those forms of compensation. "Where Congress clearly knew how to bring in" another phrase—as it surely did with respect to salaries, wages, and salary and wage adjustments—but did not do so, the omission can be presumed to be deliberate. *Dart v. United States*, 961 F.2d 284, 286 (D.C. Cir. 1992); *see also* Singer, *supra*, at 417-18 ("[W]hen the legislature expresses things through a list, the court assumes that what is not listed is excluded."). Accordingly, the Department has no authority to regulate salaries, wages and adjustments thereto as it has done in the Compensation regulations; the regulations must be vacated.[6]

**B.      The Compensation Regulations Violate The Higher Education Act By Regulating Senior Management Compensation.**

The Compensation regulations also violate the HEA by restricting how schools compensate senior management, including academic deans and school presidents. 75 Fed. Reg. at 66,874. The HEA limits the reach of its restrictions on compensation to persons "*engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance.*" 20 U.S.C. § 1094(a)(20) (emphasis added). The Compensation regulations extend to "any higher level employee *with responsibility for* recruitment or admission of students, or making decisions about awarding title IV, HEA program funds." 75 Fed. Reg. at 66,951 (emphasis added); *see also id*. at 34,819 (asserting, without support, that the HEA's compensation restriction "applies all the way to the top of an institution").

---

6    The legislative history of the HEA's compensation prohibition only confirms this point. Congress intended the compensation restriction to end schools' use of "commissioned salespeople" and "commissioned sales representatives," not salaried salespeople. H.R. Rep. No. 102-630, pt. G, at 499 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 334, 435.

This extension plainly exceeds the scope of the statutory provision in § 1094(a)(20). Congress chose the precise limiting phrase "engaged in," which must be given its proper meaning in this rulemaking context. A person is "engaged in" "student recruiting" or "admission" activities or in the activity of making student financial aid decisions if he (or she) is "involved in [that] activity," *Merriam Webster's Collegiate Dictionary* 383 (10th ed. 1999), and a person is "involved" in an activity where he (or she) is "draw[n] in as a participant" in the activity, *Webster's*, *Third New International Dictionary*, *supra*, at 1191. Thus, for example, if someone is "engaged in acting," they are actors on stage or screen.

But having "responsibility for" an activity, 34 C.F.R. § 668.14(b)(22)(iii)(C)(2), is not the same as being an active participant in the activity. Directors and producers, for example, are not "engaged in" acting by virtue of their role overseeing and managing the actors; they are "engaged in" directing and producing. College presidents or other senior officials are not "engaged in" recruiting or admission activities or in deciding whether individual students receive financial aid. Schools have recruiting, admissions, and financial aid officers for those tasks. Rather, college presidents and senior officials have broad oversight and management responsibility for *all* aspects of their schools' affairs, including recruiting and admissions. But that does not make them "engaged in" those activities.

The legislative history confirms this point. The Conference Report explains that the "Senate bill eliminates any institution from Title IV eligibility that uses *commissioned salespeople*" and that the "House bill adds a similar prohibition." H.R. Rep. No. 102-630, pt. G, at 499 (emphasis added). In other words, the focus of the statute is on "salespeople," not upper management. Applying the Compensation regulations to senior management personnel is contrary to the statutory text and its underlying congressional intent and transforms a law aimed

at correcting recruiting abuses into a sweeping regulation of executive compensation.  For

example, if senior executives are deemed to have responsibility for recruiting, admissions, and

financial aid, the new regulations could be read to prohibit schools from using profit-sharing

plans or other payments based on schools' revenues to compensate them because an institution's

profits and revenues are necessarily based, at least in part, on student enrollments.  A.R. 2632.

That the Compensation regulations appear designed to reach those payments underscores that the

extension of the compensation restriction to all employees with "responsibility for" certain

activities exceeds the scope of the Department's authority.  If Congress had meant to grant such

broad and unusual authority, it would have said so clearly.  *See Whitman v. Am. Trucking Ass'ns,

Inc.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not . . . hide elephants in mouseholes.").

 **C.** **The Compensation Regulations Arbitrarily And Capriciously Depart From
  Current Regulations.**

 The Compensation regulations are also unlawful because they are arbitrary and

capricious amendments of regulations currently in force.  When an agency's new regulation

"rests upon factual findings that contradict those which underlay its prior policy; or when its

prior policy has engendered serious reliance interests," an agency acts in an arbitrary and

capricious manner where it "ignore[s] such matters."  *FCC v. Fox Television Stations, Inc.*, 129

S. Ct. 1800, 1811 (2009).  In either case, "a reasoned explanation is needed for disregarding facts

and circumstances that underlay or were engendered by the prior policy."  *Id.*  Even if an agency

has not ignored previous factual findings or reliance interests, it "must show that there are good

reasons for the new policy."  *Id.*  The Department has not satisfied either test.

 **1.** **The Department Has Ignored Earlier Findings And Reliance Interests
  Underlying The Clarifying Regulations.**

 In 2002, the Department concluded that the Clarifying regulations identified "legitimate

business practices that," based on a purposive reading of the HEA, do not "fall within the scope"

of the HEA's compensation restriction. 67 Fed. Reg. at 67,053.  In particular, the Department

concluded that allowing semi-annual, merit-based adjustments to employee salaries would not be

"a loophole that institutions could use to bundle their bonuses and pay them as a salary

adjustment." *Id.* at 67,054.  And the Department found that permitting profit-sharing payments,

if made to all employees at a given level of an organization, would not create a loophole

allowing statutorily prohibited bonuses. *Id.* at 67,055.  Finally, the Department found that "other

legislative and regulatory requirements"—not the HEA's compensation restriction—should be

the primary tools used to "weed out institutions with poor quality programs." *Id.* at 67,056.

Schools also have entrenched reliance interests predicated on the validity of the

Clarifying regulations, including having spent significant resources to develop compensation

policies in good-faith reliance on those regulations. *See, e.g.*, A.R. 5736; *id.* at 5988.  The

Compensation regulations upset those interests by, at a minimum, requiring schools to "re-

examine their practices," and, almost universally, to scrap their entire compensation regimes.

*See* 75 Fed. Reg. at 66,873; Elwood Decl. ¶ 18.  Revamping an entire compensation system

strikes at the core of any company's business model and is a costly endeavor.  For postsecondary

educational institutions, it will also alter the quality of their employees and therefore their ability

to reach students capable of benefiting from their programs.  *See* A.R. 3197.

The Department completely ignored its previous findings and schools' reliance interests

in its final regulations.  In fact, the final regulations are devoid of any discussion of either.  That

is sufficient to find that the Compensation regulations are arbitrary and capricious.  *Fox*

*Television Stations*, 129 S. Ct. at 1811.

### 2.     The Compensation Regulations Do Not Increase Regulatory Clarity.

The Department's first justification for its Compensation regulations—that they will

result in "increased clarity about incentive compensation for employees at institutions of higher

education," 75 Fed. Reg. at 66,971—defies both logic and history. *See, e.g.*, A.R. 5988-89.

