# EXHIBIT 2

**Declaration of Harris N. Miller**

I, Harris N. Miller, hereby state and declare as follows:

1.     I serve as the President and Chief Executive Officer of the Career College Association d/b/a Association of Private Sector Colleges and Universities ("APSCU"), which is a voluntary membership organization of more than 1,500 accredited, postsecondary schools that offer career-specific educational programs to their students.  APSCU's member-schools annually educate and support more than 1.5 million students for employment in some 200 occupational fields.  These schools graduate a substantial percentage of the technically trained workers who enter the U.S. workforce each year and also provide retraining for displaced workers and skills-upgrading for a wide variety of public and private employers.  The educational programs offered by APSCU member-schools provide valuable training to many traditional students as well as working adults, single parents, and other nontraditional students who are underrepresented at nonprofit and public schools.

2.     At my direction, I and others at APSCU have solicited the views of member-schools to ascertain the expected impact of the State Authorization regulations (34 C.F.R. § 600.9 (2010)), Compensation regulations (34 C.F.R. § 668.14(b) (2010)), and Misrepresentation regulations (34 C.F.R. §§ 668.71-75 (2010)).  Indeed, they were eager to ensure that APSCU understands their deep concerns over the regulations.

3.     Based on these discussions, and as set forth in greater detail below, the new regulations—if allowed to go fully into effect—will irreparably harm and injure schools and students.  In general, APSCU members anticipate that:

(a) Schools and their students face potential loss of Title IV funding through no fault of their own if States fail to adopt the specified authorization regimes required under the

regulations. The regulations thus will change the educational programs offered, unduly limiting or even eliminating some online, distance learning opportunities that are beneficial to many nontraditional students. Indeed, in some States, students' ability to choose a private sector education could be eliminated altogether.

(b) The changes required by the regulations will restrict schools from paying merit-based compensation to recruiting, admissions, and financial aid employees based on their job performance. This, in turn, will make it more difficult for schools to hire and retain high-performing recruiting personnel and financial aid officials, impairing outreach efforts to nontraditional students who benefit most from private sector education. Thus, the make-up of the schools' workforces, and of their student bodies, will be irreparably changed by the regulations.

(c) Prospective students will also receive less information from schools to guide their decision-making about post-secondary educational opportunities, as schools react to regulations that threaten sanctions for trivial misstatements that are immaterial and made without any intent to deceive. Students will thus be making choices in real time based on a different mix of information as a result of the regulations.

**State Authorization**

4.     The new State Authorization regulations require that individual States have certain specified authorization regimes in order for schools that operate within their jurisdiction to be considered eligible for Title IV programs. 34 C.F.R. § 600.9 (2010). They also require that schools offering online programs obtain approval in each State in which their students reside. *Id.* § 600.9(c).

5. Some APSCU members operate entirely online, while other APSCU members operate entirely on physical campuses. Still other APSCU members provide a combination of both physical and online classrooms. In addition, many APSCU members operate in more than one State, and many of the States in which they operate will need to revamp their authorization practices and policies to follow the new State Authorization regulations.

6. APSCU members expressed deep concern that some of the States they operate in may choose not to comply with the State Authorization regulations, or will fail to comply in a timely manner, thereby causing students to lose access to Title IV funding to attend schools in those States through no fault of their own. Some APSCU members explained that their schools are located in States that have previously exempted them from applicable authorization requirements. Other APSCU members expressed concern that their schools operate in States that currently do not have authorization regimes that would comply with the requirements of the new regulations. APSCU members further stated that notwithstanding their efforts to bring these issues to the attention of State officials, they have received no reasonable assurances that States will be willing or able (particularly in these exceptionally stressful economic times) to adopt conforming changes to their authorization regimes. Without such changes, however, the flow of Title IV funds to schools in those States could be cut off.

7. APSCU members expressed concern that States may adopt and impose different—and even conflicting—authorization and approval requirements, which would impose significant burdens on schools with campuses in multiple States or schools that offer innovative online or distance learning programs, which would have to comply with the various State requirements to obtain Title IV funds. APSCU members stated that their ability to offer online and distance learning programs to students would be adversely affected under this new regime.

