# EXHIBIT 3

## Declaration of Clark D. Elwood

I, Clark D. Elwood, hereby state and declare as follows:

1.      I currently serve as the Executive Vice President, Chief Administrative and Legal Officer of ITT Educational Services, Inc. ("ITT").  ITT has more than 125 campuses in more than 38 states and combined with its online programs educates more than 80,000 students each year in fields such as Information Technology, Electronics Technology, Drafting and Design, Business, Criminal Justice, and Health Sciences.  ITT has been educating students as part of the higher education community since 1969.

2.      ITT's student body is broad and diverse and includes many non-traditional students that are drawn to ITT's flexible, hands-on programs and course offerings.  As of December 31, 2010, approximately 34% of ITT's students were age 31 or over and approximately 49% were non-white.

3.      As of December 31, 2010, ITT had approximately 6,327 full-time employees and 4,526 part-time employees, including 2,900 professional recruiting and financial aid personnel.

4.      ITT has expressed concern with the new Compensation regulations (34 C.F.R. § 668.14(b) (2010)) and Misrepresentation regulations (*id.* § 668.71-75) for several months.  *See* ITT Educational Services, Inc., *Public Comment*, No. ED-2010-OPE-0004-0324, *available at* www.regulations.gov ("ITT Comment Letter").  The final regulations, which apply to ITT, its employees, and its students, did not address most of the concerns that ITT identified in its comment letter.  Notwithstanding the significant regulatory uncertainty and confusion created by the new regulations, ITT has already begun efforts to try to comply with the regulations, and these efforts will continue over the next several months before the regulations' July 1 effective date.

5.      As described in greater detail below, the new Compensation and Misrepresentation regulations are having adverse effects on ITT's operations and its ability to serve its students. These harms will only increase as ITT continues to make implementing changes in response to the new regulations.

**Compensation Regulations**

6.      The initial implementation of § 1094(a)(20), which was enacted as part of the Higher Education Amendments of 1992, caused confusion about what types of payments to employees engaged in recruiting, admissions, and financial aid were permitted and prohibited, including how often and to what extent enrollment data could impact those determinations.  The Department of Education's (the "Department") efforts to provide guidance to schools on this issue was often contradictory, limiting their usefulness.  *See, e.g.,* Letter from Brian Kerrigan, Dep't of Educ., to Charles Galland, Corporate Counsel, Computer-Ed, Inc. (July 8, 1997) (only annual adjustment allowed); Letter from Jeffrey Baker, Dep't of Educ., to Alice Kurz, Arthur Andersen & Company (Jan. 23, 1996) (only annual adjustment permitted); Letter from Brian Kerrigan, Dep't of Educ., to Stanley Freeman, Powers, Pyles, Sutter & Verville (Apr. 3, 1996) (upward adjustment only) [Attached hereto as Exhibits A-C].

7.      As a result, ITT was forced to operate with significant regulatory uncertainty regarding whether its compensation policies were in compliance, making it hard to manage its operations.

8.      In response, the Department adopted twelve clarifying regulations in 2002 (the "Clarifying regulations"), which provided schools with clear instructions on what types of compensation were permissible.  34 C.F.R. § 668.14(b)(22)(ii)(A-L) (2002).

9.      Among other things, these regulations enabled ITT to confidently pay its employees merit-based salaries and to provide competitive compensation packages to senior management.  As with any business, being able to compensate personnel based on how well they perform their duties allowed private sector schools like ITT to attract and retain quality recruiting, admissions, and financial aid personnel, as well as other employees like career counselors whose jobs may tangentially involve them in recruiting, admissions, and financial aid decisions.  Employing dedicated and talented people in such positions has enabled ITT to reach and admit thousands of prospective students who have benefited from ITT's programs, and who might otherwise never have learned about the educational and financial aid opportunities available to them.

10.     The recently promulgated Compensation regulations eliminate all twelve clarifying regulations without replacing them with any helpful guidelines.  They thus return all interested stakeholders to the pre-2002 *status quo*, in which schools were left without any meaningful guidance about how to legally compensate their employees.

