# EXHIBIT 5

Case 1:11-cv-00138-RMC   Document 15-6   Filed 02/25/11   Page 1 of 8

## **Declaration of Stan A. Mortensen**

I, Stan A. Mortensen, hereby state and declare as follows:

1.     I currently serve as the Executive Vice President and General Counsel of Corinthian Colleges, Inc. ("Corinthian"). Corinthian has over 100 Everest, Heald and WyoTech campuses in 25 states in the United States, and 17 campuses in the Province of Ontario, Canada. Many of Corinthian's institutions also offer online degrees. As of September 30, 2010, Corinthian had a total enrollment of more than 113,000 students. Corinthian offers diploma and degree programs that prepare students for careers in growing industries or for advancement in their chosen fields. Corinthian's program areas include health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology. Corinthian educates many non-traditional students who benefit from its hands-on, flexible educational programs.

2.     Corinthian has long supported the prohibition in the Higher Education Act ("HEA") on schools providing "bonus[es]," "commission[s]," and "other incentive payments" to admissions or financial aid personnel for success in securing enrollments or awards of financial aid. 20 U.S.C. § 1094(a)(20). Moreover, the meaning of these terms is clear, and compliance with this prohibition should not have been difficult. Unfortunately, since its adoption in 1992, the Department has construed it in varying, often inconsistent ways that have created significant regulatory uncertainty for schools and their students.

3.     The initial implementation of § 1094(a)(20) in the early 1990s caused considerable confusion among institutions of higher education about what types of compensation were permitted and prohibited. Before the promulgation of the 2002 regulations, schools like Corinthian had difficulty determining whether—and under what circumstances—*adjustments* to

***fixed salary compensation*** for admissions or financial aid personnel could be made in a manner that complied with the statutory prohibition as interpreted by the Department. The resulting uncertainty made it difficult for schools to manage their operations.

4. The Department responded to this uncertainty in 2002, when it adopted twelve clarifying regulations, which provided schools with clear, consistent instructions on what types of compensation were permissible. 34 C.F.R. § 668.14(b)(22)(ii) (2002). As with any business, being able to compensate personnel based on how well they perform their duties, as provided for by the 2002 regulations, allowed private sector schools like Corinthian to attract and retain quality recruiting, admissions, and financial aid personnel. Employing dedicated and talented people in such positions has enabled Corinthian to reach and admit thousands of prospective students who have benefited from Corinthian's programs who might otherwise never have learned about the educational and financial aid opportunities available to them. Indeed, the premise of President Obama's goal to have the highest proportion of students graduating from college in the world by 2020 is that not enough Americans are currently taking advantage of higher education services. If schools are unable to recruit, fairly compensate, and retain those admissions personnel whose job it is to counsel and encourage potential new students to enroll in higher education institutions suitable for their needs, overcoming these challenges will be even more difficult.

5. The recently promulgated Compensation regulations, 34 C.F.R. § 668.14(b) (2010), which apply to Corinthian and its employees, eliminate all twelve clarifying regulations, and make the task of complying with the prohibition much more problematic.

6. Numerous organizations, including Corinthian, provided extensive comments to the Department expressing concern regarding the elimination of the 2002 clarifying regulations.

*See* Corinthian Colleges, Inc., *Public Comment*, No. ED-2010-OPE-0004-0621.1, at 8-14, *available at* www.regulations.gov ("Corinthian Comment Letter"). In its comment letter, Corinthian identified several serious flaws in the substance of the Department's regulatory proposal. For example, Corinthian explained that the proposed Compensation regulations' effective prohibition on merit-based compensation was inconsistent with both the text and congressional intent of the compensation restriction in the "HEA". *Id.* at 9. Corinthian also explained that unlike the proposed regulations, the HEA "makes no reference to" individuals "all the way [at] the top of institutions," but rather "covers only those involved in recruiting, admissions, and financial aid." *Id.* at 11. Further, Corinthian pointed out that nearly every performance-based "standard evaluative factor" that could be used to set and adjust employee compensation is, at least under the Department's interpretation, arguably indirectly related to success in recruiting and securing enrollments. Corinthian also explained that the Department's regulations would expose even schools acting in good faith to severe litigation risk by requiring them to prove a negative—that no part of an employee's salary was in any way connected to recruiting success—to avoid liability. *Id.* at 13-14. Finally, Corinthian noted that the Department's proposed regulations failed to satisfy the requirements of reasoned decisionmaking by offering only "generalities and vague allusions" to justify its proposed regulatory changes. *Id.* at 13. In my judgment, the Department did not respond to, much less remedy, most of the problems Corinthian highlighted in its letter.

    7.    The Compensation regulations create significant regulatory uncertainty and risk if Corinthian attempts to make merit-based adjustments to the fixed salary compensation of its admissions and financial aid personnel. Indeed, self-interested *qui tam* lawyers may argue that such adjustments are based, *in part, indirectly*, on success in securing enrollments. This

uncertainty is likely to have significant negative effects on the composition, productivity and morale of Corinthian's workforce, and in turn, on its student body.

8.  In an attempt to mitigate these concerns, Corinthian has already engaged the services of a leading compensation consulting firm and a leading education regulatory law firm to assist it in designing and implementing a compliant employee performance management and compensation program for admission and financial aid personnel. We expect to pay these firms in excess of $500,000, collectively, in support of these efforts.

