# EXHIBIT 6

Case 1:11-cv-00138-RMC   Document 15-7   Filed 02/25/11   Page 1 of 7

## Declaration of Diane L. Thompson

I, Diane L. Thompson, hereby state and declare as follows:

1.  I currently serve as the Senior Vice President, Secretary and General Counsel of Bridgepoint Education ("Bridgepoint"), the parent corporation for Ashford University ("Ashford") and the University of the Rockies. Bridgepoint has universities with campuses in Clinton, Iowa and Colorado Springs, Colorado, and offers numerous online programs. Bridgepoint's combined educational programs offer approximately 1,300 courses and 65 degree programs. As of September 30, 2010, 77,129 students were enrolled in Bridgepoint's educational programs.

2.  Ashford and the University of the Rockies, which both offer on-campus and online programs, are regionally accredited by the Higher Learning Commission and offer Associate, Bachelor's, Master's, and Doctoral programs.

3.  By providing high-quality degree programs through on-campus and online offerings at its schools, Bridgepoint is reaching out to students seeking innovative, high-quality choices in higher education.

4.  Bridgepoint has previously expressed concerns with the proposed Compensation regulations (34 C.F.R. § 668.14(b) (2010)) and the Misrepresentation Regulations (34 C.F.R. § 668.71-75 (2010))—regulations which apply to Bridgepoint and its school employees. *See* Bridgepoint Education, Inc., *Public Comment*, No. ED-2010-OPE-0004-0349, *available at* www.regulations.gov ("Bridgepoint Comment Letter"). Now that the Department has adopted its final regulations, there are many aspects that continue to cause us concern regarding the potential effects on our students and schools.

5. Indeed, the new regulations lack meaningful regulatory guidance in several key areas and this uncertainty has impeded Bridgepoint's efforts to implement changes to try to comply with the new regulations. Coupled with the regulations' overly broad scope, Bridgepoint is concerned that its ability to continue to provide superior educational opportunities for its students may be adversely affected.

**Compensation Regulations**

6. In response to the notice of proposed rulemaking relating to the Compensation regulations, Bridgepoint submitted written comments stating that the proposed regulatory changes would have many harmful effects on Bridgepoint's students and schools. Bridgepoint Comment Letter at 5-10.

7. For example, Bridgepoint expressed concerns with the proposed wholesale repeal of clarifying regulations adopted by the Department in 2002 that had provided much needed guidance to the regulated community. Bridgepoint's comment letter further noted that the Department failed to provide any basis for eliminating the clarifying regulations beyond unfounded speculation and unsubstantiated anecdotes. Bridgepoint Comment Letter at 6.

8. In addition, Bridgepoint explained that the new Compensation regulations would force schools to abandon compensation structures tied to performance. Bridgepoint Comment Letter at 6. For example, the new Compensation regulations require schools to stop considering success in recruiting and identifying students most likely to benefit from their educational programs as part of evaluating employees whose very job is to reach out and help enroll such students. Bridgepoint Comment Letter at 7.

9. Bridgepoint's experience has been that employee performance and productivity are highest when tied to merit-based evaluation and compensation systems. Although there are other

regimes Bridgepoint schools can try to implement to comply with the new Compensation regulations, we strongly believe that merit-based evaluations are the best method for evaluating performance and basing appropriate salary levels and adjustments. Utilizing suboptimal performance factors to evaluate employees has the potential to harm both employees and students—employees perform to their full capabilities when their salaries are based on their job performance and students benefit from interacting and being served by such high-performing employees.

10. Bridgepoint is also concerned that the new regulations could inhibit the use of other common forms of employee compensation, such as employer contributions to 401(k) plans, which improve worker productivity and morale and provide a useful mechanism for employees to accumulate savings for their retirement years. Under the new regulations, such payments could be prohibited because they are arguably linked to school performance which itself is dependent, in part, upon student enrollments. We have learned that following the release of the regulations, the Department was specifically asked if schools had to discontinue making 401(k) contributions for their employees and that the Department failed to provide any meaningful guidance in this regard. This regulatory uncertainty and the potential applicability of the regulations to prohibit beneficial retirement contributions undermines the ability of Bridgepoint to compensate its employees in ways that align with their long-term interests and makes it harder to attract a high-quality workforce.

11. The new Compensation regulations are written in such a broad manner that they apply to school officials who are merely "responsible" for overseeing recruiting and financial aid efforts and have only a limited role with respect to those activities. Schools are being forced to change compensation plans for senior management who now may fall under the Department's regulatory

regime. This will likely require schools to eliminate bonuses and other types of payments commonly paid in every other sector of the economy to high-ranking employees merely because they exercise supervisory oversight over recruiting and financial aid functions at the school. This change away from merit-based compensation will make these high-level positions less attractive, making it more difficult for schools to continue to attract "top talent" for these jobs.

12. It is to the benefit of Bridgepoint's schools and students for the best and most talented individuals to serve in these high-ranking positions to help fulfill our educational mission which is to educate students in their chosen careers. It defies logic that executives involved with admissions and financial aid activities who have responsibility for perhaps the most critical aspect of a school's operation—providing outreach in a professional and informative manner to students—would be excluded from receiving merit-based pay for outstanding job performance.

13. Requiring non-performance based compensation structures not widely used for other executive positions will make it difficult to find high-caliber executives willing to serve in these key admissions and financial aid related positions. To continue to attract a similar caliber of managerial talent under the new regulations, Bridgepoint may be forced to increase significantly base-salaries for executives. But relying exclusively on fixed salaries to compensate senior admissions and financial aid personnel would significantly diminish incentives for hard work and high job performance among these executives. They would reap very little financial award for doing their job well, or conversely suffer little financial harm for performing poorly. This is a fundamental and pressing issue confronting Bridgepoint as it continues to try to identify ways to compensate executives that comply with the new regulations and align with student and school interests.

4

14.  Finally, the new Compensation regulations will no longer permit payments based on graduation and retention rates. Payments based on these metrics, however, help (a) ensure that school officials are focusing their recruiting efforts on students most likely to succeed in their educational programs and (b) incentivize employees to assist students in maintaining and completing educational programs. They work to achieve the very goals Congress envisioned when it enacted the statute and serve the interests of schools and students alike. Therefore, it makes no sense for the regulations to prohibit these forms of payments which Bridgepoint considers useful tools to fulfilling its educational mission.

**Misrepresentation Regulations**

15.  Bridgepoint supports the goal that institutions are clear and accurate in their communications with prospective students, enrolled students, parents, and other members of the public. Bridgepoint Comment Letter at 10. The new Misrepresentation regulations, however, are overbroad and subject schools to severe penalties for innocent, immaterial misstatements. Bridgepoint Comment Letter at 11.

16.  Bridgepoint is concerned that liability could be imposed for innocent misstatements made in a context far-removed from the recruiting process. For example, a school might make a clerical error in its annual report to its accreditor relating to its enrollment or student success metrics. Bridgepoint Comment Letter at 11. Because a prospective student might see the clerical error and the error might have a "tendency" to confuse the student, the school could be subjected to severe sanctions from the Department. These sanctions may be imposed under the new regulations even if the school quickly discovers and corrects the error.

17.  Bridgepoint is concerned that the regulations are so broadly written that it will be difficult for its schools, notwithstanding their best efforts at compliance, to be insulated from liability

risks for making innocent, non-material mistakes, and this accordingly will make it harder for schools to provide valuable informational materials to the public.

* * *

I hereby declare under penalty of perjury that the forgoing is true and correct.

Dated: January 31, 2011

*[signature]*
Diane L. Thompson