As a matter of logic, it is impossible to improve clarity about compensation issues by

replacing regulations that use bright-line rules to draw explicit distinctions between permissible

and impermissible payments, with regulations that fail to draw any such distinctions.  For

example, under the Clarifying regulations, bonuses to senior management personnel were

explicitly permitted.  34 C.F.R. § 668.14(b)(22)(ii)(G).  Neither schools nor the Department had

to undertake any analysis to judge the legality of such payments.  Under the Compensation

regulations, however, bonuses to senior executives with "responsibility for" recruiting activities

are prohibited if the bonuses are "indirectly" based "on success in securing enrollments."  To

apply this rule, schools and the Department must first make judgments about which senior

management personnel have "responsibility for" recruiting.  They then must determine whether

any part of a payment made to such a person is "indirectly" based "on success in securing

enrollments."  The regulations do not define either the phrase "responsibility for" or the word

"indirectly."  Schools must therefore guess at their meaning without any assurance as to whether

they have guessed correctly.  Rather than instill clarity regarding compensation issues, the new

regulations muddy the waters.[7]

---

[7]    This analysis holds true for other aspects of the Compensation regulations as well.  *Compare* 75 Fed. Reg. at 66,877 (failing to provide a single example of a standard evaluative factor that could be used to make salary adjustments consistent with the Compensation regulations), *with* 34 C.F.R. § 668.14(b)(22)(ii)(A) (two salary adjustments per year not unlawful provided they are not based solely on success in securing enrollments); *compare also* 75 Fed. Reg. at 66,876

[Footnote continued on next page]

The Compensation regulations create uncertainty where none existed before with respect to other common forms of compensation as well.  Indeed, the Department has explicitly stated that "going forward, actions that were permitted under [the Clarifying regulations] will neither be automatically prohibited, nor automatically permitted.  Instead, institutions will need to re-examine their practices to ensure that they comply" with the Compensation regulations.  75 Fed. Reg. at 66,873.  The Department, however, has provided very little guidance as to *which* previously permitted practices are now prohibited, sowing confusion where none existed before. *See, e.g.*, A.R. 5997.  That is not adding clarity; that is arbitrary and capricious.

For example, under the Clarifying regulations, it was absolutely clear that schools could make contributions to employee retirement plans organized under Section 401(k) of the Internal Revenue Code.  Under the Compensation regulations, those payments are arguably illegal; they are "sum[s] of money" that are not "fixed salar[ies]" and that the Department could deem to be "indirectly" linked to success in securing enrollments (because schools use their revenue to make them).  Notably, if the Compensation regulations do prohibit contributions to recruiting, admissions, and financial aid employees' 401(k) plans, the regulations could upset compensation for *all* school employees and senior management because federal tax law generally prohibits employers from contributing to some employees' 401(k) plans and not others.  *See* 26 U.S.C. § 401(k)(3)(A).  There is simply no reason to suspect Congress intended that the HEA preclude schools from utilizing 401(k) retirement plans.  *See Am. Trucking Ass'ns*, 531 U.S. at 468.  And

_____

[Footnote continued from previous page]
(demotions are permissible only "as long as [they] are consistent with the HEA's prohibition"), *with Bott*, 262 F. App'x at 812 ("The decision to fire an employee is not covered by the Act.").

it is absurd to claim that regulations that call into doubt forms of compensation that fall well beyond the Department's authority actually improve clarity regarding compensation issues.[8]

Additionally, the claim that the Compensation regulations will result in increased clarity flies in the face of the historical record.  The decade preceding the adoption of the Clarifying regulations was, indeed, a period of great uncertainty about the meaning given by the Department to the HEA's compensation restriction.  This uncertainty is embodied in the often contradictory guidance the Department gave to schools and other interested parties in private letter rulings.  For example, the Department's guidance generally acknowledged that merit-based salaries are proper (and not prohibited by the HEA).  But the guidance varied with regard to the extent to which salary adjustments could be based on enrollments and the permissible direction and frequency of the adjustments.  *See, e.g.*, Lyons Decl., Ex. A (only annual adjustment allowed); *id.*, Ex. B (same); *id.*, Ex C (biannual adjustment permitted); *id.* (upward adjustment only); *id.*, Ex. B (drawing no distinction between upward and downward adjustments).

By 2002, the substantial confusion and its attendant costs to students, schools, and taxpayers led the Department to admit that its approach had proven "problematic" and had resulted in "unclear guidance."  *Id.*, Ex. D.  Accordingly, the Department sought to establish more uniform standards and increase regulatory certainty.  The 2002 Clarifying regulations were the result of that process.  With regard to merit-based salary adjustments, for example, the Clarifying regulations ended the confusion by making it clear that such adjustments are proper provided they are not made more than twice per year and are not based "solely" on enrollments.

---

[8]   The ACE letter, *see supra* note 5, is further proof that the Compensation regulations do not increase clarity.  In that letter, ACE stated that "[i]n reviewing" the Compensation regulations, "many questions have arisen regarding [their] application" and identifies ten specific areas of uncertainty.

As a matter of historical fact, therefore, it was the 2002 regulations that *resolved* the confusion that existed between 1992 and 2002 over what forms of compensation were permitted under the statute.  By repealing the Clarifying regulations, the Department's new regulations will *revive* that confusion.  There has been no intervening change in the HEA's text since 2002, and the Department has not introduced any evidence that would undermine the clear historical record.  In fact, despite several comments highlighting this incongruity, *e.g.*, A.R. 2046; *id.* at 6193, 6395, the Department has failed to confront the historical record, much less reconcile the Compensation regulations with it.  That is not a hallmark of reasoned decisionmaking.  Because the Department's "increase[d] clarity" rationale does not withstand scrutiny, the Compensation regulations must be set aside.  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (when one of several rationales is flawed, courts ordinarily vacate the regulation unless they are certain that the agency would have adopted the rule anyway).

**3.    Hypothetical Circumvention Of The Higher Education Act Is An Insufficient Rationale For The Compensation Regulations.**

The Department also claims that the new regulations are necessary to prevent "unscrupulous actors" from "routinely rely[ing] upon [the Clarifying regulations] to circumvent the intent of . . . the HEA."  75 Fed. Reg. at 66,872.  Institutional employees have supposedly "repeatedly advised" the Department that "institutions are making actual compensation decisions based exclusively on the numbers of students enrolled," which forces the Department to "look behind the documents that institutions allege they have used to make recruiter compensation decisions."  *Id.* at 66,873.  Because of this allegedly hard-to-detect circumvention, even though the Department has expended "enormous amounts of resources" on enforcement, it has been unable "to adequately determine whether institutions are in compliance."  *Id.*  Accordingly, the

Clarifying regulations have allegedly served to "obstruct" rather than "effectuate the goals intended by Congress." *Id.* at 66,872.