8.  Indeed, APSCU members expect that they will incur significant costs and regulatory burdens, whether or not they are currently exempt from State regulation, even in those States that follow the new regulations, because the regulations force schools to change their current methods of obtaining State authorizations.

9.  As a result of these changes, APSCU members believe that students will be required to select a less preferred educational alternative, or, even more significantly, will forego post-secondary education altogether.

10. For the preceding reasons, APSCU members believe that the State Authorization regulations will irreparably harm and injure their students and schools if allowed to go fully into effect.

**Compensation Regulations**

11. Under the new Compensation regulations, schools will no longer be permitted to consider, in any manner, an employee's success in securing enrollments or financial aid for students, or the successful graduation of those students in compensating their recruiting and admissions personnel.  34 C.F.R. § 668.14(b) (2010).

12. This eliminates the clarifying regulations adopted by the Department in 2002, which provided much needed guidance to the regulated community after a period of significant regulatory uncertainty.  APSCU members stated that the clarifying regulations were extremely helpful to schools in understanding what actions were appropriate to take under 20 U.S.C. § 1094(a)(20).

13. APSCU members stated that, consistent with the clarifying regulations adopted by the Department in 2002, their schools currently (i) pay merit-based salaries to recruiting and admissions employees based, in part, on their success in securing enrollments or financial aid for

students, (ii) base recruiter compensation, in part, on the graduation rates of the students they enroll, (iii) allow their employees, including recruiting, admissions, and financial aid personnel, to participate in profit-sharing plans, and (iv) pay compensation to senior management based on metrics that are arguably tied to student enrollments.  Under the regulations adopted by the Department in 2002, periodic adjustments to employee salaries based on such merit-based factors, as well as the legality of profit-sharing plans and senior management bonuses, were reaffirmed as expressly permissible under the Higher Education Act.  *See* 34 C.F.R. §§ 668.14(b)(ii)(22)(A)-(L) (2002).

14. APSCU members stated that their schools and their student outreach efforts are being adversely affected by the repeal of these clarifying regulations.  APSCU members stated that they are unsure what types of compensation plans will comply with the new regulations and that the costs and burdens of their efforts to comply with the regulations are significant.

15. APSCU members stated that the most effective way to incentivize high employee performance and productivity is through merit-based evaluation and compensation systems that are based on the performance of employees' primary job responsibilities.  APSCU members stated that the inability to evaluate and compensate employees based on performance-based considerations under the new regulations is already making it more difficult for schools to develop quality workforces that are responsive to student needs.

16. APSCU members are also confounded by the regulations' ban on retention and graduation-based compensation.  APSCU members believe these forms of compensation incentivize recruiting and admissions personnel to focus outreach efforts on students most likely to benefit and succeed in their schools' educational programs.  Indeed, APSCU members believe that these forms of compensation encourage recruiting and admissions personnel to follow

students throughout their education and to encourage students to overcome obstacles that might otherwise prevent them from completing their studies. School employees become invested in the successful outcomes of their students and that serves the interests of the student, the school, and the higher education system as a whole. APSCU members are hard-pressed to identify alternative compensation regimes that would better align the incentives of their employees with those of their students, and therefore believe that the regulations' ban on payments linked to student success will have many negative consequences.

17. APSCU members anticipate that it will be more difficult for them to recruit and retain high-quality employees as a result of these various restrictions on merit-based compensation. APSCU members believe that high-quality employees are likely to become frustrated and seek out other employment opportunities if there is no correlation between their performance in their job and their compensation. Indeed, APSCU members have noted that the Department itself has advocated for increased use of performance-based compensation in the K-12 education system because it believes that such compensation helps better align the incentives of educators and students. APSCU members believe that the loss of these highly qualified employees will impair the ability of schools to inform prospective and current students—particularly those nontraditional students that benefit most from such outreach efforts—about the educational and financial aid opportunities available to them. APSCU members believe that the workforce of their schools and the composition of their student bodies will be different as a result of the regulations.

18. In addition, APSCU members expressed concern that the Compensation regulations appear to apply to the very top levels of their organizations—including college presidents—even though senior management officials may have only a peripheral role with

6

respect to recruiting, admissions, and financial aid activities. APSCU members believe that schools will no longer be able to utilize legitimate business and organizational metrics that have a tangential relationship to student enrollment numbers when evaluating and compensating senior management. Moreover, schools will be unable to pay senior management commonly used performance bonuses.