11.     Numerous organizations, including ITT, provided extensive comments to the Department expressing concerns over this proposed regulatory approach.  For example, ITT explained that the breadth of the regulations' definitions would leave schools with "no substantive evaluative factors" upon which to base employee salary determinations, meaning that institutions "would be precluded from paying [their] employees based on how well they perform their jobs," effectively banning merit-based salaries.  ITT Comment Letter at 5-6.  ITT further explained that the regulations impermissibly extended the scope of the statute to limit schools' ability to compensate personnel—like school presidents, career placement personnel, and athletic coaches— whose core job responsibilities are unrelated to recruiting, admissions, and financial

aid. *Id.* at 5.  As ITT explained, Congress prohibited certain forms of compensation "*only* to those persons or entities engaged in any student recruiting or admissions activities or in making decisions regarding the award of student financial assistance," not to everyone connected to the institution. *Id.* at 7.  ITT also explained that the proposed regulations generated uncertainty about whether schools could fire underperforming employees, or whether terminating an employee would be viewed as an impermissible salary adjustment. *Id.* at 6.

12.     In my judgment, the Department has failed to respond to comments that its new regulations would revive the troubling uncertainty that inhibited the regulated community before the adoption of the Clarifying regulations in 2002.  As noted in the public comments to the record—and unaddressed by the Department in the final rule—the regulatory uncertainty the new regulations will generate will have harmful effects on both schools and students, requiring additional resources to be spent on compliance and defending against litigation and enforcement efforts rather than educating and training students.

13.     In particular, the Compensation regulations will prevent ITT from paying employees with responsibilities over recruiting, admissions and financial aid activities—perhaps even including its Chief Executive Officer and career counselors—merit-based salaries.  This will have significant effects on the composition of ITT's workforce.  As ITT understands the Compensation regulations, it will be difficult, if not impossible, for it to devise a compensation regime that rewards employees for good performance for completing their on-the-job duties. ITT strongly expects that as compensation converges for high-quality and low-quality employees, its high-quality employees will experience dissatisfaction in their jobs and seek out employment opportunities in industries capable of compensating them according to their workplace contributions.  Because the Compensation regulations extend their reach to regulate

compensation even for senior management, ITT expects that this "talent drain" will also alter the composition of its executive ranks.

14.     ITT relies on its well-trained and qualified recruiting and financial aid officials to interact with prospective and current students and inform them of available educational opportunities.  High-performing management and recruiting personnel are important for locating, enrolling, and educating students who will benefit from ITT's educational programs.  These individuals can help students navigate the complexities that litter the pathway between a desire to increase one's earning potential through additional education and making that education a reality.

15.     As quality employees leave for other industries as a result of the Compensation regulations, however, ITT will become less able to help prospective students achieve educational and employment success.  In fact, as the quality of outreach programs decreases with the quality of its workforce, ITT will be able to inform fewer prospective students about the benefits available from its programs, which means that some prospective students who may have benefited from enrolling in one of those programs will never learn about them.  The Compensation regulations will therefore adversely affect student interests.  This is particularly true for ITT's non-traditional students who benefit most from informational outreach efforts.

16.     In sum, ITT expects that the Compensation regulations will affect not only its workforce, but also the size and composition of its student body.

17.     Indeed, based on the Department's actions thus far, ITT is unsure of what new policies and procedures must be implemented to comply with the regulations.  Since the publication of the proposed Compensation regulations in June 2010, and particularly since the promulgation of the final regulations in October 2010, ITT has struggled to devise compensation

regimes for its thousands of recruiting, admissions, and financial aid employees that will enable it to retain its top-quality personnel while complying with the regulations' broad prohibition. ITT has had difficulty identifying any "standard evaluative factors," upon which it could base compensation for such employees that would not fit the Compensation regulations' definition of "indirectly[] upon success in securing enrollments."  ITT has faced similar struggles devising ways to compensate its senior management personnel who may have some responsibility for recruiting, admissions, or financial aid.