9.  But even using these external expert services, Corinthian anticipates that the Compensation regulations will still subject it and its students to significant regulatory uncertainty and risk regarding its compensation practices. Uncertainty as to Corinthian's ability to evaluate, compensate and promote those employees who demonstrate excellent job performance will have a material adverse impact on Corinthian and its students, whose educational experiences depend on the quality and professionalism of Corinthian's employees. This is particularly true for Corinthian's non-traditional students who are often the least well-informed about the beneficial educational opportunities available to them and who therefore benefit the most from informational outreach and recruiting efforts. Therefore, Corinthian expects that the Compensation regulations will negatively affect not only its workforce, but also the size and composition of its student body.

10.  In addition, the Department's statutorily unsupported extension of the Compensation regulations not just to those "engaged in" student recruitment or admissions, but also to "any higher level employee with *responsibility for* recruitment or admission of students or making decisions about awarding title IV HEA program funds," potentially subjects all management personnel in an institution to the incentive compensation prohibition. Even after

4

engaging with a leading law firm and compensation consulting firm, Corinthian is still at a loss regarding how it is supposed to comply with this prohibition.

11. The Department's guidance in the final regulations' preamble is of minimal use. In response to questions from commenters about whether the proposed regulations would permit a college president to receive a bonus for meeting an institutional goal of increasing minority graduation, the Department provided the following unhelpful guidance:

> [T]he actions of a college president could potentially come within the HEA's prohibition on the payment of incentive compensation. However, the Department does not see how mere attendance at an open house or speaking with prospective students about the value of a college education or the virtues of attending a particular institution would violate the incentive compensation plan [*sic*]. Other activities should be evaluated within the context of the Department's previously discussed two-part test to receive assistance as to whether a particular activity is permissible.

75 Fed. Reg. 66,832, 66,874 (Oct. 29, 2010).

12. Whether certain *activities* of a college president would constitute securing enrollments, however, evades the heart of the matter, which is that college presidents are almost always the highest-level employee with "**responsibility for** recruitment or admission of students." Thus, whether or not attending an open house constitutes recruiting is irrelevant. The important consideration is whether, under the Compensation regulations, presidents'—or other senior executives'—responsibility for recruiting, admissions, and financial aid precludes their compensation from being based, "in any part, directly or indirectly," on their school's success in securing enrollments.

13. If so, and if the Department stands by its claim that something is "indirectly" related to success in securing enrollments if it is only possible as a result of enrollments, *see* 75 Fed. Reg. at 66,874, the Compensation regulations would seem to prohibit compensating university presidents—and other senior executives—on the basis of most, if not all, measures of

5

institutional success; after all institutional success is usually only possible if schools are first successful in enrolling students. Indeed, in the guidance noted above, the Department did not dispute that under its view, increased minority graduation rates are "indirectly" tied to enrollment and thus cannot be the basis for any compensation to a college president.

14. Commenters also asked whether extending the HEA's compensation restriction to cover management personnel and others with responsibility for recruiting, admissions, and financial aid activities would prohibit institutions from rewarding athletic coaches whose student athletes stay in school and graduate. Again the Department's response was unhelpful. The Department simply stated that it " does not consider 'bonus' payments made to coaching staff . . . to be prohibited if they are rewarding performance . . . such as a successful athletic season, team academic performance, or other measures of a successful team." 75 Fed. Reg. at 66,874.

15. This guidance is confounding, particularly in light of the Department's discussion of the Compensation regulations' prohibition on graduation-based payments, which according to the Department violate the HEA because they are "'indirectly' based upon securing enrollments—that is, unless the student enrolls, the student cannot successfully complete an educational program." 75 Fed. Reg. at 66,874. But successful athletic seasons—like graduation—are only possible if students enroll. Indeed, successful athletic seasons appear to be even more closely related to recruiting than graduation because such seasons are difficult to achieve if recruiting efforts have been unsuccessful. The apparent inconsistency as to what it means for compensation to be "indirectly" related to success in securing enrollments that emerges from these two examples generates significant, harmful regulatory uncertainty for schools who are attempting in good faith to design compliant compensation regimes.

6

16. In sum, the Department's guidance and rationales are internally inconsistent as well as inconsistent with the text and congressional intent of the HEA. In light of such incoherence, a practitioner is left merely with the hope that the Department will act reasonably in its enforcement actions. That is not enough.

17. Moreover, even if the Department acts reasonably, *qui tam* relators and their counsel are unlikely to do so. They will seize on the vague regulatory language and conflicting departmental guidance to subject schools like Corinthian to costly and drawn-out litigation. As a result, the Compensation regulations force Corinthian and other schools to endure enormous risks even after engaging in good faith efforts to design compliant compensation plans for its employees engaged in recruiting, admissions, and financial aid, as well as any of its employees who could arguably be said to have "responsibility for" the school's recruiting, admissions, or financial aid activities. Despite their best efforts, Corinthian and other schools may face crippling litigation exposure from self-interested *qui tam* relators and their counsel, even if the Department concludes that their compensation plans are compliant with the new regulations.

* * *

I hereby declare under penalty of perjury that the forgoing is true and correct.

Dated: January 31, 2011

_____
Stan A. Mortensen