There are at least two independent problems with these claims.  First, the Department has not provided any factual foundation to support its claims that the Compensation regulations are necessary to prevent unscrupulous actors from violating the statute or to mitigate the amount of resources the Department must expend to catch and punish such actors.  The Department simply asserts the existence of such actors based on anonymous "advice" without providing any hard evidence in the administrative record.  *See* 75 Fed. Reg. at 66,873.  That is insufficient.  *See ALLTEL Corp. v. FCC*, 838 F.2d 551, 560 (D.C. Cir. 1988) (agency assertion that a rule change is needed to prevent "abuse" is insufficient where there "has been no showing that such abuse exists and no showing that the rule targets companies engaged in such abuse"); *id.* at 561 ("[A] regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." internal quotation marks and citations omitted)).

In fact, according to a recent Government Accountability Office ("GAO") report, substantiated violations of the statutory compensation restriction have not significantly increased in frequency or severity since the adoption of the Clarifying regulations.  A.R. 3516-17 (citing GAO, *Higher Education:  Information on Incentive Compensation Violations Substantiated by the U.S. Department of Education*, Feb. 23, 2010).  Notably, the total number of violations found over the period running from 1998 to 2009 was also quite small:  32 substantiated violations during a period in which nearly 6,000 institutions of higher education were in daily operation. *Id.*

Moreover, the Department's own analysis belies its claims that the Compensation regulations are necessary to prevent unscrupulous actors from evading the law.  According to the

Department, the regulations will not impact the volume or composition of federal student aid programs or the federal budget. 75 Fed. Reg. at 66,973. That is a fatal concession. If evasion of the compensation prohibition was widespread and the regulations would make it easier to detect and punish that evasion, the effects would show up in at least one of those measurements. For example, fewer unscrupulous actors would mean fewer less-qualified students taking out loans they are later unable to repay; that would change *both* the cost and composition of Title IV programs. At a minimum—at least on the Department's account—the regulations should generate taxpayer savings by making it less costly to detect and punish bad actors. Thus, if indeed a problem with unscrupulous actors exists, by the Department's own conclusions, the Compensation regulations are not a means of combating it. Adopting regulations without any real basis for doing so is quintessentially arbitrary. *Fox Television Stations*, 129 S. Ct. at 1811 ("[O]f course the agency must show that there are good reasons for [its] new" regulations); *see also Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997) (an agency's "*ipse dixit* conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking"); *County of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [a court] must undo its action."); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S 359, 374 (1998) (rule is arbitrary and capricious if it runs counter to available evidence).

Second, the regulations must, at a minimum, be remanded to the Department because they are not supportable under the Department's stated reason for adopting them. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). According to the Department, it has outlawed many practices permitted by the Clarifying regulations to enable more efficient detection and

punishment of bad actors who use the Clarifying regulations to *evade* the HEA's compensation

restriction.  *See* 75 Fed. Reg. at 66,950; *id.* at 66,873.  The need to detect and punish those who

evade the HEA, however, is not a reasoned justification for prohibiting practices that are clearly

lawful under the HEA.  Accordingly, the Department's evasion-prevention rationale must be a

mask for the Department's true reason for outlawing practices deemed unlawful by the

Clarifying regulations:  the Department has changed its understanding of what the HEA

prohibits.[9]  If that is the case, the Department must say so, to allow interested parties to comment

upon and the Court to review the reasonableness of its new interpretation.  *Chenery*, 332 U.S. at

196.  But the Department has not done so for the overwhelming majority of the provisions of the

Clarifying regulations.  Under *Chenery*, at a minimum, that failure compels a remand.

**D.      The Department's Decision To Prohibit Graduation- And Retention-Based Payments Is Arbitrary And Capricious.**

The irrationality of the Compensation regulations is further demonstrated by the

Department's decision to prohibit graduation- and retention-based payments.  *See* 75 Fed. Reg. at

66,874.  By prohibiting such payments, the Department inexplicably prevents schools from

incentivizing recruiters to seek out students likely to benefit from their programs.  A.R. 5155-56.

The only justification offered is that graduation-based payments are prohibited by the HEA

because they constitute "compensation that is 'indirectly' based upon securing enrollments—that

---

[9]    For example, both the Clarifying regulations and the guidance that the Department provided prior to the Clarifying regulations made clear that the Department had concluded that the HEA did not prohibit merit-based salaries and salary adjustments and was limited to employees actually engaged in securing enrollments or the award of financial aid rather than applying "all the way to the top" of an institution.  In addition, that Congress chose not to amend the Clarifying regulations in the recently enacted Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078 (2008) (reauthorizing Title IV), is strong evidence that the Clarifying regulations do not permit activities prohibited by the HEA.  *Cf. NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974).

is, unless the student enrolls, the student cannot successfully complete an educational program." 75 Fed. Reg. at 66,874.[10]

The Department's explanation is a complete and unsound reversal from its longstanding interpretation of the HEA. *See, e.g.*, A.R. 5811-12. As early as 1996, the Department (correctly) explained that "[g]raduation from, or completion of, eligible programs is what the taxpayer is paying for with the student aid programs," Lyons Decl., Ex. E; *see also* 67 Fed. Reg. at 67,056. And applied consistently, the Department's logic would prohibit *all bonuses* to covered employees—including bonuses based on (i) successful job placement; (ii) successful loan repayment; and (iii) student satisfaction—rather than only bonuses based directly or indirectly on success in securing enrollments. If Congress had wanted to prohibit all bonuses to these employees, it could have said as much. *Cf. TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (the "most natural reading" of a statute "explicitly includ[ing] a more limited" rule is that Congress "implicitly excluded" a more general rule); Lyons Decl., Ex. F (1996 Department letter stating that "Congress did not prohibit all incentive payments," and therefore "the statute and regulation must . . . logically be read to permit some kinds of incentives based on job performance"). Because the Department's reasoning for forbidding graduation-based payments rests on an unsound interpretation of the HEA, at a minimum, that portion of the Compensation regulations

---

[10]  Oddly, the Department does not apply that same logic to bonuses for coaches who recruit. Although "recruitment of student athletes is not different from recruitment of other students," coaches who recruit may receive bonuses for successful athletic seasons and team academic performance, even though such results would—like graduation—not be possible unless their players first enroll. *See id.* at 66,874-75. The Department's formal construction of the rule is internally contradictory and therefore arbitrary. *AT&T v. FCC*, 836 F.2d 1386, 1391 (D.C. Cir. 1988).

must be vacated and remanded.  *See Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 740 (D.C. Cir.

1990) (decision based on erroneous statutory interpretation is not reasonable).