19. Several APSCU members also expressed concern that the new regulations may interfere with long-term contracts with their schools' senior management employees that provide payments based on performance factors that may not be allowed under the new regulations. Schools therefore are faced with the prospect of renegotiating contracts with employees who may be unwilling to restructure their contracts, breaching these contractual arrangements, or violating the new regulations.

20. In addition, APSCU members stated that the compensation restrictions will make senior management positions at private sector schools appear less attractive to high-caliber executives. As a result, the regulations will impair schools' ability to hire and retain the best available management personnel to run their operations.

21. APSCU members also expressed concern based on the language in the new regulations and lack of clear departmental guidance about their continued ability to provide matching employer contributions to 401(k) plans or profit-sharing plans to some or all of their employees. APSCU members further questioned whether making changes to such plans to exclude only admissions and financial aid personnel from participating could implicate other federal laws.

22. For the reasons identified above, the Compensation regulations are requiring schools to dramatically revamp their employee-compensation policies and procedures. It is,

however, proving difficult for APSCU members to change their compensation systems from those that complied with the previous regulations' clear guidance to regimes that comply with the new regulations' vague standards; it is not clear what policies and procedures would satisfy those nebulous standards.

23.     APSCU members also expect that *qui tam* lawsuits will increase once the Compensation regulations go fully into effect, which will divert valuable resources from educating and training students. Issues of employee compensation have given rise to numerous *qui tam* lawsuits over the years; the increased regulatory uncertainty will increase the opportunity for such opportunistic litigation.

24.     For the preceding reasons, APSCU members believe that the Compensation regulations will irreparably harm and injure their students and schools if allowed to go fully into effect.

**Misrepresentation**

25.     Under the new Misrepresentation regulations, schools may be subject to severe penalties, including potential termination from participating in Title IV programs, for immaterial misstatements made without any intent to deceive, whether made by the school itself or by a third-party on its behalf.  34 C.F.R. §§ 668.71-75 (2010).

26.     APSCU members expressed concern that their schools could be liable for innocent mistakes or statements that have only a mere "tendency" to deceive, which is undefined under the new regulations and could potentially be applied broadly to a wide range of informational materials. APSCU members were particularly concerned that the new regulations' lack any materiality or intent-to-deceive requirements. APSCU members stated these new

standards are unclear and significantly increase regulatory uncertainty and liability risks for their schools.

27. APSCU members believe these risks are particularly severe because the new regulations eliminate schools' procedural rights to notice and an opportunity for a hearing before the Department may impose sanctions against them.

28. APSCU members stated that the expanded regulatory and liability risk of disseminating information under the new regulations is causing schools to modify their policies and procedures for communicating with prospective students and the public. APSCU members stated these efforts have already begun at their schools and are causing school officials to re-examine the information they provide to the public, even if they believe the information is accurate. APSCU members expressed the belief that their schools will reduce the amount of information they provide to potential and current students in order to limit their exposure to unfair and punitive sanctions under the Misrepresentation regulations.

29. APSCU members stated that these effects may be particularly harmful for working adults, single parents, and other nontraditional students who benefit most from informational materials and outreach efforts informing them of educational opportunities that fit alongside with their other obligations and responsibilities. APSCU members believe that these regulations will inadvertently result in students having less information to make informed decisions about their education and that they will make different decisions as a result.

30. APSCU members stated that their schools will incur significant expenses to make changes to their policies and procedures and to review and revise the informational materials sent by their schools and their third-party vendors to potential and current students.

31. APSCU members are fearful that False Claims Act *qui tam* lawsuits will be filed challenging so-called "misrepresentations" that are nothing more than innocent, immaterial errors or omissions. These potential lawsuits have the potential to impose significant costs and divert valuable resources from educating and training students.

32. For the preceding reasons, APSCU members believe that the Misrepresentations regulations will irreparably harm and injure their students and schools if allowed to go fully into effect.

\* \* \*

I hereby declare under penalty of perjury that the forgoing is true and correct.

Executed in Washington, D.C.
Dated: February 25, 2011

*[signature]*
Harris N. Miller