18.     In fact, there is the possibility that despite their best efforts at compliance, ITT may be unable to craft policies that both properly reward employees and fully satisfy every conceivable interpretation that could be given to the regulations.  The lack of adequate regulatory guidance increases the severity of the potential consequences under the Compensation regulations.  Accordingly, although ITT has invested, and will continue to invest, considerable time, money, and effort in devising ways to comply with the new Compensation regulations, it has no reasonable assurance that its actions will actually be deemed compliant by the Department or courts.

19.     ITT believes that the costs of implementing the new regulatory regime will be multiplied by self-interested relators and plaintiffs' lawyers, who are likely to seize on the ambiguity in the Compensation regulations to force it to defend against False Claims Act accusations.  Defending against such lawsuits is expensive and requires ITT to divert resources from its educational mission to cover litigation costs.

**Misrepresentation Regulations**

20.     Section 487 of the Higher Education Act ("HEA") prohibits institutions that receive Title IV funds from engaging in "substantial misrepresentations" regarding their educational program(s), financial charges, or the employability of their graduates.

21.     As ITT understands the new Misrepresentation regulations, they could be applied by the Department or private litigants in *qui tam* False Claims Act cases to try to hold schools liable for insignificant statements, immaterial statements, statements that have a mere tendency to confuse, statements made without any intent to deceive, and statements made by remote third parties.  Imposing sanctions under such a regulatory regime could irreparably harm schools that, for example, mail a brochure that contains a non-material, yet inaccurate statement.  For example, under the new regulations, a school could lose its eligibility to participate in Title IV programs if it publishes a catalogue that contains a minor misprinting of the school's tuition price, even if the school promptly ceases distributing the flawed catalogue once it becomes aware of the error.

22.     The new Misrepresentation regulations also do not require the Department to provide notice and opportunity for a hearing before imposing sanctions, which may include termination of participation in Title IV programs.  *See* 75 Fed. Reg. at 66,958-59.  Under the new Misrepresentation regulations, ITT could be completely barred from participating in Title IV programs based on allegations that they are unable to investigate or defend themselves against before the Department.

23.     Numerous organizations, including ITT, expressed serious concerns with the Misrepresentation regulations.  For example, ITT explained that the regulations' elimination of schools' right to notice and an opportunity to be heard "denies [institutions] any due process

rights." ITT Comment Letter at 9.  ITT also explained that the breadth of the regulations'

definitions "could lead to absurd results." *Id.* at 10.  As ITT explained, under the regulations, an

institution would be liable for publishing a misrepresentation "if a typesetter . . . misprints the

tuition costs in the institution's catalog and the institution finds the error after some of the

catalogs are distributed, discards the remaining catalogs and reprints and redistributes new

catalogs." *Id.*  In effect, the Misrepresentation regulations' definitions are so broad that they

"make every error or mistake in any statement an actionable act of misrepresentation, even if no

deception was intended or actually occurred." *Id.*

24.     Instead of correcting or otherwise addressing these (and other) concerns, the

Department told schools to trust that it would act appropriately:

> [T]he Department has also always operated within a rule of reasonableness and
> has not pursued sanctions without evaluating the available evidence in
> extenuation and mitigation as well as in aggravation.
>
> The Department intends to continue to properly consider the circumstance
> surrounding any misrepresentation before determining an appropriate response.
> Depending on the facts presented, an appropriate response could run the gamut
> from no action at all to termination of an institution's title IV, HEA eligibility
> depending upon all of the facts that are present.

75 Fed. Reg. at 66,914.

25.     This approach provides insufficient guidance to the regulated community.  The

meaning of Regulations should be clear on their face.  Indeed, ITT needs clear guidance so that it

can properly implement policies and procedures to minimize the chances that its authorized

speakers will communicate anything to the public that could potentially meet the

Misrepresentation regulations' definition of a "substantial misrepresentation."  Substantial

misrepresentations are a serious matter that should be seriously punished.  Schools that make

material, intentional misstatements about their educational programs, costs, or the employability

of their graduates are rightly threatened with the loss of their ability to participate in Title IV

programs.  It is important to realize, however, that the loss of Title IV eligibility is a severe

sanction.