Ultimately, the Department's objection to graduation-based bonuses appears to be that

they reward recruiters for enrolling students who graduate from programs the Department may

someday conclude are not worthwhile.  But whether becoming a graduate of a particular program

is a worthwhile investment is a determination Congress has reserved primarily for the potential

students and accreditation agencies, and not to the Department.  It therefore cannot supply a

reasoned basis for the Department's decision.  *State Farm*, 463 U.S. at 43 (agency reliance on

factors Congress did not intend it to consider is arbitrary and capricious).  The Department's own

authority to judge the utility of any particular institution is quite limited and entirely unrelated to

how recruiters are paid.  *See, e.g.*, 20 U.S.C. § 1085(a)(2)(A)-(B) (giving the Department

authority to terminate institutions' Title IV eligibility if their students' cohort default rates reach

a certain level).  Congress did not intend the statutory compensation restriction to become a

backdoor means for the Department to make it harder for schools to seek out high-quality,

capable students, or a mechanism for the Department to regulate course offerings.  *See* 67 Fed.

Reg. at 67,056 ("[O]ther legislative and regulatory requirements are designed to weed out

institutions with poor quality programs.").  But the Compensation regulations would turn it into

just such a mechanism to intrude deeply into schools' operations.[11]

---

[11]   The Department's claims that "[e]mployees should not be rewarded beyond their standard
salary or wages for their contributions to [the] fundamental duty" to help students graduate, that
graduation-based payments are "not necessary for institutions to appreciate the value of keeping
students in school," and that "institutions should not need [such payments] to demonstrate their
commitment to retaining students," *see* 75 Fed. Reg. at 66,874, are fluffy generalities—not
reasoned explanations—that demonstrate how far afield the Department has wandered.

**E.      The Department's Failure To Respond To Relevant Comments Is Arbitrary And Capricious.**

The Department failed to consider significant factors that various commenters brought to the Department's attention during the comment period.  That alone renders the Compensation regulations arbitrary and capricious.

During the public comment period, several commenters explained that the Compensation regulations would resurrect the harmful confusion that permeated the uncertain, case-by-case approach that governed the pre-2002 period.  Commenters highlighted their concerns by posing numerous compensation-related questions to which the proposed regulations provided no clear answer. *E.g.*, A.R. 3059-60.  The Department failed to respond.

The Department's final regulations would harm both students and the country by decreasing student enrollment.  For example, schools that are unable to "bas[e] any portion of [a salary] adjustment on success in securing student enrollments or financial aid awards," 75 Fed. Reg. at 34,854, will be unable to differentiate between recruiters on the basis of their performance of their primary job description.  Once the link between quality work and compensation is severed, employees will be less motivated to put in the effort needed to locate qualified students who can benefit from schools' educational programs.  Many high-performing employees will leave for other jobs in occupations where merit-based compensation is not prohibited by the Government.  *See* A.R. 3528-52 (Report of Daniel J. Slottje, Ph.D. on NPRM dated June 18, 2010).  As a result, prospective qualified students may never learn about the educational opportunities and payment options available to them.  A.R. 3489 (citing Watson Scott Swail, *Graduating At-Risk Students*, Imagine Am. Found. 8 (2009), *available at* http://www.imagine-america.org/pdfs/Graduating-At-Risk-Students-Web.pdf (noting that "policies and practices in the area[ ] of recruitment . . . are critical to supporting student

26

persistence to [obtaining a] degree")).  And the Nation's economy will suffer as fewer students enroll in educational programs that teach the skills necessary to thrive in the twenty-first century economy.  *See* A.R. 3547 (citing President Barack Obama, Remarks To A Joint Session Of Congress (Feb. 24, 2009) (it is a national priority to "once again have the highest proportion of college graduates in the world")).

Several commenters pointed out that the Department ignored the compliance costs the Compensation regulations would impose on schools.  As explained by one commenter, the Department's statement that "going forward" schools would need to "re-examine their practices to ensure that they comply" with the new regulations will undoubtedly entail costs for all schools.  A.R. 3405 (quoting 75 Fed. Reg. at 34,819); *see also* A.R. 3287.  Moreover, by generating a more ambiguous regulatory environment, the Compensation regulations will impose increased litigation risks on schools.  Under the Compensation regulations, schools will have to expend a greater portion of their resources—which could instead go toward educating students— defending against an increased number of False Claims Act *qui tam* lawsuits.  A.R. 4371.

The Department did not respond to *any* of these comments in its final regulations.  The final regulations completely ignore the historical record; the Department never mentions the pre-2002 regulatory confusion, let alone offers any explanation for why repealing the Clarifying regulations would not reinstate it.  The final regulations are also devoid of any concern for the regulations' direct effect on school employees and their derivative effect on students and prospective students.  Finally, the final regulations simply repeat the economic analysis published in the NPRM without even attempting to address the additional costs of its regulations highlighted in the public comments, including those of at least one economic expert.  A.R. 3528-52; *see also* 75 Fed. Reg. at 66,932-44; *id.* at 66,968-73.  In sum, the Department's "failure to

27

respond to petitioners' specific challenges in the record is fatal here since 'the points raised in the comments were sufficiently central that agency silence . . . demonstrate[s] the rulemaking to be arbitrary and capricious.'"  *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1190-91 (D.C. Cir. 1990) (internal citation omitted); *see also Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir.), *cert denied*, 434 U.S. 829 (1977) ("[D]ialogue is a two-way street:  the opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

III.    **THE MISREPRESENTATION REGULATIONS VIOLATE THE HIGHER EDUCATION ACT, THE CONSTITUTION OF THE UNITED STATES, AND THE ADMINISTRATIVE PROCEDURE ACT.**

A.    **The Misrepresentation Regulations Violate The Higher Education Act And Due Process By Eliminating Schools' Rights To Notice And Opportunity For Hearing.**

The HEA directs that if the Department determines "that an eligible institution has engaged in substantial misrepresentation" it may suspend or terminate the school's participation in Title IV financial aid programs only "after reasonable notice and opportunity for a hearing." 20 U.S.C. § 1094(c)(3)(A).  Under the current regulations, all allegations of misrepresentations are subject to robust procedural protections.  34 C.F.R. § 668.71(a) (requiring the Department to follow the procedural protections in subpart G of Title 34).  The Misrepresentation regulations would, contrary to statute, transform this mandatory requirement for notice and opportunity for a hearing into a matter left to the Department's enforcement discretion.  *See* 75 Fed. Reg. at 66,958; *see also* A.R. 3274.  Under the new regulations the Department may impose any one of a number of penalties—including revocation of a school's program participation agreement— without either notice or an opportunity to be heard.  *See* 75 Fed. Reg. at 66,958 (permitting termination sanctions while making the procedural protections in 34 C.F.R. pt. G optional).  The effort to turn the mandatory statutory requirement that schools be given "reasonable notice and

opportunity for a hearing" before being punished for alleged misrepresentations into a discretionary power of the Department is a clear violation of the HEA.  *See* A.R. 5748-49; *id.* at 5807-08.

That effort also violates the Due Process Clause of the Fifth Amendment to the Constitution.  *See, e.g.*, A.R. 5666 (ACE noted that the new regulations "eliminate due process protections for institutions in the case of a substantial misrepresentation.").  Schools have both liberty and property interests in their continued eligibility to participate in Title IV programs that are sufficient to trigger procedural due process rights.  *See, e.g.*, *Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990).  "[A]t a minimum," the Due Process Clause requires that a "deprivation of . . . liberty or property . . . be preceded by notice and opportunity for hearing."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950); *see also* A.R. 3271.  The precise contours of the required procedures may vary with the situation, but it is inconsistent with the Constitution for the Secretary to assert the power to suspend or revoke schools' liberty and property interests without either notice or an opportunity to be heard.  *See, e.g.*, A.R. 6004.