26.     Since the publication of the proposed Misrepresentation regulations in June 2010,

and particularly since the promulgation of the final regulations in October 2010, ITT has

engaged in a comprehensive effort to review its publications to minimize the risk that it will run

afoul of the Misrepresentation regulations.  These efforts have been complicated by the

uncertainty inherent in the Department's proposed approach to punishing misrepresentations.

ITT has no assurance that its good-faith efforts at compliance will comply fully and adequately

with the Department's intent or its understanding of which types of statements may have a

"tendency to deceive or confuse" or which may be reasonable for prospective students to rely

upon.  The lack of clear standards in the text of the regulations is particularly disconcerting

because the Department's understanding of those concepts may shift over time.

27.     This uncertainty will have real effects for ITT and its students.  The draconian

penalties possible under the Misrepresentation regulations for even trivial misstatements will

cause ITT to speak less and through fewer mechanisms than it would if the regulations had taken

a more reasonable approach toward misrepresentations.  The significant regulatory uncertainty

about what forms of communications could subject it to punishment is causing ITT to curtail or

otherwise make significant changes to its informational materials—not because current materials

are inaccurate, but simply to minimize regulatory risk.  ITT is already in the process of reviewing

its promotional materials to eliminate any statements that could possibly be construed as "having

a tendency to mislead."  ITT's efforts to review and revise its materials require it to expend

substantial time and incur significant costs.

28.     ITT anticipates that this review process, will not only change the content of its public communications but will also reduce their overall volume, thereby affecting students' ability to learn about its educational programs.  By changing the mix of information available to students, the Misrepresentation regulations will change the makeup of schools' student bodies. Indeed, a significant number of students—particularly non-traditional students who benefit tremendously from private sector programs—learn about the flexible, innovative programs available at ITT from the informational materials it publishes.  Without these materials, students are likely to alter their educational choices, or worse, never learn about the beneficial post-secondary educational opportunities available to them.  Less effective outreach means smaller student populations that are likely to be composed of a lower percentage of non-traditional students.

29.     ITT believes that the costs of implementing the new regulatory regime will be multiplied by self-interested relators and plaintiffs' lawyers and aggressive *qui tam* litigants, who are likely to seize on the ambiguities of the Misrepresentation regulations to force it to defend against False Claims Act claims.  ITT will have to divert significant resources from its educational programs to defend against these lawsuits.

* * *

I hereby declare under penalty of perjury that the forgoing is true and correct.

Dated: January 28, 2011

Clark D. Elwood

# EXHIBIT A



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF POSTSECONDARY EDUCATION

Mr. Charles Galland
Corporate Counsel
Computer-Ed, Inc.
100 Sylvan Road, G-500
Woburn, MA 01801

JL  8 1997

Dear Mr. Galland:

Thank you for your inquiry to our Customer Support Branch regarding the prohibition on commissioned salespersons contained in section 487(a)(20) of the Higher Education Act of 1965, as amended (HEA) and 34 CFR 668.14(b)(22). As you know, these provisions of the statute and regulations apply to institutions that participate in a program authorized by Title IV of the HEA, and prohibit the compensation of employees by means of bonuses, commissions, or other incentive payments based directly or indirectly on success in recruiting or enrolling students, or in awarding financial aid.

The Department believes the statute considerably narrows the kinds of compensation that may be legally granted to affected employees. In general, the Department has interpreted the statute to prohibit the payment of any bonuses, commissions, or other incentives that relate in any way to recruitment, enrollment, or financial aid, or the payment of bonuses, commissions or other incentives to employees involved in such activities that can be linked to the substance of their work. With this position as background, I will address in turn each of the compensation proposals you submitted.

The Department has determined that compensation based on quarterly, semi-annual, or annual performance evaluations of actual vs. budgeted enrollment numbers for admissions representatives violates this statutory prohibition. The Department in general has determined that the adjustment of compensation on a basis more frequent than annually is in all but name a system of compensation based on bonuses or commissions. In turn, the criterion for that compensation, success in actual vs. budgeted enrollment, is a direct measure of enrollment, one of the activities for which it is prohibited to pay bonuses or commissions.