> **B.     The Misrepresentation Regulations Violate The Higher Education Act By Permitting The Department To Punish Misrepresentations Not Prohibited By The Statute.**

The Misrepresentation regulations impermissibly expand the scope of the HEA's misrepresentation prohibition in several ways.

First, the Misrepresentation regulations unlawfully expand the universe of punishable misrepresentations.  The HEA prohibits *only* three types of misrepresentations:  those regarding an institution's "educational program," those about "its financial charges," and those related to "the employability of its graduates."   20 U.S.C. § 1094(c)(3)(A).  The Misrepresentation

regulations, however, impose penalties for all misrepresentations "regarding the eligible institution, *including* [those] about the nature of its educational program, its financial charges, or the employability of its graduates." 75 Fed. Reg. at 66,958 (emphasis added); *see also* A.R. at 6706 (The University of Alaska explained that under the Misrepresentation regulations, a misrepresentation "could be interpreted to include any comment about the institution on any subject."). By claiming that the scope of punishable substantial misrepresentations "includes" those expressly prohibited by the HEA, the regulations arrogate to the Department the power to punish misrepresentations *beyond* those prohibited by the statute. It is axiomatic, however, that the Department may act "only pursuant to authority delegated to [it] by Congress." *See Comcast Corp. v. FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010).

Second, contrary to the statute, the Misrepresentation regulations assert the authority to punish statements that are neither untrue nor misleading. At a bare minimum, a "misrepresentation" must be untrue. *See, e.g.*, *Wieczorek v. Volkswagenwerk, A.G.*, 731 F.2d 309, 312 (6th Cir. 1984) ("The general definition of 'misrepresentation' refers to any 'untrue statement of fact.'") (citing *Black's Law Dictionary*); *Little v. Keystone Continuum, LLC*, No. 07-0241, 2008 WL 2901854, at *7 (M.D. Tenn. July 22, 2008) ("[A] misrepresentation . . . must be false."); *Black's Law Dictionary* 1001 (6th ed 1990). Yet the Misrepresentation regulations punish true statements if they have a "tendency to . . . confuse," which makes schools responsible not only for their statements, but also for how their statements are interpreted by the public. 75 Fed. Reg. at 66,959; *see also* A.R. 6038.

Third, in contrast to the current regulatory regime, the Department has reserved for itself the power to punish severely even minor misrepresentations, eliminating any materiality requirement and reading the term "substantial" out of the statutory text. The current regulatory

regime correctly recognizes that not all misrepresentations are punishable misrepresentations.  It therefore provides that "minor" misrepresentations that could be "readily corrected" are to be simply communicated to the educational institution to "obtain an informal, voluntary correction." *See* 34 C.F.R. § 668.75(b); *see also* A.R. 5152; *id.* at 5665-66 (ACE urged the Department to maintain the current language distinguishing "minor" and "substantial" misrepresentations.).

The new Misrepresentation regulations eliminate that crucial distinction and subject schools to liability for any and all misrepresentations.  They define a "substantial misrepresentation" as "[a]ny misrepresentation" upon which "the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."  75 Fed. Reg. at 66,959.  Under the Misrepresentation regulations, therefore, a school could lose its Title IV eligibility if one of its vendors inadvertently makes a clerical error that is accidentally distributed to the public, if the Department unilaterally concludes that the statement was read by even one person who subjectively "*could . . .* [have] reasonably relied" upon it.  *Id.* (emphasis added); *see also, e.g.*, A.R. 4486-87; *id.* at 4576; *id.* at 5746-47.  Similarly, an advertisement that simply uses too much jargon for the Department's taste may serve as the basis for punishment if the Department concludes that it could be confusing to a person who could have seen it and reasonably relied upon it.

The commonly accepted meaning of the word "substantial" demonstrates the importance of Congress's decision to use the term as a modifier to the term "misrepresentation."  According to *Black's Law Dictionary*, when used as a modifier for the term "misrepresentation," the word "substantial" includes a materiality requirement.  *See Black's Law Dictionary* 1428 (6th ed. 1990) (defining "substantial" as "synonymous with material").  Moreover, courts have repeatedly held that statutory schemes punishing misrepresentations and frauds punish only

materially false claims.  *See, e.g.*, *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) (even where the law's purpose is to ensure that those who receive information are able "to make an informed choice," a "standard of materiality" that is "unnecessarily low" may cause the speaker to "be subjected to liability for insignificant . . . misstatements").  In short, the new regulations unlawfully override the congressional determination that a simple "misrepresentation" is insufficient to trigger the HEA's statutory penalties; under the HEA, a misrepresentation must be "substantial"—*i.e.*, "material"—for the Department to impose those penalties.

Fourth, the Misrepresentation regulations unlawfully subject schools to punishment for misrepresentations made without the intent to deceive, mislead, or confuse.  *Cf.* A.R. 4888; *id.* at 5747-48; *id.* at 6560 (Southern Methodist University requested that the Department include an "intent" requirement); *id.* 6580 (Penn State University) (same).  The regulations impose liability on eligible institutions for statements that merely have a "likelihood or tendency to deceive or confuse," even if the speaker in good faith believed them to be correct.  75 Fed. Reg. at 66,959. The legislative history of the misrepresentation prohibition, however, demonstrates that Congress wanted to punish intentional wrongdoers and did not create a strict liability regime.  *See* H.R. Rep. No. 94-1086, at 13 (1976) ("These additions to current law are intended by the committee to provide the [Secretary] with the necessary tools to keep *unethical* individuals from engaging in unlawful conduct and *sharp practice* in the name of helping financially disadvantaged students obtain the education necessary to succeed." (emphases added)); *see also* 75 Fed. Reg. at 34,834 (new misrepresentation regulations necessary to prevent "false promises and other forms of deception").  Moreover, courts have recognized the intent requirement inherent in common law fraud, which overlaps with the concept of substantial misrepresentations.  *See, e.g., McNally*

*v. United States*, 483 U.S. 350, 358 (1987) (recognizing "the words 'to defraud' . . . usually signify the deprivation of something of value by trick, deceit, chicane or overreaching").

C.    **The Misrepresentation Regulations Violate Schools' First Amendment Right To Free Speech.**

Each of the features of the Misrepresentation regulations discussed above is contrary to the HEA.  Taken together, these flaws in the regulations also have a chilling effect on schools' exercise of their free speech rights.  A.R. 6735.  The Misrepresentation regulations impermissibly condition Title IV funding on restrictions upon schools' noncommercial speech— speech that is at the core of the First Amendment's protections.  They do so, moreover, on the basis of the content of the speech—singling out speech by schools for uniquely disfavored treatment.  Even with respect to schools' commercial speech, the Misrepresentation regulations sweep far too broadly.  Rather than prohibiting only actually, intentionally, or inherently misleading speech, they impose severe sanctions—a total ban on participation in Title IV programs—for speech that merely has a "tendency to . . . confuse," even if no one was actually confused.  The Department offers no justification for imposing such a sweeping and vague prohibition, which will inevitably chill significant quantities of lawful speech.