The Department has determined that salary increases based solely on an evaluation of past performance of successful enrollment violates the statutory prohibition. However, the Department has determined that permanent annual salary increases for personnel engaged in recruitment or enrollment, or in the awarding of financial aid, that are based on factors touching on success in recruiting or enrolling students or awarding financial aid, along with other substantive criteria, would not violate the statutory prohibition. This compensation is lawful because it is a permanent adjustment to annual salary rather than a bonus or commission, and it is based on the overall job performance of an employee, rather than on a head count of enrollments, admissions, or financial aid awards.

Mr. Galland, page 2

The Department has determined that salary decreases that are based on the number of students the employee has enrolled violates the statutory prohibition. This type of adjustment to compensation makes it clear that the employee's overall compensation is based on a headcount of students enrolled, and thus consists of commissions on students enrolled.

The Department has determined that an incentive program based on the number of enrolled students who graduate from or complete a program does not violate the statutory violation. The Department believes that this type of student success-based compensation plan incorporates the statute's intent to eliminate the incentive to recruit and enroll unprepared students.

The Department has determined that an incentive program based on the employment of students does violate the statutory prohibition. The determination above regarding compensation based on graduation or completion is a narrow exception to the general rule regarding compensation by way of bonuses or commissions. However, a plan based on employment differs from the plan based on graduation or completion in that a student's employment, unlike a student's graduation or completion, is not directly related to the student's success in the course of study for which he or she was recruited and enrolled. A student who gains employment may have been equally successful in securing that employment even if he or she had not been successful in the training program, or even if he or she had not been recruited and enrolled in that program.

The Department has determined that a requirement that an admissions representative meet enrollment goals in order to retain employment does not violate the statutory prohibition, since this requirement does not involve the payment of bonuses, commissions, or other incentives.

I hope this answers all your questions. If you have further questions, please do not hesitate to contact me.

Sincerely,

*Brian Kerrigan*

Brian Kerrigan
Deputy Director, Policy, Training and Analysis Service
Student Financial Assistance Programs

# EXHIBIT B



JAN 2 3 1996

**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF POSTSECONDARY EDUCATION

Alice Kurz
Arthur Andersen & Company SC
Suite 1000
1 Renaissance Square
2 North Central
Phoenix, AZ 85004

Dear Ms. Kurz:

This letter is to confirm in part your conversation with David Lorenzo of my staff regarding your client's compensation program. You specifically asked if the components of that program were in compliance with the prohibition of commissioned salespersons contained in section 487(a)(20) of the Higher Education Act of 1965 as amended (HEA), and 34 CFR 668.14(b)(22). As you know, these provisions of the statute and regulations prohibit the compensation of employees by means of bonuses, commissions, or other incentive payments based directly or indirectly on success in recruiting or enrolling students, or in awarding financial aid. I will address in turn each section of the compensation program you submitted. My response to the first section of the compensation plan will differ in part from the guidance you were previously given.

After further discussions among staff, the Department has determined that certain provisions of the "Admissions Review Plan" contained in this compensation program violate the prohibition against commissioned salespersons contained in the statute and regulations. This plan compensates groups of employees by means of salary adjustments based on a number of factors, including the number of students who register for class and the number of students who register as a percentage of the number of inquiries received. While this plan compensates employees by means of salary adjustments, and that compensation is tied to a number of substantive criteria other than the recruiting and enrollment of students, and the awarding of financial aid (both of which are necessary elements if such a plan is to avoid violating the prohibition), the Department is concerned by two other elements in the plan. First, the Department is concerned by the short (semiannual) evaluation period contained in this plan. Anything other than straight annual salary adjustments paid on the basis of substantive criteria that include the recruiting and enrollment of students, and the awarding of financial aid, give the appearance that the adjustment is a bonus or commission. Second, the fact that salaries may be adjusted up or down semiannually reinforces the appearance that these adjustments are bonuses or commissions. The Department believes that in order for your client to remove the statutory violation from this plan, the provision for downward adjustments of salary must be removed.