1.    **The Misrepresentation Regulations Regulate Noncommercial Speech At The Core Of The First Amendment.**

The Misrepresentation regulations are not limited to commercial speech, such as statements that do "no more than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); or that "relat[e] solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980); or that appear in an advertising format, explicitly reference a product, and derive from economic motivations, *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 69 (1983).  Rather, the regulations apply to "*any statement*" made by a school "*directly or indirectly*" to

"any member of the public"—even to people who are not potential students—and even to

statements made during the course of a debate on education policy with a representative of the

Department.  *See* 75 Fed. Reg. at 66,958-59 (emphases added).  Shockingly, as explained above,

despite the incredible breadth of the prohibition, schools cannot even be assured that they will be

able to defend themselves against misrepresentation charges at a hearing before losing their Title

IV eligibility.

Because the Misrepresentation regulations apply only to the speech of schools—as

opposed to their opponents in public debate—they are content-based and invalid unless they

survive heightened scrutiny.  *See Citizens United v. FEC*, 130 S. Ct. 876, 898-99 (2010)

("Prohibited . . . are restrictions distinguishing among different speakers, allowing speech by

some but not others.  As instruments to censor . . . restrictions based on the identity of the

speaker are all too often simply a means to control content." (citing *First Nat'l Bank of Boston v.

Bellotti*, 435 U.S. 765, 784 (1978))); *see also Simon & Schuster, Inc. v. Members of N.Y. State

Crime Victims Bd.*, 502 U.S. 105, 117 (1991) ("The government's power to impose content-

based financial disincentives on speech surely does not vary with the identity of the speaker.");

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).  For example, in a public debate

between postsecondary schools and people opposed to taxpayer-supported higher education, the

schools would be subject to the Misrepresentation regulations and related penalties when

speaking publically about their programs while those advocating for reduced funding would not

be subject to any such restrictions.  If the schools are concerned that an immaterial misstatement

with a mere tendency to confuse could result in punishment from the Department, they will be

less likely to participate vigorously in that debate.  But there is no compelling reason, let alone a

legitimate reason, for this Government-imposed result.

Accordingly, as schools engage in discussions about their programs in public debates,

there is "a realistic danger that the" Misrepresentation regulations "will significantly compromise

recognized First Amendment protections of" those "who desire to engage in legally protected

expression but who may refrain from doing so rather than risk" the penalties the regulations

impose. *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)

(internal citations omitted); *see also Members of City Council of L.A. v. Taxpayers for Vincent*,

466 U.S. 789, 796-97 (1984) (facial invalidation is appropriate where any "attempt to enforce

such legislation would create an unacceptable risk of the suppression of ideas").

> **2.      The Misrepresentation Regulations Unconstitutionally Restrict Commercial Speech.**

Even if the Misrepresentation regulations could be construed as covering only

commercial speech, they could not stand.  The Government may regulate commercial speech that

is inherently misleading.  *See In re RMJ*, 455 U.S. 191, 203 (1982); *Cent. Hudson Gas & Elec.*,

447 U.S. at 566.  But the Misrepresentation regulations curtail speech that merely has a

"tendency to . . . confuse."  75 Fed. Reg. at 66,959.  Confusing statements—much less

statements that merely tend to confuse—are not inherently misleading; they may simply lack

clarity in all respects, making them harder to understand.  To permit the Government to impose

penalties on speech that merely "tends" to confuse—as judged by the Secretary after the fact—

would profoundly restrict existing First Amendment protections.

Further, even if statements that merely "tend to confuse" could be characterized as

potentially misleading, the Supreme Court has held that the Government must show that

restrictions on commercial speech that is not *inherently* misleading "materially advanc[e]" a

substantial governmental interest; the Government cannot meet this burden by "mere speculation

or conjecture."  *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188

(1999); *see also id.* at 183 (citing *Cent. Hudson Gas & Elec.*, 577 U.S. at 566); *In re RMJ*, 455 U.S. at 203 (restrictions on potentially misleading advertising "may be no broader than reasonably necessary to prevent . . . deception"); *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994) (if "protections [of] commercial speech are to retain their force, . . . rote invocation of the words 'potentially misleading'" cannot "supplant the [Government's] burden to demonstrate that the harms it recites are real and that [its regulation] will in fact alleviate them to a material degree" (internal quotation marks omitted)); *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 109 (1990) (requiring the Government to carry a "heavy burden").

Notably, the Department has not proffered the type of "studies" or evidence from "history," "consensus," or "simple common sense," *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001), that could justify a prohibition on statements that merely "tend to . . . confuse." The Department has said in this case that it often "receives complaints from students who allege that they were the victims of false promises and other forms of deception." 75 Fed. Reg. at 34,834. "False promises" can be punished and deterred without treading upon constitutional rights; indeed, they can be punished and deterred under the current regulations. In any event, the Department's unsubstantiated assertion is insufficient to carry its burden. *Cf. Lorillard Tobacco*, 533 U.S. at 556-61 (reviewing "ample documentation" before concluding that the Government had demonstrated a significant problem with underage use of smokeless tobacco and cigars).

The Misrepresentation regulations also fail because there is not a reasonable "fit between the [Government's] ends and the means chosen to accomplish those ends"; the means are not "narrowly tailored to achieve the desired objective." *Lorillard Tobacco*, 533 U.S. at 556. The Misrepresentation regulations subject schools to severe punishments, including suspension and

termination from all Title IV programs, for innocent and trivial statements that merely have a tendency to confuse even if no person has actually been harmed by those statements. *See* 75 Fed. Reg. at 66,958-59. By promulgating regulations that are not narrowly tailored to remedying a particular harm, the Department chills schools' exercise of their constitutionally protected rights. *See Lorillard Tobacco*, 533 U.S. at 571 (Kennedy, J., concurring in part) (noting that "the obvious overbreadth" of the regulation at issue "suffices to invalidate them under the . . . test in *Central Hudson Gas & Electric*"). A tendency-to-confuse standard does not provide schools with any guidance as to what they can or cannot say to avoid liability. *See Baggett v. Bullitt*, 377 U.S. 360, 367 (1964) (a law "forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law"); *see Ga. Pac. Corp. v. OSHRC*, 25 F.3d 999, 1004-05 (11th Cir. 1994) (holding a regulation unconstitutionally vague and explaining that "where the Secretary's interpretation of a regulation is either unconstitutionally vague as applied or unreasonable given the regulated activity, [the Court] may refuse to accept the Secretary's interpretation."); *see also* A.R. 5665 (ACE explained that the quoted language was "overbroad, ambiguous and unlikely to provide any useful guidance to institutions.").