The Department has determined that the "Representative Plan for Success Quarterly Award Program" contained in this compensation program violates the prohibition

Ms. Kurz, page 2.

contained in the statute and regulations. This plan awards bonuses to members of work groups based on group and individual ratings that measure success in recruiting and enrollment. Because the plan awards bonuses based on activities for which the statute prohibits the award of any incentive payment, it is prohibited as a compensation plan.

The Department has also determined that the "Discretionary Annual Quality Award Program" contained in this compensation program violates the prohibition contained in the statute and regulations if persons working in the areas of recruitment, enrollment, or the award of financial aid participate in the program. This plan awards a prize to team members based on their annual achievements in their work areas. Because such a plan would entail an incentive payment based on success in recruiting and enrolling students, or awarding financial assistance, the institution may not allow persons who recruit or enroll students, or award financial aid, to participate in this plan.

I hope this answers your questions. Please feel free to contact my staff if you have further questions.

Sincerely,

Jeffrey Baker, Director
Policy Development Division
Student Financial Assistance Programs

# EXHIBIT C



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF POSTSECONDARY EDUCATION

Mr. Stanley A. Freeman
Powers, Pyles, Sutter & Verville
Third Floor
1275 Pennsylvania Avenue, NW
Washington, DC 20004-2404

APR - 3 1996

Dear Mr. Freeman:

Thank you for your letter of February 13 regarding payment plans for institutional personnel covered by the prohibition contained in section 487(a)(20) of the Higher Education Act of 1965, as amended (HEA) and 34 CFR 668.14(b)(22). In your letter you referred to two payment plans for these personnel proposed by your clients, and asked for the Department's interpretation of the legality of those plans.

The Department has determined that the first plan, in which admissions representatives are paid a bonus on graduates, but are paid in advance at the rate of 50% of the admissions for which the representative was responsible (the historical record of the institution's retention rate), violates the statute. Payment rendered in advance of actual graduation, based on the institution's retention record, is contrary to the Department's guidance regarding payments based on retention contained in the Notice of Proposed Rulemaking of February 28, 1994 ( 59 FR 9539). In that notice, the Secretary deemed such retention-based bonus plans to be in violation of the statute. The Secretary reiterated this guidance in response to commenters in the preamble to the April 29, 1994 Interim Final Rule (59 FR 22377). The plan you described, even though it allows for the debiting of amounts of the bonus that exceed the actual number of graduates, is essentially a bonus plan based on retention. In order for an institution to be in compliance with the statute and employ a plan that compensates personnel based on graduates, any payments must be made subsequent to actual graduations.

The second plan compensates admissions representatives on the basis of salary adjustments that are tied to twice-yearly reviews of performance measures that include admissions interviews yielding enrollments and class starts, as well as other substantive criteria. The Department considers this plan to be in compliance with the statute *except for the provision for downward adjustments of salary*. As stated in the letter of September 8, 1995, attached with your submission, the Department considers plans containing salary *increases* based in part on admissions, enrollments, or awarding of financial aid, to be in compliance with the statute. The Department, however, deems those plans based on evaluations that include both upward and downward adjustments of salary, especially when evaluations occur several times a year, to be in essence bonus or commission plans.

Our mission is to ensure equal access to education and to promote educational

Mr. Freeman, page 2.

Therefore, in order to meet the requirements of the statute, the institution must revise this second plan to eliminate the possibility for downward adjustments of salary if the adjustments are still to be based in part on the admissions and enrollment of students. You should also note that the Department believes that these types of plans meet the requirements of the statute only if, as is the case with this plan, the criteria that form the basis for employee evaluation also include substantive items other than measures of student recruitment and enrollment, and the awarding of financial aid.

I hope this answers your questions fully.  If you have further questions, please do not hesitate to contact us again.

Sincerely,

Brian Kerrigan
Deputy Director
Policy, Training and Analysis Service
Student Financial Assistance Programs