Statistics regarding graduation rates, job placement rates, salaries upon graduation, debt at graduation, and other factors that are important to students are sufficiently complex that they sometimes arguably "tend[] to . . . confuse" even people who are well versed in such topics. In fact, the phrase "tendency to . . . confuse" is so devoid of content that it leaves the Department with nearly unfettered discretion to silence disfavored speakers. *Cf. Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988) (invalidating as a prior restraint a licensing statute that placed "unbridled discretion in the hands of a government official"); *see also* A.R. 6603 (Indiana

University explained that the word "confuse" "seem[ed] quite misplaced," and argued that "the nature and sheer volume of (for example) the current required disclosures leads to a capacity or tendency to confuse.").  Accordingly, the regulations are unconstitutionally vague.

### D.   The Department Acted In An Arbitrary And Capricious Manner By Failing To Respond To Relevant Comments.

Commenters noted that the Misrepresentation regulations would deprive schools of their rights to notice and an opportunity to be heard and would impose on schools an overly broad definition of the term "substantial misrepresentation."  A.R. 5747.  Instead of altering or justifying its deficient proposals, *see* A.R. 6782 (Arizona State University noting a lack of justification for the new, unclear regulation), the Department simply asserted—wrongly—that "nothing in the proposed regulations diminishes the procedural rights that an institution otherwise possesses to respond to [an enforcement] action," 75 Fed. Reg. at 66,915.  It stated that it "intends to enforce the . . . regulations with the same degree of fairness" that it uses to enforce other regulations and that it "can be trusted to properly evaluate" using a "rule of reasonableness," whether "a claim is confusing to a degree that it becomes actionable," *see id.* at 66,914-15, 66,917.

These responses do not satisfy the APA's requirement that agencies meaningfully respond to public comments.  *Home Box Office, Inc.*, 567 F.2d at 35-56; *Gas Appliance Mfrs. Ass'n v. Dep't of Energy*, 773 F. Supp. 461, 468 (D.D.C. 1991) ("conclusory and vague" responses are insufficient under the APA).  Assuming they qualify as "responses," the Department's dismissals are not *reasoned* explanations for failing to preserve schools' statutory rights to notice and opportunity to be heard and for omitting a materiality requirement from the regulations.  *See Fox Television Stations*, 129 S. Ct. at 1811 (requiring agencies to provide a

reasoned explanation for their regulatory decisions); *Reytblatt*, 105 F.3d at 722 (agency "must respond in a reasoned manner to those [comments] that raise significant problems").

In fact, the Department's responses exacerbate the legal problems of the Misrepresentation regulations. By reserving absolute discretion to punish immaterial misstatements and to distinguish between material and immaterial statements, the Department has granted itself the largely unreviewable ability to severely punish disfavored speakers while giving favored speakers a free pass. *Cf. Lakewood*, 486 U.S. at 764.

## IV.   THE STATE AUTHORIZATION REGULATIONS VIOLATE THE HIGHER EDUCATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT.

### A.   The State Authorization Regulations Exceed The Higher Education Act's State Authorization Requirements.

As defined by the HEA, an institution of higher education is an educational institution operating within a State that, among other things, is "legally authorized within such state to provide a program of education beyond secondary education." 20 U.S.C. § 1001(a)(2). The State Authorization regulations would compel many States to either *change* their approach or *implement* a new system from scratch. *See* A.R. 5172.

Under the State Authorization regulations, with limited exceptions, if States would like Title IV-eligible schools to operate within their borders, they must have in place authorization regimes that meet two new characteristics. First, compliant authorization regimes cannot simply authorize schools as a class to do business within a State; they must be capable of expressly authorizing schools, *by name*, to provide educational programs beyond secondary education. *See* 75 Fed. Reg. at 66,946-47. Second, authorizing authorities must be capable of reviewing and responding to complaints concerning schools and of enforcing applicable laws. *Id.*

The Department has exceeded its statutory authority by interpreting the statutory requirement that Title IV-eligible institutions be "legally authorized . . . to provide a program of

education beyond secondary education," 20 U.S.C. § 1001(a)(2), to mandate that States implement *particular* authorization regimes.  A.R. 6857 (the State of California asserted that "[f]ederal regulations should reflect basic policy goals and principles for state authorization while permitting States the administrative flexibility to use very limited state resources in the most cost-effective way possible to meet those goals.").  Congress set forth state responsibilities under the HEA in 20 U.S.C. § 1099a.  Pursuant to § 1099a, States must (i) provide the Department with information about their licensing or other authorization processes upon request; (ii) notify the Department when they have revoked any school's license or authorization; and (iii) notify the Department of any credible evidence of fraud or other violations of Title IV.  In the State Authorization regulations, the Department asserts the authority to establish minimum state licensure requirements, even though the statutory text in § 1099a does not itself impose an obligation on a State to even have a licensure or authorization regime at all.  If Congress had intended to mandate minimum standards for state licensing or authorization, it would have set forth those requirements in § 1099a with the other state requirements under Title IV.

In addition, the Department has unlawfully seized upon § 1001 to fundamentally—and unlawfully—alter the balance of responsibility between the States and the Federal Government. *See Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991) (before a court will permit legislation to alter the federal-state balance, it "must be absolutely certain that Congress intended such an exercise"); *id.* ("[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which" courts traditionally rely "to protect [S]tates' interests." (quoting Laurence Tribe, *American Constitutional Law* § 6-25, at 480 (2d ed. 1988) (first alteration in original)).  The need to preserve the federal-state balance is particularly important in education, traditionally a matter of state concern.  *See Gregory*, 501

U.S. at 469; *cf. Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009) (courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress").  By defining what States must do to authorize educational institutions to provide programs of postsecondary education, the Department restricts States' ability to adopt other authorization regimes that they might prefer. *See* A.R. 2333 (The University of Michigan expressed concern that the State Authorization regulations "appear[] to be an attempt to *force* the state of Michigan to create an entity to oversee the universities in the state and as such is an *encroachment* on the State's rights." (emphases added)); *see also* A.R. 4507 (University of Wisconsin) (same).

        The relevant statutory text does not express a "clear and manifest purpose" of Congress to displace the States and to move the Department into the driver's seat on in-state accreditation requirements and processes.  In fact, nowhere in the text, structure, or history of the HEA is there any indication that Congress sought to use the statute's state authorization requirement to control how States should authorize schools to operate within their borders.  *See, e.g.*, A.R. 4787 (noting language in a Senate Report that "Department officials should guard against carrying out any practices which have the impact of homogenizing or standardizing policies and services developed by state, local, or private higher education officials and their governing boards or of intruding into the areas central to the autonomy of such institutions.").  Accordingly, the Department has erred by interpreting the HEA's state authorization requirement to permit it to impose specific regulatory regimes on the States.

        Further, with respect to online programs, the State Authorization regulations violate the HEA by distorting what it means to be "in" a particular State.  Under the HEA, an "institution of higher education" is an "educational institution *in* any State that is legally authorized within such

41

State." 20 U.S.C. § 1001(a)(2) (emphasis added). The State Authorization regulations turn the requirement that a program be authorized in the State in which it is located into a requirement that it be approved in every State in which its students are located. 75 Fed. Reg. at 66,867. But an online program that is physically located in Connecticut with students in Texas is no more "in" Texas than its students are "in" Connecticut. *Cf. Goldberg v. Sweet*, 488 U.S. 252, 263 (1989) (expressing "doubt that termination of an interstate telephone call, by itself, provides a substantial enough nexus for a State to tax a call"). Accordingly, the State Authorization regulations impose a significant, new regulatory burden on schools with students in multiple States, by requiring the schools to obtain approval from every State where their students reside.

**B.     The State Authorization Regulations Are Arbitrary And Capricious.**

The State Authorization regulations are also arbitrary and capricious for several reasons.

First, the Department's explanation regarding the regulations' requirement is internally contradictory. The Department asserts that its regulations "do not mandate that a State create any agency for the purposes of Federal program eligibility." 75 Fed. Reg. at 66,858. Yet only three sentences later, it explains that "these final regulations require the creation of a State licensing agency." *Id.* Regulations that provide conflicting dictates are clearly not the product of reasoned decisionmaking. *AT&T*, 836 F.2d at 1391 (a rule is unreasonable where the agency's "own understanding" of its rule "constitutes a self-contradiction").

Second, the State Authorization regulations also subject schools to dramatic penalties— exclusion from Title IV programs—even though schools have no control over whether States enact compliant authorization regimes. A.R. 4788, *id.* at 5731. The Department recognized but dismissed this concern, stating that it does not believe that "such a circumstance is any different than an institution failing to comply with an accreditation requirement that results in the

institution's loss of accredited status." *Id.* at 66,859.  That is nonsensical.  An institution can

work to meet various accreditation requirements; it cannot make a State enact conforming

legislation.  Ultimately, the Department's rationale for the regulations rests upon its unfounded

belief that States "will take the necessary actions to meet the requirements." *Id.*; *but see* A.R.

5778-79 (The Iowa College Student Aid Commission explained that it lacks the resources and

expertise to comply with the regulations.); *id.* at 6580 (Penn State University expressed concern

about "the potential for much confusion" regarding the new regulations.); *id.* at 6781 (Arizona

State University) (same).  Such wishful thinking is the antithesis of reasoned decisionmaking.[12]

Third, the State Authorization regulations place particularly severe burdens on interstate

commerce, including online programs, without offering any justification for doing so; this results

in a reduction in the educational opportunities available to students.  The regulations require

online programs to "be able to document to the Secretary [a] State's approval upon request."

75 Fed. Reg. at 66,947.  For schools with students in States that do not have requirements that

schools must satisfy before offering postsecondary distance or correspondence education, this

will be a particularly daunting—often impossible—task:  In reality, a State may not have any

requirements, or there may not be a state official willing or able to provide schools with the

documentation required.  The Department's failure to account for either of these likely scenarios

renders its regulations arbitrary and capricious.

---

[12]  The Department did not even take the time to figure out how many States would have to
enact legislation in response to its regulations.  Instead, it blithely assumed that "many States
already meet these requirements," 75 Fed. Reg. at 66,861, and that "many States will already
satisfy these requirements," *id.* at 66,859.  The record, however, undercuts that assumption.  A.R.
6363 (a commenter's conclusion that 13 States would comply with the proposed regulations, 6
States would not comply, and 31 States would probably not comply).

Finally, the Department simply has not offered any reason to alter the current regulatory regime.  A.R. 6315 (noting the variety of state licensing mechanisms for private institutions like Georgetown University and Loyola Marymount University); A.R. 6559 (Southern Methodist University stated that "there is no evidence that [the regulations are] necessary with respect to nonprofit institutions within the State of Texas.").  The Department points to concerns that arose when California's authorization regime briefly lapsed.  According to the Department, its new regulations "may have prevented [that] situation . . . from occurring or would have greatly reduced the period of time during which the State failed to provide adequate oversight."  75 Fed. Reg. at 66,859.  How the State Authorization regulations would achieve these results is not explained.  More importantly, the Department has not explained what harm was caused by California that these regulations would remedy.  *Cf.* A.R. 6355 (noting that "the Department itself allowed the situation to occur by directly advising the State of California that financial aid would continue even without the existence of a state licensing statute").  The only mention of harm comes from a commenter who noted that "we do not know yet the extent of the mischief that may have occurred or still may occur."  75 Fed. Reg. at 66,859.  Accordingly, the California example is an insufficient basis for enacting regulations with an unknown reach that will endanger the educational opportunities of students throughout the country.  *See* A.R. 4786 (noting that it did not appear that "harm" occurred to any party in California); *id.* at 5919 (Boston College noted that it was "troubled by the lack of a demonstrated problem in this area that would warrant such sweeping changes to the current regulatory framework.").  It is also insufficient justification for adopting a regulatory regime that puts every school in States that fail to enact or renew compliant authorization regimes at risk, regardless of the quality of the educational programs offered and of the harm students will suffer if their school loses its Title IV eligibility.

44

Commenters explained to the Department that the State Authorization regulations imposed an unjustifiable, impossible burden on online educational programs, *id.* at 2998-99, and that no harm resulted from the California incident, *id.* at 4365. The Department did not respond to those comments. Its failure to do so is an additional reason why the State Authorization regulations must be vacated and remanded to the Department. *See Home Box Office, Inc.*, 567 F.2d at 35-56.

## CONCLUSION

For the foregoing reasons, the Department should grant summary judgment in APSCU's favor, declaring the Compensation, Misrepresentation, and State Authorization regulations to be unlawful, vacating them, and enjoining their enforcement.

Dated:  February 25, 2011

RANDOLPH D. MOSS, SBN 417749
Randolph.moss@wilmerhale.com
JAY P. URWITZ, SBN 229393*
Jay.urwitz@wilmerhale.com
BRIAN M. BOYNTON, SBN 483187
Brian.boynton@wilmerhale.com
STEVEN P. LEHOTSKY, SBN 992725*
Steven.lehotsky@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, District of Columbia 20006
Telephone: 202.663.6000
Facsimile: 202.663.6363

Respectfully submitted,

/s/ Douglas R. Cox
DOUGLAS R. COX, SBN 459668
DCox@gibsondunn.com
NIKESH JINDAL, SBN 492008*
NJindal@gibsondunn.com
DEREK S. LYONS, SBN 995720
DLyons@gibsondunn.com
VERONICA S. ROOT, SBN 992717
VRoot@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

TIMOTHY J. HATCH, SBN 374694
THatch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7500
Facsimile: 213.229.7520

* Applications for admission pending

*Attorneys For Plaintiff Career College Association d/b/a Association of Private Sector Colleges and Universities*