IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:11-cv-00138-RMC |
| v. | ) ) | |
| ARNE DUNCAN, in his official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants Arne Duncan, in his official capacity as Secretary of the Department of Education, and the Department of Education respectfully move to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, or, in the alternative, respectfully move for summary judgment in their favor on all of plaintiff's claims pursuant to Fed. R. Civ. P. 56(b), as there is no genuine issue of material fact precluding judgment in defendants' favor. Defendants do not request an oral hearing pursuant to Local Civil Rule 7(f).

Accompanying this motion is a memorandum of law in support of defendant's motion and in opposition to plaintiff's motion for summary judgment (Docket # 15). Defendants respectfully request that the Court grant their motion to dismiss, or, in the alternative, their motion for summary judgment, and deny plaintiff's motion for summary judgment, for the

reasons described in the memorandum.

Respectfully Submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch


 /s/ Marcia Berman
MARCIA BERMAN
Senior Trial Counsel
MICHELLE BENNETT
Trial Attorney
GREGORY P. DWORKOWITZ
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7132
Washington, D.C.  20530
Tel.: (202) 514-2205
Fax: (202) 616-8470
Email:  marcia.berman@usdoj.gov

Attorneys for Defendants.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2011, a true and correct copy of Defendants' Motion to Dismiss for Lack of Jurisdiction, or in the Alternative, for Summary Judgment, and a true and correct copy of Defendants' Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction, or in the Alternative, for Summary Judgment, and in Opposition to Plaintiff's Motion for Summary Judgment, was served upon plaintiff's counsel of record at the addresses listed below:

<u>Via ECF</u>:

Brian M. Boynton
WILMER CUTLER PICKERING HALE AND DORR, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6044
Email: brian.boynton@wilmerhale.com
ATTORNEY TO BE NOTICED

Derek S. Lyons
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036-5306
(202) 887-3722
Email: dlyons@gibsondunn.com
ATTORNEY TO BE NOTICED

Douglas R. Cox
GIBSON, DUNN & CRUTCHER, L.L.P.
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
(202) 955-8500
Fax: (202) 467-0539
Email: dcox@gibsondunn.com
ATTORNEY TO BE NOTICED

Randolph D. Moss
WILMER CUTLER PICKERING HALE & DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6640
Fax: (202) 663-6363
Email: randolph.moss@wilmerhale.com
ATTORNEY TO BE NOTICED

Timothy John Hatch
GIBSON, DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7368
Fax: (213) 229-6368
Email: thatch@gibsondunn.com
ATTORNEY TO BE NOTICED

Veronica S. Root
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036-5306
(202) 887-3539
Email: vroot@gibsondunn.com
ATTORNEY TO BE NOTICED

 /s/ Marcia Berman                           
MARCIA BERMAN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| ARNE DUNCAN, in his official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION, | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.
1:11-cv-00138-RMC

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. .................................................................................................... -iii-

INTRODUCTION ..................................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND. .......................................................... 2

    I.       The Compensation Regulations.. ............................................................................ 4

    II.      The Misrepresentation Regulations.. ...................................................................... 7

    III.    The State Authorization Regulations.. .................................................................... 8

ARGUMENT. .......................................................................................................................... 9

    I.       PLAINTIFF'S CHALLENGE TO THE COMPENSATION
           REGULATIONS FAILS .................................................................................... 10

          A.     This Court Lacks Jurisdiction Over Plaintiff's Speculative Claims
                About The Manner In Which The Compensation Regulations Will
                Be Applied Because Those Claims Are Not Ripe For Review ................ 10

          B.     Application Of The Incentive Compensation Ban To Salaries And
                Salary Adjustments That Are Based Directly Or Indirectly On
                Success In Securing Enrollments Or Financial Aid Is Consistent
                With The Higher Education Act.. ......................................................... 13

          C.     Application Of The Incentive Compensation Ban To Higher Level
                Employees With Responsibility For Recruitment, Admissions, Or
                Financial Aid Is Consistent With The Higher Education Act ................. 17

          D.     The Compensation Regulations Are Neither Arbitrary Nor
                Capricious.. .......................................................................................... 20

                1.     The Department Provided a Reasoned Analysis for
                        Changing Its Course .................................................................. 20

                2.     The Compensation Regulations Provide Sufficiently Clear
                        Guidance to Regulated Parties.. ................................................. 26

                3.     The Department Adequately Responded To Public
                        Comments.. ............................................................................... 29

II.      THE MISREPRESENTATION REGULATIONS DO NOT VIOLATE THE
         HEA, PLAINTIFF'S FIRST AMENDMENT RIGHTS, OR THE APA............. 31

         A.      Plaintiff's Statutory Claim is Not Ripe..................................................... 32

         B.      The New Regulations Do Not Impermissibly Expand "Substantial
                 Misrepresentations" Prohibited by Statute................................................ 33

                 1.      Consistent with the Statute, the New Regulations Apply
                         Only to Substantial Misrepresentations about the Nature of
                         a School's Educational Program, its Financial Charges, or
                         the Employability of its Graduates................................................. 33

                 2.      The New Regulations Do Not Diminish Plaintiff's
                         Procedural Rights............................................................................ 34

                 3.      The Secretary's Definition of Misrepresentation Is
                         Reasonable.. .................................................................................... 35

                 4.      The Regulations Contain a Materiality Requirement.................... 39

         C.      The New Regulations Do Not Violate Plaintiff's First Amendment
                 Rights.. ...................................................................................................... 40

                 1.      The Regulations Regulate Commercial Speech............................ 41

                 2.      The Regulations Prohibit False or Inherently Misleading
                         Speech Not Protected by the First Amendment.. ......................... 46

         D.      The Misrepresentation Regulations Are Not Unconstitutionally
                 Vague.. ....................................................................................................... 48

III.     THE STATE AUTHORIZATION REGULATIONS ARE LAWFUL.. .............. 49

         A.      Plaintiff Lacks Standing to Challenge the State Authorization
                 Regulations, and its Claims Are Not Ripe.................................................. 50

         B.      The State Authorization Regulations Do Not Violate the HEA.. ............. 54

         C.      The State Authorization Regulations Are Not Arbitrary Or Capricious... 57

CONCLUSION.................................................................................................................. 63

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(s)**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967), *overruled on other grounds in Califano v. Sanders*,
  430 U.S. 99, 105 (1977)..................................................................................... 11, 12

*Alexander v. Cahill*,
  598 F.3d 79 (2d Cir. 2010)............................................................................... 33, 40

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008).............................................................................................. 15

*Allen v. Wright*,
  468 U.S. 737 (1984).............................................................................................. 50

*Am. Acad. of Pain Mgmt. v. Joseph*,
  353 F.3d 1099 (9th Cir. 2004). ............................................................................ 47

*Am. Tel. & Tel. Co. v. FCC*,
  836 F.2d 1386 (D.C. Cir.  1988). ......................................................................... 59

*Ambrose v. New England Ass'n of Schools and Colleges, Inc.*,
  252 F.3d 488 (1st Cir. 2001). .............................................................................. 37

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*,
  143 F. Supp. 2d 7 (D.D.C. 2001). ....................................................................... 10

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................. 10

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992)............................................................................................... 26

*Atascadero State Hosp. v. Scanlon*,
  473 U.S. 234 (1985)............................................................................................. 51

*Bates v. State Bar of Ariz.*,
  433 U.S. 350 (1977)........................................................................................ 32, 36

*Bell Atlantic Tel. Cos. v. FCC*,
  131 F.3d 1044 (D.C. Cir. 1997). ..................................................................... 55, 56

*Beneficial Corp. v. FTC,*
    542 F.2d 611 (3d Cir. 1976) ........................................................... 37

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983) ......................................................... 41, 44, 45

*Camp v. Pitts,*
    411 U.S. 138 (1973) ........................................................... 10

*Career College Ass'n v. Riley,*
    74 F.3d 1265 (D.C. Cir. 1996) ........................................................ 60

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................... 10

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
    447 U.S. 557 (1980) ......................................................... 41, 44, 46

*\*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ................................................... passim

*Chrysler Corp. v. FTC,*
    561 F.2d 357 (D.C. Cir. 1977) ....................................................... 36, 37

*Consumer Elecs. Ass'n v. FCC,*
    347 F.3d 291 (D.C. Cir. 2003) ........................................................ 15

*Crete Carrier Corp. v. EPA,*
    363 F.3d 490 (D.C. Cir. 2004) ........................................................ 52

*Cronin v. FAA,*
    73 F.3d 1126 (D.C. Cir. 1996) ........................................................ 12

*Curtis Lumber Co. v. Louisiana Pacific Corp.,*
    618 F.3d 762 (8th Cir. 2010) ......................................................... 38

*FCC v. Fox Television Stations, Inc.,*
    129 S. Ct. 1800 (2009) ......................................................... 26

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................... 55

*FTC v. Brown & Williamson Tobacco Corp.,*
    778 F.2d 35 (D.C. Cir. 1985) ........................................................ 36

*FTC v. Civil Service Training Bureau,*
    79 F.2d 113 (6th Cir. 1935). ............................................. 37

*FTC v. Cyberspace.Com LLC,*
    453 F.3d 1196 (9th Cir. 2006). ........................................... 39

*FTC v. Freecom Commc'ns, Inc.,*
    401 F.3d 1192 (10th Cir. 2005). .......................................... 39

*FTC v. Nat'l Urological Grp., Inc.,*
    645 F. Supp. 2d 1167 (N.D. Ga. 2008). .............................. 49

*FTC v. Medlab, Inc.,*
    615 F. Supp. 2d 1068 (N.D. Cal. 2009). .............................. 39

*FTC v. Pharmtech Research, Inc.,*
    576 F. Supp. 294 (D.D.C. 1983). ........................................ 37

*FTC v. Transnet Wireless Corp.,*
    506 F. Supp. 2d 1247 (S.D. Fla. 2007). ........................... 37, 39

*FTC v. Verity Int'l, Ltd.,*
    443 F.3d 48 (2d Cir. 2006) ................................................ 37

*Farrin v. Thigpen,*
    173 F. Supp. 2d 427 (M.D.N.C. 2001). .............................. 38

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996). ............................................ 52

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985). .......................................................... 10

*Freedom Republicans, Inc. v. FEC,*
    13 F.3d 412 (D.C. Cir. 1994). ............................................ 51

*Garcia v. San Antonio Metro. Transit Auth.,*
    469 U.S. 528 (1985). .......................................................... 51

*Goodman v. FTC,*
    244 F.2d 584 (9th Cir. 1957). ............................................ 37

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991). .......................................................... 51

*Ibanez v. Fl. Dep't of Business & Prof. Regulation*,
    512 U.S. 136 (1994)..................................................................................... 41, 46

*Int'l Dairy Foods Ass'n v. Boggs*,
    622 F.3d 628 (6th Cir. 2010). ........................................................................... 47

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*,
    326 U.S. 310 (1945)......................................................................................... 56

*Joe Conte Toyota, Inc. v. Louisiana Motor Vehicle Comm'n*,
    24 F.3d 754 (5th Cir. 1994). ............................................................................ 47

*Johnson v. Hall*,
    Nos. 4:08-cv-2726-TLW-TER, 4:09-cv-0102-TLW-TER, 2010 WL 3724746
    (D.S.C. Aug. 23, 2010). .................................................................................... 47

*\*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939, 119 Cal. Rptr. 2d 296, 45 P.3d 243 (Cal. 2003)................................... passim

*Kraft, Inc. v. FTC*,
    970 F.2d 311 (7th Cir. 1992). .................................................................. 36, 37, 44

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................... 52

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)......................................................................................... 12

*Manley v. Wichita Business College*,
    237 Kan. 427, 701 P.2d 893 (Kan. 1985). ........................................................... 38

*Marwais Steel Co. v. Dep't of Air Force*,
    871 F. Supp. 1448 (D.D.C. 1994). ..................................................................... 60

*McConnell v. FEC*,
    540 U.S. 93 (2003), *overruled in part on other grounds by Citizens United*
    *v. FEC*, 130 S. Ct. 876 (2010)......................................................................... 50

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991)......................................................................................... 53

*Mother & Unborn Baby Care of N. Tex., Inc. v. Texas*,
    749 S.W.2d 533 (Tex. App. 1988)...................................................................... 49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................ 21

*Munsell v. Dep't of Agric.*,
    509 F.3d 572 (D.C. Cir. 2007). ............................................ 12

*N. Broward Hosp. Dist. v. Shalala*,
    172 F.3d 90 (D.C. Cir. 1999). .............................................. 59

*N.C. State Bar v. Culbertson*,
    177 N.C. App. 89, 627 S.E.2d 644 (Ct. App. 2006). ........................ 47

*Nat'l Cable & Telecomm. Assoc. v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)............................................................ 26

*Nat'l Cable & Telecomm. Assoc. v. FCC*,
    567 F.3d 659 (D.C. Cir. 2009). ............................................ 18

*Nat'l Comm'n on Egg Nutrition v. FTC*,
    570 F.2d 157 (7th Cir. 1977). ...................................... 36, 44, 45

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003).......................................................... 11, 12

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996). .......................................... 53, 54

*New York v. United States*,
    505 U.S. 144 (1992).......................................................... 50, 51

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998).......................................................... 51

*Peel v. Attorney Registration and Disciplinary  Comm'n of Ill.*,
    496 U.S. 91 (1990).......................................................... 46, 47

*Piazza's Seafood World, LLC v. Odom*,
    No. Civ. A. 04-690, 2004 WL 2998575 (E.D. La. Dec. 23, 2004). ...... 47

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
    344 U.S. 237 (1952).......................................................... 11

*Public Citizen, Inc. v. Louisiana Attorney Disciplinary Bd.*,
    632 F.3d 212 (5th Cir. 2011). .............................................. 47

*Public Citizen, Inc. v. NHTSA,*
     489 F.3d 1279 (D.C. Cir. 2007). ................................................................. 52, 54

*In re R.M.J.,*
     455 U.S. 191 (1982). ................................................................. 36, 46, 47, 48

*Rubin v. Coors Brewing Co.,*
     514 U.S. 476 (1995). ................................................................................. 41

*Rust v. Sullivan,*
     500 U.S. 173 (1991). ................................................................. 20, 21, 26

*Scott v. Ass'n for Childbirth at Home, Int'l,*
     88 Ill. 2d 279, 430 N.E.2d 1012, 58 Ill. Dec. 761 (1982). ................................. 49

*In re Shack,*
     177 N.J. Super. 358, 426 A.2d 1031 (N.J. Super. Ct. App. Div. 1981). .............................. 38

*Shays v. FEC,*
     337 F. Supp. 2d 28 (D.D.C. 2004). ....................................................................... 13

*Simon v. E. Ky. Welfare Rights Org.,*
     426 U.S. 26 (1976). ....................................................................................... 53

*Sistema Universitario Ana G. Mendez v. Riley,*
     234 F.3d 772 (1st Cir. 2000). ..................................................................... 56

*Smiley v. Citibank (S. Dak.), N.A.,*
     517 U.S. 735 (1996). ..................................................................................... 27

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.,*
     306 U.S. 118 (1939). ..................................................................................... 50

*Texas v. United States,*
     523 U.S. 296 (1998). ..................................................................................... 12

*Toilet Goods Assoc. v. Gardner,*
     387 U.S. 158 (1967). ............................................................................... 12, 13

*Trans World Accounts, Inc. v. FTC,*
     594 F.2d 212 (9th Cir. 1979). ..................................................................... 36, 37

*USA Group Loan Svcs., Inc. v. Riley,*
     82 F.3d 708 (7th Cir. 1996). ......................................................................... 3

*U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993)....................................................................... 59

*United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006). ....................................................... 4

*United States ex rel. Irwin v. Significant Educ., Inc.*,
    No. CV-07-1771-PHX-DGC, 2009 WL 322875 (D. Ariz. Feb. 10, 2009).......................... 25

*United States ex rel. Leveski v. ITT Educ. Servs.*,
    No. 1:07-CV-867-WTL-JMS, 2010 WL 1936118 (S.D. Ind. May 12, 2010). ..................... 25

*United States ex rel. Main v. Oakland City Univ.*,
    426 F.3d 914 (7th Cir. 2005). ........................................................ 4

*United States v. Alpers*,
    338 U.S. 680 (1950)...................................................................... 16

*United States v. Gonzales*,
    520 U.S. 1 (1997)....................................................................... 15

*United Transp. Union v. Interstate Commerce Comm'n*,
    891 F.2d 908 (D.C. Cir. 1989)........................................................... 52

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
    618 F.3d 417 (4th Cir. 2010). ......................................................... 37

*\*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)............................................................... passim

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................... 51

*Weaver v. U.S. Info. Agency*,
    87 F.3d 1429 (D.C. Cir. 1996). ..................................................... 34, 40

*Wieczorek v. Volkswagenwerk, A.G.*,
    731 F.2d 309 (6th Cir. 1984). .......................................................... 38

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985)................................................................ 36, 46, 48

## STATUTES, REGULATIONS AND LEGISLATIVE HISTORY

34 C.F.R. § 600.2................................................................................. 8

34 C.F.R. § 600.5. ............................................................................................ 8

34 C.F.R. § 668.14. ....................................................................................... 3, 5

34 C.F.R. § 668.71. ............................................................................... 3, 7, 8, 38

34 C.F.R. § 668.75. ......................................................................................... 35

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 9

Fed. R. Civ. P. 56. ........................................................................................... 9

59 Fed. Reg. 22,348 (Apr. 29, 1994). ............................................................ 4, 29

67 Fed. Reg. 67,048 (Nov. 1, 2002) ............................................................... 4, 5

74 Fed. Reg. 46,399 (Sept. 9, 2009). ................................................................ 2

75 Fed. Reg. 66,831 (Oct. 29, 2010). ......................................................... passim

75 Fed. Reg. 34,805 (June 18, 2010). ......................................................... passim

H.R. Rep. No. 102-447 (1992) ......................................................................... 4

H.R. Rep. No. 105-481 (1998) .............................................................. 54, 56, 57

H.R. Rep. No. 107-225 (2001) ....................................................................... 18

S. Rep. No. 102-204 (1991). .......................................................................... 17

S. Rep. No. 105-181 (1998). ............................................................. 54, 56, 57, 60

5 U.S.C. § 706 ............................................................................................. 57

15 U.S.C. § 45 ............................................................................................. 36

20 U.S.C. § 1001 .......................................................................... 8, 55, 57, 59

20 U.S.C. §1002 .......................................................................................... 55

20 U.S.C. § 1003 ..................................................................................... 55, 56

20 U.S.C. § 1070 ........................................................................................... 2

20 U.S.C. § 1085 (1991). ............................................................................. 17

20 U.S.C. § 1091 ....................................................................................................... 54

20 U.S.C. § 1094 .................................................................................................. passim

20 U.S.C. § 1099a ................................................................................... 55, 57, 59, 60

20 U.S.C. § 1099c ...................................................................................................... 55

20 U.S.C. § 1221e-3 ................................................................................................... 23

24 U.S.C. § 2461 ......................................................................................................... 7

## MISCELLANEOUS

Dep't of Educ., Dear Colleague Letter, Implementation of Program Integrity Regulations, (Mar. 17, 2011). ..................................................................................................... passim

## **INTRODUCTION**

Plaintiff Career College Association d/b/a Association of Private Sector Colleges and

Universities challenges the legality of three regulations promulgated by the United States

Department of Education (the "Department").  The regulations serve to strengthen the integrity of

the federal student aid programs authorized by Title IV of the Higher Education Act of 1965, as

amended ("HEA," or "Act"), to protect students and to safeguard the taxpayers' investment in

these programs.  Plaintiff's claims amount to abject speculation about draconian enforcement of

the regulations by the Department—speculation belied by the language of the regulations

themselves, statements in the preamble to the regulations, and subsequent regulatory guidance

issued by the Department regarding how it interprets and intends to enforce the regulations.  In

the event that any of plaintiff's unsubstantiated predictions of enforcement run amock actually

materialize, plaintiff is free to raise its claims at that time.  But it would be inappropriate for the

Court to issue what would amount to an advisory opinion on these issues now.

Plaintiff's claims also fail on the merits.  The challenged incentive compensation,

misrepresentation, and state authorization regulations are all permissible under the plain language

of the HEA; plaintiff's crabbed reading of that broad language is neither persuasive nor required.

The regulations give effect to Congress's intent (1) to restrict incentive compensation payments

made to recruiting and admissions personnel to ensure that they act in the best interest of students

rather than to maximize their own compensation; (2) to protect students and prospective students

from untrue or misleading statements about the nature of a school's educational programs,

financial charges, and employability of its graduates; and (3) to require state authorization of

schools receiving Title IV funds and enlist the states' assistance in protecting its student-citizens'

interests as consumers.  For these reasons, plaintiff's sweeping constitutional, statutory, and

administrative claims fail.

## STATUTORY AND REGULATORY BACKGROUND

Since Congress passed the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq.*, the federal government has provided financial assistance to millions of students wishing to earn a postsecondary degree. The Department each year distributes billions of dollars to postsecondary students through a variety of financial aid programs described in Title IV of the Act. In 2007 and 2008, 93.6% of full-time students at private, for-profit institutions; 56.6% percent at public institutions; and 70.0% at private, non-profit institutions, received federal aid. U.S. Dep't of Educ., Inst. of Educ. Scis., Nat'l Ctr. for Educ. Statistics, Amount Borrowed, *available at* http://nces.ed.gov/programs/digest/d09/tables/dt09_342.asp (last visited Mar. 18, 2011).

Congress has paid particular attention through the years to HEA program integrity. The Act itself contains a series of provisions designed to ensure that the federal financial aid programs Congress funds are indeed helping students who are vulnerable to abuse. Nevertheless, problems concerning the integrity of Title IV programs have continued to arise, and the Department has continued to work towards eliminating fraud and abuse in the administration of the Title IV programs.

In 2009, the Department established a negotiated rulemaking committee to prepare proposed regulations regarding improving Title IV program integrity. 74 Fed. Reg. 46,399 (Sept. 9, 2009). The Department had determined that the existing regulations, which were promulgated in 2002, had provided insufficient safeguards against fraud and abuse and had hampered vigorous enforcement of the statutory requirements. The rulemaking committee, comprised of

representatives from multiple interested communities such as students, public and private

institutions (including a representative of for-profit colleges and universities), admissions

officers, and financial aid administrators, discussed a number of topics but did not reach

consensus on all of the regulations that were ultimately adopted by the Department.[1]  *See* 75 Fed.

Reg. 66,832-33 (Oct. 29, 2010) (final rule); AR 789-90.

On June 18, 2010, the Department issued a notice of proposed rulemaking on program

integrity that was based on public input in the form of hearings and comments.  75 Fed. Reg.

34,805 (June 18, 2010); *see also* 75 Fed. Reg. at 66,833.  The proposed regulations governed

most of the issues debated by the committee, including incentive compensation,

misrepresentation, and state authorizations.  *Id.* at 34,808.  Over one thousand parties submitted

comments on the proposed regulations, many of which were form comments or substantially

similar.  75 Fed. Reg. at 66,833.  On October 29, 2010, the Department issued its final

regulations.  75 Fed. Reg. 66,831; *id*. at 66,950 (to be codified at 34 C.F.R. § 668.14); *id*. at

66,959 (to be codified at 34 C.F.R. § 668.71); *id*. at 66,946 (to be codified at 34 C.F.R. § 600.9).[2]

The challenged regulations become effective July 1, 2011.  *Id.* at 66,832.[3]

---

[1] Neither the Negotiated Rulemaking Act, nor the protocols adopted by the negotiated rulemaking committee, required the Department to reach consensus before adopting a final rule, nor was the Department compelled to accept the committee's recommendations in any areas in which consensus was reached.  *USA Group Loan Svcs., Inc. v. Riley*, 82 F.3d 708, 714-15 (7th Cir. 1996); Administrative Record ("AR") 754-55, 1044.

[2] The proposed and final regulations covered a wide array of topics not involved in this case such as monitoring grade point averages, defining a credit hour, defining a high school diploma for purposes of establishing eligibility to participate in federal student aid programs, and agreements between institutions of higher education.  *See* 75 Fed. Reg. at 34,806, 66,832.

[3] In its complaint, plaintiff cast various aspersions at the manner in which the Department conducted its negotiated rulemaking process.  *See* Complaint at ¶¶ 29-34.  In its

I.     The Compensation Regulations

The HEA prohibits educational institutions that receive Title IV federal student aid funds from "provid[ing] any commission, bonus, *or other incentive payment* based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance."  20 U.S.C. § 1094(a)(20) (emphasis added).  The ban was enacted to eliminate payments that Congress found rewarded the recruiting of unqualified students and students who would not benefit from particular post-secondary programs—a practice that led to ever-increasing student loan default rates with the government and taxpayers footing the bill.  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1168-69 (9th Cir. 2006); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005); Rep. No. 102-630, at 499 (1992) (Conf. Rep.); H.R. Rep. No. 102-447, at 343 (1992).

The regulations implementing the incentive compensation ban largely replicated the language of the statute until 2002. 59 Fed. Reg. 22,348, 22,427 (Apr. 29, 1994).  In that year, the Department substantially revised the regulations by creating twelve "safe harbors."  67 Fed. Reg. 67,048 (Nov. 1, 2002).  The Department identified twelve activities or arrangements as to which the Department would not take enforcement action.  The first safe harbor described the conditions under which an educational institution could pay compensation without that compensation being considered an incentive payment.  *Id*. at 67,054.  It permitted "[t]he payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that

_____

motion for summary judgment, however, plaintiff abandoned these assertions and claimed only that the Department failed to respond to all the relevant comments it received.

4

compensation [was] not adjusted up or down more than twice during any twelve month period, and any adjustment [was] not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2002).  In other words, it immunized incentive payments built into semi-annual compensation plans.  The remaining eleven safe harbors described "incentive payment[s] . . . that could be construed as based upon securing enrollments," but which the Department determined it would not take enforcement action against. 67 Fed. Reg. at 67,054.  As relevant here, these safe harbors permitted incentive compensation based on students' successful completion of an educational program, 34 C.F.R. § 668.14(b)(22)(ii)(E) (2002), and incentive compensation to managers who did not directly supervise employees who were directly involved in recruiting or admissions activities or the awarding of financial aid.  *Id.* § 668.14(b)(22)(ii)(G).  The Department recognized when it promulgated the safe harbor regulations in 2002 that they are not mandated by the HEA.

After operating under these safe harbors for a number of years, the Department found, based on its own experience and "student and advisor complaints," that the safe harbors were "do[ing] substantially more harm than good." 75 Fed. Reg. 34,806, 34,818, 34,850 (June 18, 2010).  Rather than serving to effectuate the goals intended by Congress, the safe harbors were being used by "unscrupulous actors . . . to circumvent [Congress's] intent" and had hampered the Department's ability to gauge compliance with the ban and effectively enforce its parameters.  75 Fed. Reg. at 66,872-66,873; *see also* 75 Fed. Reg. at 34,817.  Based on these experiences, which are documented in the administrative record, *see infra* n. 13,  the Department determined the goals it hoped to achieve through adoption of the safe harbors were not being accomplished.  75 Fed. Reg. at 34,817; 75 Fed. Reg. at 66,872-66,873.  Instead, the safe harbors had served as an

"impediment to ensuring that students are enrolled in educational programs that are meaningful to them."  75 Fed. Reg. at 34,817; *see also* 75 Fed. Reg. at 66,872-66,873.

Accordingly, the Department promulgated new regulations that eliminate the safe harbors and "better align [the regulations] with [the] HEA."  75 Fed. Reg. at 34,818.  Echoing the HEA, the compensation regulations prohibit the provision of "any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds." 75 Fed. Reg. at 66,950.  The compensation regulations define "[c]ommission, bonus, or other incentive payment" as "a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or an entity for services rendered," *id*., but expressly permit "[m]erit based adjustments to employee compensation" that "are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid," *id*.  The regulations further specify that the ban applies to "any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding [financial aid]," *id*. at 66,951, and to compensation that is based upon retention, completion, graduation, or job placement.  75 Fed. Reg. at 66,874; 75 Fed. Reg. at 66,950.  Most non-federal negotiators and numerous commenters, including the two major national associations representing admissions officers, supported the Department's promulgation of the compensation regulations.  75 Fed. Reg. at 34,818; AR1457-73, 3799-3801; AR1597-1610, 6057-66.[4]

---

[4] *See also* AR1158-91; AR1416-19; AR1483-84; AR2174; AR2179-80; AR 2275; AR 3041; AR3999-4000; AR4264-66; AR4334-35; AR4733; AR4791-4816; AR4832-33; AR5666-68; AR5837; AR5938-40; AR6086; AR6220-21; AR6226; AR6570-72; AR6617; AR 6686;

II.      The Misrepresentation Regulations

The HEA prohibits an institution receiving Title IV funds from "engag[ing] in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates."  20 U.S.C. § 1094(c)(3)(A).  Upon a determination, after reasonable notice and opportunity for a hearing, that an institution has made such a misrepresentation, the Secretary may suspend or terminate the institution's Title IV eligibility status.  *Id*.  The Secretary may also impose a civil penalty of up to $27,500 for each violation or misrepresentation.  *Id*. § 1094(c)(3)(B)(i); Federal Civil Penalties Adjustment Act, as amended, 24 U.S.C. § 2461 note.  In determining the amount of such penalty, the Secretary "shall" consider the "appropriateness of the penalty to the size of the institution . . . and the gravity of the violation, failure, or misrepresentation."  *Id*. § 1094(c)(3)(B)(ii).

The statute does not define "substantial misrepresentation."  Accordingly, in 2002 the Department issued regulations defining the terms "misrepresentation" and "substantial misrepresentation" and providing examples of statements about the nature of a school's education program, its financial charges, and the employability of its graduates.  34 C.F.R. §§ 668.71-75.  Plaintiff does not challenge these existing regulations.  The newly promulgated regulations, which plaintiff does challenge, clarify and strengthen the Department's ability to protect students from misleading and overly aggressive advertising and marketing tactics which may compromise students' ability to make informed choices about schools and the expenditure of their resources on higher education.  75 Fed. Reg. at 66,913-15.

Both the existing regulations and the new regulations define the term "misrepresentation"

───────────────

AR6717; AR6937-38; AR7042; AR7378-79.

as a false, erroneous, or misleading statement.  34 C.F.R. § 668.71(b); 75 Fed Reg. at 66,959.[5]

Whereas the regulations now in effect do not further define a misleading statement, *see* 34 C.F.R. § 668.71, the new regulations provide that a misleading statement "includes any statement that has the likelihood or tendency to deceive or confuse."  75 Fed. Reg. at 66,959.  Both the existing and new regulations define "substantial misrepresentation" as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."  *Id.*[6]

III.     The State Authorization Regulations

The HEA requires that a student receive Title IV funds only for attendance at "an educational institution in any State that . . . is *legally authorized within such State* to provide a program of education beyond secondary education."  20 U.S.C. § 1001(a)(2) (emphasis added). The Department's prior regulations did not explain what it would mean for an institution to be legally authorized within a state, and they explicitly required only that institutions be legally authorized in those states in which they were physically located.  See 34 C.F.R. §§ 600.2,

---

[5]  The full definition of "misrepresentation" in the existing regulations is "[a]ny false, erroneous or misleading statement an eligible institution makes to a student enrolled at the institution, to any prospective student, to the family of an enrolled or prospective student, or to the Secretary."  34 C.F.R. § 668.71(b).  The full definition of "misrepresentation" in the new regulations is "[a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary."  75 Fed Reg. at 66,959.

[6]  The new regulations spell out in slightly more detail than the existing regulations the types of statements that relate to the nature of a school's educational program, the nature of its financial charges, and the employability of its graduates, but plaintiff does not challenge any of these changes.  *See* 75 Fed Reg. at 66,959-60.

600.5(a)(4).  The state authorization regulations challenged in this suit further implement the command of the HEA, and are distinguished by three primary characteristics.

First, the authorizing state must have in place an authorization process before an institution may be legally authorized:  "[an] institution [must be] established by name as an educational institution by a State through a charter, statute, constitutional provision, or other action issued by an appropriate State agency or State entity."  75 Fed. Reg. at 66,946.  Second, the authorizing state must have in place a process to review and act on student complaints before an institution may be legally authorized:  "An institution . . . is legally authorized by a State if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws."  *Id.* at 66,946.  Third, institutions providing distance education must obtain authorizations from both the state in which the school is located and the state in which a student resides, if such authorization is required by the state in which the student resides:

> If an institution is offering postsecondary education through distance or correspondence education to students in a State in which it is not physically located or in which it is otherwise subject to State jurisdiction as determined by the State, the institution must meet any State requirements for it to be legally offering postsecondary distance or correspondence education in that State.

*Id.* at 66,947.

## ARGUMENT

Much of plaintiff's complaint should be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction to adjudicate claims that are not ripe or which plaintiff lacks standing to assert.  In the alternative, pursuant to Fed. R. Civ. P. 56, the Department agrees with plaintiff that this matter can be resolved pursuant to cross-motions for summary judgment.  Pl.'s

Mot. at 8.  The Department is entitled to summary judgment because there is no genuine issue as to any material fact and the Department is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[7]

I.     PLAINTIFF'S CHALLENGE TO THE COMPENSATION REGULATIONS FAILS.

A.     This Court Lacks Jurisdiction Over Plaintiff's Speculative Claims About The Manner In Which The Compensation Regulations Will Be Applied Because Those Claims Are Not Ripe For Review.

What is clear from plaintiff's complaint is that it vastly prefers to continue operating under the 2002 safe harbor scheme that immunized, for example, increasing recruiting and admissions personnel's compensation through semi-annual salary adjustments, which were really incentive payments dressed up in slightly different clothes.  Such conduct is no longer immunized, but what is far from clear, and is highly doubtful, is that the Department will use the new regulations in the heavy-handed manner plaintiff suggests.  At bottom, plaintiff's challenge to the compensation regulations reduces to a series of "what ifs" regarding potential, future enforcement action by the Department.  Plaintiff speculates about ways in which the Department could apply the compensation regulations to prohibit practices that plaintiff believes are lawful.

---

[7] Plaintiff has submitted five declarations it claims "confirm and illustrate the real-world consequences of the regulations' deficiencies."  Pl.'s Mot. at 2 n.1, Exs. 2-6.  But plaintiff admits that these declarations "are not part of the administrative record," *id.*, and thus, the Court should not consider them in assessing the merits of plaintiff's APA claims.  "[T]he focal point for judicial review [in an APA case] should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).  Although there are "narrow exceptions" to this rule, *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 11 & n.5 (D.D.C. 2001), plaintiff has not demonstrated—nor even attempted to demonstrate—that any of those exceptions applies here.

10

For example, plaintiff hypothesizes that the regulations "could be read," Pl.'s Mot. at 15, to prohibit educational institutions from paying any salaries or making any merit-based salary adjustments, *id*. at 9-10; or from making contributions to employees' 401(k) retirement plans, *id*. at 18.  But plaintiff does not allege—nor could it—that the Department has taken any action to enforce the compensation regulations in this manner.  Indeed, the final rule and subsequent guidance issued by the Department demonstrate that plaintiff's fears are unfounded. Nevertheless, to the extent plaintiff claims there is any remaining uncertainty about how the Department will apply the compensation regulations in the future, such uncertainty does not provide a basis to adjudicate plaintiff's claims now.

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003).  It requires that an issue "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them."  *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952).  In assessing ripeness, courts evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Plaintiff's claims about the manner in which the compensation regulations may be applied are not fit for judicial review because they rest on contingent future events.  The Supreme Court has held that the mere promulgation of regulations "is not ordinarily considered the type of

11

agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Here, the Department has taken no enforcement action at all, much less one that suggests the agency will apply the regulations in the extreme manner plaintiff anticipates. If and when the Department does take such an action, an educational institution may challenge the legality of the regulations at that time. *See* 20 U.S.C. § 1094(b),(c)(3)(B). Assisted by consideration of "a specific application of th[e] regulation[s]," any decision of the court will "stand on a much surer footing . . . than could be the case in the framework of the generalized challenge" brought here. *Toilet Goods Assoc. v. Gardner*, 387 U.S. 158, 164 (1967); *see also Munsell v. Dep't of Agric.*, 509 F.3d 572, 586 (D.C. Cir. 2007). In the meantime, this Court will avoid opining on the legality of "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Cronin v. F.A.A.*, 73 F.3d 1126, 1132 (D.C. Cir. 1996) ("It makes no sense for us to anticipate a wrong when none may ever arise.").

Plaintiff, moreover, will not suffer any immediate and significant harm if judicial review of its claims is postponed. Plaintiff does not face the possibility of criminal penalties for failure to adhere to the challenged regulations. *Cf. Abbott Labs.*, 387 U.S. at 153. And "mere uncertainty as to the validity of a legal rule" is not sufficient to warrant pre-enforcement judicial review. *Nat'l Park Hospitality Ass'n*, 538 U.S. at 811. If it were, "courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal

12

uncertainties were resolved." *Id*.  Because plaintiff's speculative claims regarding the

compensation regulations are not fit for review, and plaintiff has not established that

postponement of review will result in "irremediable adverse consequences," those claims should

be dismissed as unripe.  *Toilet Goods*, 387 U.S. at 164-65; *see Shays v. F.E.C.*, 337 F. Supp. 2d

28, 49 n.17 (D.D.C. 2004) (declining to entertain arguments that "call for speculation as to how

the regulations will be applied and the consequential potential effects").

> B.      Application Of The Incentive Compensation Ban To Salaries And
>         Salary Adjustments That Are Based Directly Or Indirectly On
>         Success In Securing Enrollments Or Financial Aid Is Consistent
>         With The Higher Education Act.

Even if some (or all) of plaintiff's claims regarding the compensation regulations were

ripe, those claims nevertheless fail on the merits.  The compensation regulations prohibit

educational institutions from providing recruiting, admissions, or financial aid personnel

(collectively, "recruiters") "a sum of money or something of value" based directly or indirectly

upon their success in securing enrollments or the award of financial aid.  75 Fed. Reg. at 66,950.

Plaintiff alleges that this language prevents educational institutions from paying recruiters a

salary, or, at the least, making merit-based adjustments to salaries and that the regulations are

contrary to the HEA.  Pl.'s Mot. at 9-13.  Plaintiff is wrong on both counts.

First, the regulations do not impose a blanket prohibition on salaries or merit-based salary

adjustments.  Plaintiff's argument to the contrary ignores the regulations' plain language and

relies on a cramped (and incorrect) view of the proper role of educational recruiters.  The

compensation regulations explicitly permit the payment of a fixed salary or wage that is not

based on securing enrollments or the award of financial aid.  75 Fed. Reg. at 66,950.  They also

permit educational institutions to make "[m]erit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid." *Id*.

Plaintiff maintains that, because a recruiter's job is to secure enrollments, any merit-based adjustments made to a recruiter's salary will necessarily be based, either directly or indirectly, on success in activities aimed at securing enrollments. Pl.'s Mot. at 10. But, as numerous commenters—including associations representing admissions officers—explained, a recruiter's job is not to enroll as many students as possible. Instead, these are counseling professions that should focus on the needs, interests, and abilities of prospective students and assist those students in determining whether a particular educational program is in their best interest.[8]

The Department explained in the final rule that educational institutions "may use a variety of standard evaluative factors" to lawfully provide merit-based compensation to recruiters, 75 Fed. Reg. at 66,877, and the Department has since provided examples of such factors. Dep't of Educ., Dear Colleague Letter, Implementation of Program Integrity Regulations, at 13 (Mar. 17, 2011) ("Dear Colleague Letter"), available at http://ifap.ed.gov/dpcletters/attachments/GEN1105.pdf (last visited Mar. 18, 2011) (listing, *inter alia*, job knowledge, initiative, communications skills, and dependability). Thus, contrary to plaintiff's assertion, the

---

[8] *See, e.g.*, AR1483-84; AR1605 ("Our membership believes that college admissions is primarily a counseling profession concerned with assisting students to attend an institution *that is right for them*, and that any attempt to tie the compensation of admissions officials to the number of students they recruit for their own institution would constitute an inherent conflict of interest."); AR2174; AR 2397; AR 4733; AR6057-66; AR6226. Viewed in the proper light, a recruiter who assists a prospective student in recognizing that he is not qualified for a particular program or that the program would not benefit him has performed just as well as a recruiter who assists a qualified, prospective student who would benefit from a particular program in enrolling in that program.

compensation regulations do not prohibit the payment of all salaries or merit-based salary adjustments to recruiters; they prohibit only certain types of salaries and salary adjustments (as well as other forms of incentive compensation)—*i.e.*, those that are based in whole or in part, directly or indirectly, on success in securing enrollments or the award of financial aid.

Second, the Department's interpretation of the phrase "commission, bonus, or other incentive payment" to include salaries and salary adjustments that are based directly or indirectly on success in securing enrollments or the award of financial aid is not unambiguously foreclosed by the HEA; it is both permissible and reasonable.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  "[T]he Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application." *Consumer Elecs. Ass'n v. F.C.C.*, 347 F.3d 291, 298 (D.C. Cir. 2003).  And the language of the HEA's incentive compensation ban is undeniably broad.  It prohibits the payment of "*any* commission, bonus, or *other incentive payment*" that is "based *directly or indirectly* on success in securing enrollments or financial aid." 20 U.S.C. § 1094(a)(20) (emphasis added); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-19 (2008) (interpreting "any" broadly when used in a series); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("[T]he word 'any' has an expansive meaning.").  Indeed, plaintiff acknowledges that the term "incentive payment," chosen by Congress, covers a wide range of payments, *i.e.*, any that are "designed to enhance or improve production."  Pl.'s Mot. at 11-12.  A salary or salary adjustment based directly or indirectly on success in securing enrollments or the award of financial aid fits squarely within this definition because it is designed to enhance or improve the rate at which employees enroll students or secure financial aid.

15

Relying on the rule of *ejusdem generis*, plaintiff urges the Court to limit the expansive definition of incentive payment that plaintiff itself offers to include only those incentive payments that are most like commissions or bonuses. *Id*. at 12. Plaintiff further argues that commissions and bonuses are distinct from the "fixed" notion of a salary and "relatively durable and stable" salary adjustments. *Id*. But nothing in the definitions of commission or bonus cited by plaintiff indicates that those payments cannot be infrequent, durable, or stable. And nothing (except the HEA, as implemented by the challenged compensation regulations) prevents educational institutions from making commission-and-bonus-like payments and calling them salaries or salary adjustments. The difference between providing a recruiter a $1,000 bonus for enrolling more than 100 students and adjusting that recruiter's salary upward by $1,000 for the same performance is in name only.[9] In enacting the HEA, Congress sought to ban compensation that incentivized success in securing enrollments and financial aid, not merely compensation that was given a particular name. Plaintiff cannot rely on the rule of *ejusdem generis* to defeat that purpose. *See United States v. Alpers*, 338 U.S. 680, 682 (1950) (the rule of *ejusdem generis* "is to be resorted to not to obscure and defeat the intent and purpose of Congress"). Because the Department's interpretation of the phrase "commission, bonus, or other incentive payment" is consistent with both the language and purpose of the HEA's incentive compensation ban, it is

---

[9] Plaintiff contends that "no one would characterize the adjustment of federal employees' salaries once per year as 'bonuses.'" Pl.'s Mot. at 12. This analogy is not convincing. For example, a federal government attorney who received an adjustment in compensation based on the number of cases won or settled would be receiving an incentive payment whether the attorney's pay stub labeled the adjustment a salary, bonus, raise, gift, or otherwise.

16

reasonable and should be upheld.[10]

Plaintiff's contention that the legislative history of the HEA confirms its narrow reading of the statutory text misconstrues that history.  Pl.'s Mot. at 13 n.6.  Prior to 1992, the HEA prohibited educational institutions from "employ[ing] or us[ing] commissioned salesmen to promote the availability of [certain loan programs]."  20 U.S.C. § 1085(1) (1991); *see also* S. Rep. No. 102-204, at 264 (1991).  The 1992 Amendments expanded this prohibition from "commissioned salesmen" to "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid."  20 U.S.C. § 1094(a)(20).  Plaintiff's suggestion that what Congress meant when it said "any commission, bonus, or other incentive payment" was really "commissioned salesmen" reads the term "other incentive payment" completely out of the statute and renders Congress's 1992 amendment a nullity.

C.     Application Of The Incentive Compensation Ban To Higher Level Employees With Responsibility For Recruitment, Admissions, Or Financial Aid Is Consistent With The Higher Education Act.

The compensation regulations specify that the ban on incentive payments extends to "any higher level employee with responsibility for recruitment or admission of students, or making

---

[10] Plaintiff faults Congress for not using the terms salaries or wages in the HEA if salaries and wages were to be banned.  Pl.'s Mot. at 13.  As noted above, however, Congress did not intend to prohibit all salaries and wages, but rather, only those based directly or indirectly on success in securing enrollments or financial aid.  In light of this purpose, it is not surprising (and certainly not fatal to the Department's interpretation) that Congress chose the term "other incentive payment" instead of listing salaries and wages, along with the myriad other terms that might someday be devised to avoid the ban.

Indeed, plaintiff's endorsement of the safe harbors, Pl.'s Mot. at 16-20, is inconsistent with its position that the text of the statute unambiguously excludes salaries and salary adjustments from the scope of the ban.  There would have been no need for the first safe harbor, which immunized from enforcement action by the Department certain types of salaries and salary adjustments, if the statute unambiguously excluded salaries from its scope.

17

decisions about awarding [financial aid]." 75 Fed. Reg. at 66,951.  Plaintiff claims this regulation of higher level employees violates the HEA.  The limitation plaintiff attempts to engraft on the incentive compensation ban, however, is found nowhere in the statute itself.  The ban applies broadly to "*any* persons or entities *engaged in any* student recruiting or admission activities or in making decisions regarding the award of student financial assistance."  20 U.S.C. § 1094(a)(20).  The text of the statute contains no explicit exemption for higher level employees.

Indeed, Congress declined to create such an exemption in 2001.  In that year, the House of Representatives proposed to amend the HEA so that the ban only applied to persons or entities "directly engaged" in recruiting or admissions activities or awarding financial aid.  H.R. Rep. No. 107-225, at 2 (2001).  The change was meant to limit the ban "to those whose primary job responsibility is to directly recruit students or award financial aid and not to those with managerial or supervisory responsibilities for recruitment, admissions or financial aid."  *Id*. at 10. The amendment, however, was never enacted into law.  Thus, as currently written, the HEA's incentive compensation ban applies to any person engaged in any recruitment or admission activities or financial aid decisions, not just those directly engaged in such activities.  This language does not "unambiguously foreclose[]" application of the ban to higher level employees with responsibility for these activities.  *Nat'l Cable & Telecomm. Assoc.* v. FCC, 567 F.3d 659, 663 (D.C. Cir. 2009).

Despite the lack of an express exemption in the statute, plaintiff argues the phrase "engaged in" used in the HEA encompasses a narrower universe of employees than the phrase "with responsibility for" used in the compensation regulations.  Pl.'s Mot. at 13-14.  According to plaintiff, "engaged in" implies active participation whereas "with responsibility for" permits

18

mere oversight. *Id*. at 14.  To reach this result, plaintiff defines "engaged in" to mean "involved in [an] activity," and then uses a different dictionary to define "involved" as "draw[n] in as a participant." *Id*. (second alteration in original).  Then, without offering any dictionary definition of "responsibility," plaintiff deems this term distinct from active participation. *Id*. at 13-14.

"Engaged" means "involved" or "being affected or implicated."  Merriam Webster's Collegiate Dictionary 383, 616 (10th ed. 2001).  "Responsibility" means being "liable to be called on to answer" or "account as the primary cause, motive, or agent." *Id*. at 995.  A person who is liable to be called on to answer or account for recruiting or admissions activities is involved or implicated in those activities.  For example, a college admissions office manager who supervises recruiters is involved or implicated in recruiting or admissions activities even if that official does not directly recruit prospective students.  At the very least, it was not unreasonable for the Department to construe the incentive compensation ban to apply to such individuals, given the expansive language of the statute and its purpose. *See infra* Part I.D.1 (explaining the Department's rationale for applying ban to higher level employees).

Furthermore, the "sweeping regulation of executive compensation" plaintiff conjures up is simply not supported by the record.  Pl.'s Mot. at 15.  The Department has confirmed that the compensation regulations do not preclude a college president from speaking with students about the value of a college education or the virtues of attending a particular institution.  75 Fed. Reg. at 66,874.  Further, the Department recently explained that "[s]enior managers and executive level employees who are *only* involved in the development of policy and do not engage in individual student contact or [] other covered activities . . . will not generally be subject to the incentive compensation ban."  Dear Colleague Letter at 13.  To the extent plaintiff still has

19

concerns about the permissible outer reaches of the compensation regulations, those concerns, if not addressed in future guidance issued by the Department, can be litigated if and when the Department initiates an enforcement action against a particular institution's compensation practices.  Until then, plaintiff's worse-case-scenario allegations are not ripe.  *See supra* Part I.A.

      D.      The Compensation Regulations Are Neither Arbitrary Nor Capricious.

The Department's decision to eliminate the safe harbors was not made without great deliberation.  After engaging in negotiated rulemaking and following notice-and-comment procedures, the Department promulgated regulations that it believes will "more accurately reflect congressional intent and protect students from abusive recruitment practices" that resulted from institutions' reliance on the safe harbors.  75 Fed. Reg. at 34,818.  In doing so, the Department thoroughly explained its reasoning and provided documentation to support its findings.  It provided clarification on how the new compensation regulations would apply to certain compensation practices and indicated that further broadly-applicable guidance would be provided as necessary.  The agency also considered, and reasonably responded to, all relevant and significant comments submitted during the comment period.  The Department's process was the epitome of reasoned decisionmaking, and the result of that process should not be set aside merely because plaintiff disagrees with the policy choices made.

      1.      The Department Provided a Reasoned Analysis for Changing Its Course.

The compensation regulations are not due less deference merely because they represent a change from the prior "safe harbor" regulations.  An agency is not "required to establish rules of conduct to last forever."  *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991) (quotations and citations

omitted).  Rather, an agency, "to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."  *Chevron*, 467 U.S. at 863-64.  "An agency's view of what is in the public interest may change, either with or without a change in circumstances,"  *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983), and an agency "must be given ample latitude to adapt [its] rules and policies to [those changes],"  *Rust*, 500 U.S. 186 (quotations and citations omitted) (first alteration in original).  To withstand judicial scrutiny under the APA, an agency need only supply a "reasoned analysis" for "changing its course."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57.  The Department has satisfied that burden here.

The Department thoroughly explained why each safe harbor was subject to abuse, inconsistent with congressional intent, or no longer necessary.  75 Fed. Reg. at 34,817-34,819; 75 Fed. Reg. at 66,873-66,879.  As relevant here, the Department noted that the first safe harbor had led institutions to establish compensation plans that, on paper, purported to evaluate recruiters based on factors other than the number of students enrolled, but in reality those other factors were ignored.  75 Fed. Reg. at 34,817; 75 Fed. Reg. at 66,872-66,873.  This practice, which valued numbers over substance, encouraged recruiters to "deceive or misrepresent the manner in which a particular educational program [might meet] a student's need[s]," exactly contrary to what Congress intended and what the Department had in mind when it promulgated the safe harbors.  75 Fed. Reg. at 34,817; *see also* 75 Fed. Reg. at 66,872-66,873.  Although the Department expended vast resources in the years after the safe harbors went into effect to enforce the incentive compensation ban, the first safe harbor's focus on the term "solely" made it very difficult for the Department to evaluate compliance and to successfully enforce the ban when

21

violations occurred.  75 Fed. Reg. at 34,817; 75 Fed. Reg. at 66,873.

The Department found that the safe harbor addressing managerial employees resulted in similar abuses.  "[S]enior management may drive the organizational and operational culture at an institution."  75 Fed. Reg. at 34,818.  And even if lower level employees are not paid based on enrollments, relying on this factor to compensate their supervisors can lead these higher level employees to exert immense pressure on their subordinates to fill seats regardless of a student's abilities, interests, or needs.  *Id*.

Moreover, the Department reasonably explained its elimination of the safe harbor that permitted compensation based on graduation.  It acknowledged that this safe harbor was originally promulgated because it appeared to further an objective of the incentive compensation ban—discouraging the admission of unqualified students.  75 Fed. Reg. at 66,874.  If a student graduated, the Department previously reasoned, she must have been qualified for the program. Since the promulgation of this safe harbor, however, short-term, accelerated programs have proliferated and the Department has observed "increased efforts by institutions to rely upon this safe harbor to incentivize recruiters."  *Id*.  Institutions have "devised and operated grading policies that all but ensure that students who enroll will graduate, regardless of their academic performance."  75 Fed. Reg. at 34,818.  And the Department was concerned that retention of this safe harbor would lead to further lowering of admissions and academic progress standards and the altering of attendance records.  *Id*. at 34,817-34,818.

The Department pointed to related abuses stemming from compensating recruiters based on the placement of students after graduation.  One institution rewarded an employee who enrolled a student in a culinary arts program after that student graduated and received an entry-

level position in the fast food industry. 75 Fed. Reg. at 66,874. The Department appropriately

recognized that "[s]uch a position did not require the student to purchase a higher education

credential." *Id.* (quotation omitted). In other words, just because a student is qualified for an

educational program, and could graduate from that program, does not mean it is in the student's

best interest to enroll in the program.[11]

The Department determined that the harms caused by the graduation safe harbor more

than outweighed the minimal benefits the Department sought to achieve when it promulgated the

safe harbor in 2002. 75 Fed. Reg. at 66,874. Specifically, the Department noted:

> Institutions should not need this safe harbor . . . to demonstrate their commitment
> to retaining students within their program of instruction. In addition, there is
> nothing about the making of incentivized payments to recruiters based upon
> student retention that enhances the quality of a student's educational experience.
> If the program of instruction has value and is appropriate for a student's needs, a
> student will likely enjoy a positive educational experience regardless of the
> manner in which the student's recruiter is compensated.

*Id.*[12]

---

[11] Plaintiff urges the Court to reject this rationale because, according to plaintiff, the
Department lacks authority to use the incentive compensation ban to determine whether a
particular educational program is a "worthwhile investment." Pl.'s Mot. at 25. This argument
misses the point. The Department is not trying to evaluate the meaningfulness of particular
programs in general or as they relate to the needs of particular students. Instead, consistent with
Congress's intent, the Department is seeking to eliminate compensation practices that incentivize
recruiters to convince prospective students that a program is worthwhile regardless of whether it
actually is. The Department recognizes that these decisions are ultimately ones for prospective
students to make and is merely trying to ensure that students have accurate information (and the
assistance of unbiased recruiters) when making them. Such an endeavor does not exceed the
scope of the Department's authority. *See* 20 U.S.C. § 1221e-3.

[12] Plaintiff alleges that application of the ban to compensation that is based on student
retention, completion, graduation, or job placement is contrary to the HEA because the statute
bans only compensation based on securing enrollments. Compl. ¶¶ 55, 93; Pl.'s Mot. at 23-25.
According to plaintiff, "[i]f Congress had wanted to prohibit all bonuses" based on these
milestones, "it could have said as much." Pl.'s Mot. at 24. But Congress did, through its use of

Furthermore, the Department's reasons for eliminating the safe harbors are not merely

"[h]ypothetical," Pl.'s Mot. at 20; they are amply supported by documentation in the

administrative record.[13]  Plaintiff maintains that the February 2010 GAO report relied on by the

---

the term "indirectly."  20 U.S.C. § 1094(a)(20).  Retention, completion, graduation, and placement are all based indirectly on securing enrollments because a student cannot be retained, complete a program, graduate, or obtain a job in her field of study unless she first enrolls. 75 Fed. Reg. at 66,874.  At the very least, Congress's use of the term "indirectly" is sufficiently ambiguous to permit the agency to reasonably construe the statute to ban compensation based on these milestones, especially in light of the agency's established expertise in enforcing the law. *See Chevron*, 467 U.S. at 843.

The Department's interpretation does not become impermissible merely because the agency refuses to extend its rationale to any extreme scenario imagined by plaintiff.  *See* Pl.'s Mot. at 24 n.10 (arguing the Department's rationale would prohibit schools from paying bonuses to athletics coaches for successful performance on the field because the coach could not win if his players did not enroll); 75 Fed. Reg. at 66,875 (explaining that the regulations do not prohibit this practice).   The agency's construction, including any limits it places on that construction, need only be reasonable.  *Chevron*, 467 U.S. at 843.  And it is here.

[13] *See e.g.*, AR7204-61, 7292-7307 (GAO reports); AR7061-7107 (program review of University of Phoenix, describing compensation policy that purported to evaluate factors other than enrollments in determining salary, but in practice hinged solely on the number of students enrolled; and discussing how supervisors promoted aggressive sales tactics); AR7126-51 (*qui tam* action brought by former recruiter, alleging, *inter alia*, compensation plan required specific number of enrollments for promotion to next "salary" level; supervisors were paid based on success of subordinates in securing enrollments; and institution "hid[] its recruitment compensation practices"); AR7152-84 (*qui tam* action brought by admissions and financial aid representatives, alleging, *inter alia*, "supervisors put enormous pressure on [subordinates] to recruit students and fill seats;" and recruiters "were given monthly and weekly goals for admissions and told to "convince potential students to enter low-enrollment programs[] even if that was not their interest of study"); AR1158-91, 4264-66 (comments from National Consumer Law Center documenting abuses observed through its direct representation of clients and citing 2005 report regarding "problems with aggressive and often illegal recruiting"); AR1457-73 (comment from National Association for College Admission Counseling, documenting "evidence of widespread disregard for the incentive compensation statute"); AR 1421-25 (comment by former collections agent for delinquent student loans: "When I spoke to [college admissions personnel] it was routinely said that they [] had goals they were expected to meet each and every month or face the consequences. . . .  I asked if they were rewarded if their goals were met or exceeded [and] they said, 'Yes, but you didn't hear that from me,'"); AR4832-33 (comment from American Federation of Teachers, stating "[s]ince [the safe harbors] took effect . . . there have been far too many reports demonstrating how aggressive recruiting practices in the for-profit

Department demonstrates that elimination of the safe harbors was not necessary because it shows there was no increase in the frequency or severity of incentive compensation violations after the safe harbors went into effect.  The report, however, suggests[14] just the opposite.  When compared with the widespread allegations of improper incentive compensation practices found elsewhere in the administrative record, the limited number of "substantiated violations" identified in the GAO report *supports* the Department's position that the safe harbors made it difficult for it to substantiate violations of, and thereby enforce, the incentive compensation ban.  Indeed, GAO recognized as much in a follow-up report issued in October 2010.  AR 7208 ("[The Department] changed its enforcement policy in 2002, which resulted in an increased burden on [the Department] to prove a violation . . . .  As a result, it became more difficult for [the Department] to prove a school violated the incentive compensation ban.").

Accordingly, contrary to plaintiff's bald assertion, Pl.'s Mot. at 15-16, the Department did not "completely ignore" the reasons the agency offered for promulgating the safe harbors in 2002.  Instead, it acknowledged the prior reasoning and explained how the prediction that the safe harbors would not create loopholes in the incentive compensation ban had, in the

---

industry led to students being placed in programs unconnected to real-life jobs, or being admitted to programs for which they were not educationally prepared, or being encouraged to take out loans they could not afford to repay even if they completed the program and got a job in their field"); AR07378-79 (comment describing recruiting efforts at homeless shelters); AR 7408; AR 7421-27; AR 7444-45; AR 7489; *see also United States ex rel. Irwin v. Significant Educ., Inc.*, No. CV-07-1771-PHX-DGC, 2009 WL 322875, *1 (D. Ariz. Feb. 10, 2009) (alleging abuse of the first safe harbor); *United States ex rel. Leveski v. ITT Educ. Servs.*, No. 1:07-CV-867-WTL-JMS, 2010 WL 1936118, *2 (S.D. Ind. May 12, 2010) (same).

[14]   The GAO report expressly disclaims any attempt to "assess the overall impact of the safe harbor regulations on Education's efforts to enforce the incentive compensation ban."  AR 7293.

Department's view, been proven wrong in the years since the safe harbors were promulgated.[15]
Plaintiff may not agree with the Department's new policy choices, but that is not the standard for
assessing a regulation's validity.  *Arkansas v. Oklahoma*, 503 U.S. 91, 113-14 (1992) ("It is not
[a court's] role . . . to decide which policy choice is the better one.").  The Department need only
justify its change with a reasoned analysis, and it has done that here.  *See F.C.C. v. Fox
Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009) ("[An agency] need not demonstrate to a
court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one;
it suffices that the new policy is permissible under the statute, that there are good reasons for it,
and that the agency *believes* it to be better.") (emphasis in original); *Nat'l Cable & Telecomm.
Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (explaining a change in policy may
be warranted by "changed factual circumstances, or a change in administrations"); *Rust*, 500 U.S.
at 187 (upholding agency regulations that reversed long-standing agency policy where change of
interpretation was supported by reasoned analysis indicating that new regulations were more in
keeping with statute's original intent, justified by client experience under prior policy, and
accorded with shift in public attitudes).

> 2. The Compensation Regulations Provide Sufficiently
> Clear Guidance to Regulated Parties.

Plaintiff also claims the compensation regulations are arbitrary or capricious because they

---

[15] Nor did the Department ignore institutions' reliance interests.  *See* Pl.'s Mot. at 16.
Even assuming institutions' reliance interests are more substantial than those present in the
average situation where an agency changes its policy and that they therefore might need to be
acknowledged, the Department has done so here.  *See* 75 Fed. Reg. at 66,873, 66,968
(recognizing that institutions "will need to re-examine their practices to ensure they comply with
[the new regulations]," but concluding that any related costs are outweighed by the benefits of
the new regulations).

lack clarity or, at least, are less clear than the safe harbors that preceded them.  Pl.'s Mot. at 17-18.  As an initial matter, it was the reasons set forth above, *see supra* Part I.D.1., and not a quest for increased clarity, that prompted the Department to eliminate the safe harbors.  Nevertheless, the new regulations provide sufficiently clear guidance to regulated parties.

The APA does not require an agency to promulgate "regulations that use bright-line rules to draw explicit distinctions between permissible and impermissible [conduct]."  Pl.'s Mot. at 17.  An agency instead may define what is prohibited in broad terms that can be applied to varied circumstances.  It certainly may do so when it is attempting to ensure that its regulations encompass all of the broad range of practices Congress sought to prohibit.  *See Smiley v. Citibank (S. Dak.), N.A.*, 517 U.S. 735, 740-41 (1996) (observing that, when implementing an ambiguous statute, courts presume Congress "desired the agency . . . to possess whatever degree of discretion the ambiguity allows").  Where plaintiff saw "bright-line rules," Pl.'s Mot. at 17, the Department found institutions that were circumventing congressional intent and evading agency enforcement actions.  The agency was entitled, in the exercise of its discretion, to address those abuses.

Plaintiff's dissatisfaction, in any event, appears to center not on a lack of bright-line rules, but rather, on where the line has been drawn—*i.e.*, with the substance of the new rules, which, in most cases, still draw explicit distinctions between conduct that is permitted and conduct that is prohibited.  *See, e.g.*, 75 Fed. Reg. at 66,951 (prohibiting incentive compensation based on graduation); 75 Fed. Reg. at 34,818 (permitting profit sharing based on ownership); *see also* AR1609 (stating safe harbors muddied clear statutory language).  The Department has taken steps to ensure that regulated parties understand the new regulations by addressing specific

questions raised during the comment period, 75 Fed. Reg. at 66,872-66,879, and by providing

regulated parties with a two-part test to assist them in determining whether a particular

compensation practice violates the ban, 75 Fed. Reg. at 34,818.  Further, to the extent plaintiff or

other regulated parties identify areas where further clarification is necessary and appropriate, the

Department has indicated it will provide broadly applicable guidance.  75 Fed. Reg. at 66,879.

Plaintiff's dogged refusal to acknowledge the regulations' clear language and the agency's

guidance is not grounds for invalidating the regulations before they are enforced.  *See supra* Part

I.A.[16]

     Plaintiff's contention that the new regulations will effect a return to the uncertainty that

existed prior to promulgation of the safe harbors is similarly without merit.  *See* Pl.'s Mot. at 19-

20.  Plaintiff acknowledges that any uncertainty that existed prior to 2002 was caused by the

"case-by-case" and "often contradictory guidance the Department gave to schools . . . in private

letter rulings."  *Id*. at 19, 26.  The Department, however, has indicated that it does not intend to

provide such private guidance in the future.  75 Fed. Reg. at 66,879.  Any further guidance

instead will be issued "in a  broadly applicable format" and will be distributed "widely to all

participating institutions."  *Id*.

     Additionally, the compensation regulations provide much greater detail and guidance than

the regulations that existed before the safe harbors.  The pre-safe harbor regulations merely

---

[16] Plaintiff asserts that the compensation regulations "could be read" to prohibit schools from using profit-sharing plans or making contributions to employees' 401(k) retirement plans. Pl.'s Mot. at 15, 18.  The Department, however, has made clear that profit-sharing plans, including 401(k) type plans, are permitted so long as "distributions are made to individuals on a basis that is neutral with respect to the role the recipient plays in student recruitment or the securing of financial aid."  Dear Colleague Letter at 10.

repeated the language of the statute and addressed the effect of the ban on contractors and gifts. 59 Fed. Reg. 22,348, 22,427 (Apr. 29, 1994). The new compensation regulations, on the other hand, define numerous statutory terms, provide examples of activities that do and do not constitute securing enrollments or the award of financial aid, and explain the circumstances under which merit based adjustments to compensation and profit-sharing payments are permitted. 75 Fed. Reg. at 66,950-66,951. There is, therefore, no reason to suspect that any problems encountered under the pre-safe harbor regulations will be "revive[d]," Pl.'s Mot. at 20, under the new compensation regulations.[17] Plaintiff's preference for the safe harbors lies not in their clarity, but in their leniency.

>3.    The Department Adequately Responded To Public Comments.

Plaintiff asserts that the compensation regulations should be invalidated because the Department did not meaningfully respond to various comments. But the record demonstrates just the opposite. In arguing that the Department failed to address "numerous compensation-related questions" posed by "several commenters," plaintiff cites to only three questions posed by a single commenter. Pl.'s Mot. at 26 (citing AR 3059-60). And the Department answered each of these questions, along with many others, in the final rule. *See* 75 Fed. Reg. at 66,874-75, 66,877.

Plaintiff next argues that the Department did not consider the possibility that the compensation regulations will "harm both students and the country by decreasing student enrollment." Pl.'s Mot. at 26. Plaintiff reasons that if institutions cannot compensate recruiters based on merit, "high-performing" recruiters will seek employment in other sectors and

---

[17] Plaintiff maintains that the Department did not confront these concerns, but it did. *See* 75 Fed. Reg. at 66,878-79. The agency is entitled to weigh the benefits of perfect clarity against the costs of regulations that invite abuse and contravene congressional intent.

prospective students "may never learn about the educational opportunities and payment options available to them." *Id.* Plaintiff's logic is flawed for numerous reasons addressed in the final rule. First, nothing in the compensation regulations prevents institutions from informing prospective students about educational programs or payment options. Second, institutions may still use a variety of merit-based factors to evaluate the quality of their recruiters. Finally, although plaintiff is concerned that talented recruiters will exit the education market, those concerns are not shared by professional recruiters themselves, who overwhelmingly support the Department's elimination of the safe harbors. *See, e.g.*, AR1457-73, 3799-3801; AR1597-1610, 6057-66. Even if plaintiff's predictions were sound, the Department's decision to promulgate the compensation regulations still would not be arbitrary or capricious. The Department is entitled, in the exercise of its discretion, to determine that any loss of enrollment resulting from a speculative exodus of "high-performing" recruiters from the education market is outweighed by the benefits of ensuring that prospective students learn about the educational opportunities and payment options available to them from recruiters who are free of any conflict of interest.

Lastly, plaintiff asserts that the Department ignored the compliance costs the compensation regulations would impose on institutions. Pl.'s Mot. at 27. But the Department did address potential costs. It acknowledged that the new regulations would impose costs on regulated parties, 75 Fed. Reg. at 34,855-34,856, and specifically indicated that colleges would "need to re-examine their (compensation) practices to ensure that they comply with [the new regulations]," 75 Fed. Reg. at 66,873. The Department invited regulated parties to provide "comments and supporting information related to possible burden stemming from any additional workload expected under the proposed regulations." 75 Fed. Reg. at 34,856. Although, as

plaintiff notes, Pl.'s Mot. at 27, some commenters stated that the regulations would impose costs,

not a single commenter put a number on the alleged costs or provided any supporting data.  Even

so, in response to the general comments it received regarding the costliness of the regulations as

a whole, the agency revised upward its cost projections in the final rule.  75 Fed. Reg. at 66,972.

The Department nevertheless determined that the benefits of the regulations outweighed these

revised cost estimates.  *Id.*  It was required to do no more.

At its core, plaintiff's challenge to the compensation regulations "centers on the wisdom

of [the Department's] policy, rather than whether [that policy] is a reasonable choice within a gap

left open by Congress."  *Chevron*, 467 U.S. at 866.  As such, plaintiff's challenge must fail.  The

Supreme Court has instructed that

> an agency to which Congress has delegated policy-making responsibilities may,
> within the limits of that delegation, properly rely upon the incumbent
> administration's views of wise policy to inform its judgments. . . .  In such a case,
> federal judges-who have no constituency-have a duty to respect legitimate policy
> choices made by those who do.  The responsibilities for assessing the wisdom of
> such policy choices and resolving the struggle between competing views of the
> public interest are not judicial ones: Our Constitution vests such responsibilities in
> the political branches.

*Id*. at 865-66 (quotation and citation omitted).  For all these reasons, plaintiff's challenge to the

compensation regulations fails.

II.     THE MISREPRESENTATION REGULATIONS DO NOT VIOLATE THE HEA,
        PLAINTIFF'S FIRST AMENDMENT RIGHTS, OR THE APA.

Plaintiff's claims that the new misrepresentation regulations "dramatically expand" the

statutory prohibition on substantial misrepresentation by, *inter alia*, including true but misleading

statements within its scope, not requiring an intent to deceive, and eliminating a materiality

requirement, are unfounded and hyperbolic.  Contrary to plaintiff's claims, the new regulations in

fact hew quite closely to federal and state statutory provisions and Supreme Court jurisprudence prohibiting false and misleading statements.  Plaintiff's further claim that the new misrepresentation regulations violate its First Amendment rights is equally meritless.  The new regulations do no more than prohibit false or inherently misleading statements which are not protected by the First Amendment.

A.      Plaintiff's Statutory Claim is Not Ripe.

As with plaintiff's incentive compensation claim, its statutory claim that the misrepresentation regulations impermissibly expand the scope of the HEA's misrepresentation prohibition is not ripe for review.  Plaintiff forecasts various ways in which the Department could enforce the new regulations in violation of the HEA (*e.g.*, by revoking a school's Title IV eligibility for a vendor's clerical error that is "accidentally" distributed to the public, or for using "too much jargon for the Department's taste," Pl.'s Mot. at 31).  But the Department has not actually taken any such enforcement action, let alone any enforcement action at all.  And, as discussed below, the Department has in fact stated that it will not enforce the regulations in the ways plaintiff speculates.  Of course, should the Department deviate from these intentions, a school that is the subject of an enforcement action based on a substantial misrepresentation could raise the arguments plaintiff raises as part of its defense.  The issues will be much more fit for decision at that point, when the regulations have been applied to a particular alleged misrepresentation, rather than the abstract situation that exists now.  *See supra* Part I.A.  Plaintiff does not face any harm based on the chilling effect of the regulations because, as discussed below, the regulations govern commercial speech which is considered unlikely to be chilled by overbroad regulation, due to the commercial motivation of the speaker.  *See Bates v. State Bar of*

*Ariz.*, 433 U.S. 350, 380-81 (1977)*; Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976).

B.      The New Regulations Do Not Impermissibly Expand "Substantial Misrepresentations" Prohibited by Statute.

1.      Consistent with the Statute, the New Regulations Apply Only to Substantial Misrepresentations about the Nature of a School's Educational Program, its Financial Charges, or the Employability of its Graduates.

Plaintiff takes issue with language in the introductory portion of the new regulations saying that a school is deemed to have engaged in substantial misrepresentation when it makes a substantial misrepresentation "regarding the eligible institution, including about the nature of its educational program, its financial charges, or the employability of its graduates."  Plaintiff compares this language with the virtually identical language of the statute (prohibiting an institution from "engag[ing] in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates") and somehow concludes, with no factual basis, that the Department will enforce the prohibition against substantial misrepresentations beyond the three categories specified in the statute.  The Department has, however, construed the new regulations *not* to expand the scope of prohibited substantial misrepresentation beyond the three categories listed in the statute.  *See* Dear Colleague Letter at 15.

The Court should accept the Department's limiting interpretation of its own regulation rather than plaintiff's strawman argument.  *See Alexander v. Cahill*, 598 F.3d 79, 90 (2d Cir. 2010) (accepting New York Attorney General's narrower interpretation of New York Appellate

Division rule prohibiting certain types of attorney advertising and solicitation); *Weaver v. U.S.*

*Info. Agency*, 87 F.3d 1429, 1438 (D.C. Cir. 1996) (adopting Government's limiting

interpretation of agencies' prepublication review scheme).  As the court found in *Weaver*, the

Department's "interpretation is what the government itself has put forward in this litigation—and

what it must adhere to in the future, at least unless it clearly announces an alternative reading."

87 F.3d at 1437.  The Department's interpretation is also a plausible and appropriate one when

the introductory language is read in the context of the new regulations.  *See id.* at 1436.  The new

regulations provide guidance on and examples of the types of statements that concern the nature

of a school's educational program, the nature of its financial charges, and the employability of its

graduates; they do not extend beyond these three categories in any way.  *See* 75 Fed Reg. at

66,959-60.

> 2.    The New Regulations Do Not Diminish Plaintiff's
>        Procedural Rights.

Plaintiff claims that the new regulations eliminate the rights of its members to notice and

opportunity for a hearing prior to adverse action for substantial misrepresentation.  The new

regulations do no such thing.  The HEA requires that any attempt by the Department to suspend

or terminate an institution's eligibility status or to impose a civil penalty based on a finding of a

substantial misrepresentation follow reasonable notice and opportunity for a hearing.  20 U.S.C.

§ 1094(c)(3)(A), (B)(i).  Nothing in the new regulations diminishes this requirement, as the

Department clarified in the preamble of the final rule in response to comments and in subsequent

guidance.  75 Fed. Reg. at 66,915 ("To the extent the Department chooses to initiate an action

based upon a violation of the misrepresentation regulations, nothing in the proposed regulations

diminishes the procedural rights that an institution otherwise possesses to respond to that action."); Dear Colleague Letter at 14-15.  Under the existing regulations (not challenged by plaintiff), the Department had authority to initiate a proceeding against a school for a substantial misrepresentation according to the procedures under 34 C.F.R. Part 668, Subpart G, or "[t]ake other appropriate action."  34 C.F.R. § 668.75(c).  The new regulations merely flesh out what "other appropriate action" might be, *see* 75 Fed. Reg. at 66,958 (revoke the school's program participation agreement, impose limitations on the school's Title IV participation, or deny participation applications made on behalf of the school), and do not decrease procedural rights, as the Department has repeatedly confirmed.

     3.     The Secretary's Definition of Misrepresentation Is Reasonable.

Plaintiff claims that the Department's definition of misrepresentation as including a statement that has the likelihood or tendency to deceive or confuse is contrary to the statute because (1) it includes true statements, and (2) it does not require an intent to deceive.  *See* Pl.'s Mot. at 30, 32-33.  The Department's definition, which comports with federal and state statutes prohibiting deceptive trade practices on the books for decades, and with Supreme Court precedent, is entirely reasonable and should therefore be upheld.

The Secretary's interpretation of "substantial misrepresentation" is a reasonable one entitled to deference.  *Chevron*, 467 U.S. at 842-43.  Congress did not define "substantial misrepresentation" in the HEA; it certainly did not answer the precise questions posed by plaintiff—whether factually true but misleading statements could be included in the definition, and whether an intent to deceive is required.  Therefore, the court must sustain the regulations if

they are based on a permissible construction of the statute. *Id.* at 843. The Department's interpretation of "misrepresentation" to include statements that are factually true but misleading in that they have the likelihood or tendency to deceive or confuse is clearly a permissible construction of the statute. As any fifth grader can tell you, "even literally true statements can have misleading implications." *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 652 (1985)). *See also, e.g.*, *In re R.M.J.*, 455 U.S. 191, 200-03 (1982); *Bates*, 433 U.S. at 366, 383; *Va. State Bd. of Pharmacy*, 425 U.S. at 771-72; *Nat'l Comm'n on Egg Nutrition v. FTC*, 570 F.2d 157, 162 (7th Cir. 1977). For example, an advertisement for Kraft "Singles" cheese that explains that each slice of cheese is made from five ounces of milk and that imitation cheese uses hardly any milk, while true, can nonetheless be misleading if it does not also disclose the facts that roughly 30% of the calcium contained in milk is lost during processing and that most imitation slices contain about the same amount of calcium as the Kraft Singles. The consumer is left with a misleading impression even though the statements themselves are factually true. *See Kraft*, 970 F.2d at 314-15, 322.

This idea that factually true information can be misleading is incorporated into the Federal Trade Commission Act's ("FTCA") prohibition on unfair or deceptive acts or practices in or affecting commerce. *See* 15 U.S.C. § 45(a)(1). It is well-settled that an advertisement or other statement may be deceptive under the FTCA if it has "a tendency and capacity to convey misleading impressions to consumers even though other nonmisleading interpretations may also be possible." *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C. Cir. 1977). *Accord, FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40 n.2 (D.C. Cir. 1985); *Trans World*

*Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979); *Goodman v. FTC*, 244 F.2d 584, 595, 604 (9th Cir. 1957); *FTC v. Civil Service Training Bureau*, 79 F.2d 113, 115 (6th Cir. 1935); *FTC v. Pharmtech Research, Inc.*, 576 F. Supp. 294, 301 (D.D.C. 1983). Other courts have variously phrased a deceptive advertisement or statement under the FTCA as one that is "likely to mislead consumers . . . ." *Kraft*, 970 F.2d at 314. *See also FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976).

Courts commonly refer to such deceptive statements as "misrepresentations." *See, e.g., Verity Int'l*, 443 F.3d at 64; *Kraft*, 970 F.2d at 313; *Trans World Accounts*, 594 F.2d at 214; *Chrysler Corp.*, 561 F.2d at 360, 363 n. 5; *Goodman*, 244 F.2d at 591-93; *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1258, 1260, 1267, 1268 (S.D. Fla. 2007). Additionally, an intent to deceive is not required for a violation of the FTCA; whether or not the defendant intended to convey a misleading impression is simply irrelevant. *See, e.g., Verity Int'l*, 443 F.3d at 63; *Chrysler Corp.*, 561 F.2d at 363 & n.5; *Pharmtech Research*, 576 F. Supp. at 301.

Similarly, numerous states have enacted laws prohibiting misleading statements that, while true, create a likelihood of confusion or misunderstanding, using terms similar to those that appear in the Department's new regulations. *See, e.g., Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 439-40 (4th Cir. 2010) (North Carolina deceptive practices act defining deceptive as having the tendency to deceive); *Ambrose v. New England Ass'n of Schools and Colleges, Inc.*, 252 F.3d 488, 492 (1st Cir. 2001) (Maine statute rendering party liable for a deceptive trade practice if it engages in conduct that creates a likelihood of confusion or misunderstanding); *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950, 119 Cal. Rptr. 2d 296, 304, 45 P.3d 243, 250 (Cal. 2003) (California laws prohibiting not only advertising which is

false, but also advertising which, although true, is actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public); *Manley v. Wichita Business College*, 237 Kan. 427, 431-37, 701 P.2d 893, 897-901 (Kan. 1985) (affirming judgment that vocational school misled student under Kansas deceptive practices act); *In re Shack*, 177 N.J. Super. 358, 360, 426 A.2d 1031, 1033 (N.J. Super. Ct. App. Div. 1981) (per curiam) (New Jersey statute prohibiting conduct of a character likely to deceive).  *See also Farrin v. Thigpen*, 173 F. Supp. 2d 427, 432 (M.D.N.C. 2001) (state bar rule prohibiting lawyers from making false or misleading statements about their services and defining a false or misleading statement as, *inter alia*, one that is likely to create an unjustified expectation about the results the lawyer can achieve).  The majority of state deceptive trade practices acts do not require knowing or intentional deception. *Curtis Lumber Co. v. Louisiana Pacific Corp.*, 618 F.3d 762, 779 (8th Cir. 2010) (surveying statutes).[18]

Plaintiff relies upon two cases and Black's Law Dictionary (6th ed. 1990) for its argument that true yet misleading information cannot be the basis for a misrepresentation.  One of those cases, however, acknowledges that the word "misrepresent" is "subject to several interpretations."  *Wieczorek v. Volkswagenwerk, A.G.*, 731 F.2d 309, 311 (6th Cir. 1984).  And Black's Law Dictionary has since been updated; the entry for "misrepresentation" in the most recent edition opens with "[t]he act of making a false *or misleading* assertion about something ..."  Black's Law Dictionary 1091 (9th ed. 2009) (emphasis added).

---

[18]  We note that the current regulations, which have been in place for over 25 years, 75 Fed. Reg. at 66,914, and which plaintiff does not challenge and concedes are lawful, also lack an intent requirement.  *See* 34 C.F.R. § 668.71(b).

4.     The Regulations Contain a Materiality Requirement.

Plaintiff claims that the new regulations lack any materiality requirement, subjecting

schools to "liability for any and all misrepresentations."  Pl.'s Mot. at 30-31.  But the definition

of "substantial misrepresentation" in the new regulations incorporates a materiality standard.   It

holds schools accountable only for a misrepresentation about the nature of their educational

programs, their financial charges, or the employability of their graduates, "on which the person to

whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's

detriment."  75 Fed. Reg. 66,959.  Misrepresentations about a school's programs, charges, and

the employability of its graduates are unquestionably material to enrollment decisions.  *See FTC*

*v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) ("A misleading impression created

by a solicitation is material if it involves information that is important to consumers and, hence,

likely to affect their choice of, or conduct regarding, a product.") (internal quotations and citation

omitted); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) (similar); *FTC*

*v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1081 (N.D. Cal. 2009) (same).  Moreover, requiring

reasonable reliance on the misrepresentation reinforces materiality; if the misrepresentation was

not material, the person to whom it was made would not have reasonably relied upon it to his or

her detriment.  *See  Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266 ("A representation is

material [under section 5 of the FTCA] if it is of a kind usually relied upon by a reasonably

prudent person.").

Additionally, the Department repeatedly emphasized in the preamble to the final rule that

it intends to use a rule of reasonableness in enforcing the statutory and regulatory standards and

consider all of the facts present.  In response to commentators' claims that the regulations "do not

39

contain any standards of intent, harm, or materiality," the Department explained as follows:

> The Department has always possessed the legal authority to initiate a sanction under part 668, subpart G for any violation of title IV, HEA program regulations.  However, the Department has also always operated within a rule of reasonableness and has not pursued sanctions without evaluating the available evidence in extenuation and mitigation as well as in aggravation.
>
> The Department intends to continue to properly consider the circumstances surrounding any misrepresentation before determining an appropriate response. Depending on the facts presented, an appropriate response could run the gamut from no action at all to termination of an institution's title IV, HEA eligibility depending upon all of the facts that are present. . . .
>
> In determining whether an institution has engaged in substantial misrepresentation and whether to impose penalties, the Department uses a rule of reasonableness and considers various factors.

75 Fed. Reg. 66,914.  *See also id.* at 66,915 (Department will consider magnitude of the violation and whether there was a single, isolated occurrence); *id.* (Department will consider whether the misrepresentation was intentional or inadvertent).  The definition for "substantial misrepresentation" did not change from the current regulations.  It has been in place for over 25 years, and plaintiff points to no abuse of it by the Department.  The Court should accept the Department's position that it intends to use a rule of reasonableness and consider all of the facts present in enforcing the misrepresentation regulations and reject plaintiff's baseless speculation that the Department will misuse its enforcement authority.  *See Alexander*, 598 F.3d at 90; *Weaver*, 87 F.3d at 1438.

    C.    The New Regulations Do Not Violate Plaintiff's First Amendment
          Rights.

The misrepresentation regulations prohibit false or inherently misleading commercial speech not protected by the First Amendment, as a matter of law.  The Court should therefore reject plaintiff's claim that the regulations violate its First Amendment rights.

40

1.      The Regulations Regulate Commercial Speech.

Commercial speech is speech that proposes a commercial transaction and is motivated by the speaker's economic interests.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-68 (1983); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561-62 (1980); *Va. State Bd. of Pharmacy*, 425 U.S. at 762.  "Speech is commercial in its content if it is likely to influence consumers in their commercial decisions."  *Kasky*, 27 Cal. 4th at 969, 119 Cal. Rptr. 2d at 318, 45 P.3d at 262.  Commercial speech "includes statements about a product or service, or about the operations or qualifications of the person or company offering the product or service."  *Kasky*, 27 Cal. 4th at 961, 119 Cal. Rptr. at 312, 45 P.3d at 257 (citing *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 476 (1995); *Ibanez v. Fl. Dep't of Business & Prof. Regulation*, 512 U.S. 136 (1994); *Va. State Bd. of Pharmacy*, 425 U.S. 748).  The fact that the speech includes discussion of important public issues does not turn it into noncommercial speech.  *Bolger*, 463 U.S. at 67-68.  Indeed, "commercial speech commonly concerns matters of intense public and private interest."  *Kasky*, 27 Cal. 4th at 964, 119 Cal. Rptr. 2d at 315, 45 P.3d at 259.

Government is permitted to regulate false, deceptive, or misleading commercial speech for three reasons.  First, "[t]he truth of commercial speech . . . may be more easily verifiable by its disseminator than . . . news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else."  *Va. State Bd. of Pharmacy*, 425 U.S. at 771 n.24.  Second, commercial speech is considered "hardi[er]" than noncommercial speech in that commercial speakers, because they act from a profit motive, are less likely to be unduly chilled by regulation.  *Id*.  Third, the government's interest in preventing commercial harms justifies

41

restrictions on false or misleading commercial speech. *Kasky*, 27 Cal. 4th at 955-56, 119 Cal. Rptr. 2d at 308, 45 P.3d at 253.

The new misrepresentation regulations clearly regulate the commercial speech of plaintiff's private, for-profit membership.[19]  The regulations prohibit false or misleading advertising, marketing, recruiting, and admissions statements and tactics made by commercial actors for the ultimate purpose of increasing student enrollment and thus the revenues and profits of schools like plaintiff's members, which are private sector colleges and universities owned and operated by private individuals, private investors and public corporations (Compl. at ¶¶ 2, 18). *See* 75 Fed. Reg. at 66,913.   The scope of the regulations reaches not only eligible institutions and their representatives, but also "any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, recruiting or admissions services . . . ." 75 Fed. Reg. 66,959.

The regulations regulate representations concerning facts material to commercial transactions—the nature of the service provided by schools, what it costs, and what results it produces.  The types of statements identified in the regulations as concerning the nature of a school's educational programs, its financial charges, and the employability of its graduates are indicative of statements one would make in the course of encouraging someone to enroll in an institution or otherwise promoting the institution, not in debating public issues of higher education.  Examples include statements about whether a student may transfer course credits earned at the institution to another institution; whether successful completion of a course of

---

[19]  The misrepresentation regulations do not apply to plaintiff because it is not an institution receiving Title IV funds.  20 U.S.C. § 1094(c)(3)(A).

instruction qualifies a student for acceptance to a labor union or to take an examination required

for a job; the cost of the program and the school's refund policy if the student does not complete

the program; the availability and nature of any financial assistance offered to students, including

a student's responsibility to repay any loans, regardless of whether the student completes the

program and gets a job; the institution's plans to assist its graduates in finding jobs; and

government job market statistics in relation to the potential placement of a school's graduates.

*Id*. These are all factual statements describing matters within the personal knowledge of the

speaker, and, at least in a for-profit context, are reasonably presumed to be made for the purpose

of financial gain. *See Va. State Bd. of Pharmacy*, 425 U.S. at 771 n.24; *Kasky*, 27 Cal. 4th at

955-56, 962, 119 Cal. Rptr. 2d at 308, 313, 45 P.3d at 253, 257.

  The misrepresentation regulations were motivated in part by an undercover investigation

by the United States Government Accountability Office ("GAO") into fraudulent, deceptive, or

otherwise questionable sales and marketing practices in the for-profit college industry.  75 Fed.

Reg. 66,914.  As the GAO stated, for-profit colleges are institutions of post-secondary education

"that are privately-owned or owned by a publicly traded company and whose net earnings can

benefit a shareholder or individual."  *See* AR 7267.  As summarized in the preamble to the final

rule, the GAO investigation found that "[i]nstitutional personnel engaged in deceptive practices,

including by encouraging applicants to falsify their FAFSA information, by exaggerating

applicants' potential salary after graduation, and by failing to provide clear information about the

institution's program duration, costs, and graduation rates."  75 Fed. Reg. 66,914.  *See also* AR

1049-53.  The new misrepresentation regulations were aimed at curbing such abuses, which arise

in the context of proposing a commercial transaction and are motivated by the institution's

economic interests.  *See Bolger*, 463 U.S. at 66-68; *Central Hudson*, 447 U.S. at 561-62; *Va. State Bd. of Pharmacy*, 425 U.S. at 762.  The regulations protect students as well as the federal government and taxpayers, who are ultimately on the hook when, as is too frequently the case, students cannot repay their student loans.  *See* AR 6226 ("Much like incentive compensation, the propensity of schools to use misinformation and deceptive advertising to attract, enroll, and secure financial aid for students has contributed to increasing higher education debt burdens and default rates."); *id*. 7268.  They therefore further the government's interest in preventing substantial misrepresentations by institutions participating in the Title IV program.  *See Kasky*, 27 Cal. 4th at 955-56, 119 Cal. Rptr. 2d at 308, 45 P.3d at 253.

False or misleading statements, such as those prohibited by the HEA and the misrepresentation regulations, have routinely been held to be commercial speech.  *See, e.g., Kraft*, 970 F.2d at 320-21 (advertising campaign that misrepresented calcium content and relative calcium benefit of Kraft singles constituted commercial speech); *Nat'l Comm'n on Egg Nutrition*, 570 F.2d at 162-63 (false and misleading statements about relationship between eating eggs and heart and circulatory disease were commercial speech); *Kasky*, 27 Cal. 4th at 963-69, 119 Cal. Rptr. 2d at 313-18, 45 P.3d at 258-62 (allegedly false or misleading public statements made by Nike, in response to public criticism, defending its labor practices and workplace conditions, for purposes of maintaining and increasing its sales and profits, was commercial speech).

There is no support for plaintiff's argument that false or misleading statements about a school's educational programs, financial charges, or employability of its graduates, made by the school's representative during the course of a debate on education policy, would be

44

noncommercial speech.  Pl.'s Mot. at 34.  This is a not-so-thinly-veiled attempt to "immunize

false or misleading product information from government regulation simply by including

references to public issues," which the Supreme Court has proscribed.  *Bolger*, 463 U.S. at 68.  In

*Kasky*, 27 Cal. 4th at 964-65, 119 Cal. Rptr. 2d at 315, 45 P.3d at 259, the California Supreme

Court rejected a similar argument made by Nike that its allegedly false and misleading statements

about its labor practices and workplace conditions were not commercial speech because they

were part of a public debate on issues of intense public interest.  And in *Nat'l Comm'n on Egg*

*Nutrition*, 570 F.2d at 162-63, the court held that statements by a trade association denying there

was scientific evidence that eating eggs increased the risk of heart and circulatory disease were

commercial speech, even though the statements were made as part of the public debate on this

issue.[20]

---

[20]  The court in *Kasky* also rejected the same argument plaintiff makes that because the
regulations apply only to the speech of schools, and not to their opponents in public debate, they
are impermissible content-based restrictions on speech.  Pl.'s Mot. at 34.  The court found this
argument to be "misdirected" because the regulations "do not suppress points of view but instead
suppress false and misleading statements of fact."  27 Cal. 4th at 967, 119 Cal. Rptr. 2d at 317,
45 P.3d at 261.  The court explained, moreover, that "differential treatment of speech about
products and services based on the identity of the speaker is inherent in the commercial speech
doctrine as articulated by the United States Supreme Court."  *Id.*  A noncommercial speaker's
statements criticizing a product or service are generally protected as noncommercial speech,
whereas a commercial speaker's statements in support of the same product or service may be
prohibited entirely if the statements are false or misleading.  The different treatment is justified
because when a speaker promotes its own product or service, it is "'less necessary to tolerate
inaccurate statements for fear of silencing the speaker'" due to the facts that the described speech
is more easily verifiable by the speaker and less likely to be chilled by regulation.  *Id.* (quoting
*Va. State Bd. of Pharmacy*, 425 U.S. at 771 n.24).
   Of course, to the extent that the Department initiates an enforcement action against
plaintiff or one of its members for noncommercial speech, plaintiff or the member school would
be free to argue in that action that heightened scrutiny applies to any First Amendment claim.
*See Kasky*, 27 Cal. 4th at 966, 119 Cal. Rptr. 2d at 316, 45 P.3d at 260.

>2.      The Regulations Prohibit False or Inherently
>        Misleading Speech Not Protected by the First
>        Amendment.

Commercial speech that is false, deceptive, or misleading is not protected by the First

Amendment.  *See, e.g., Ibanez*, 512 U.S. at 142; *Peel v. Attorney Registration and Disciplinary*

*Comm'n of Il.*, 496 U.S. 91, 100 (1990); *Zauderer*, 471 U.S. at 638; *In re R.M.J.*, 455 U.S. at

200-03; *Central Hudson*, 447 U.S. at 566; *Kasky*, 27 Cal. 4th at 967, 119 Cal. Rptr. 2d at 317, 45

P.3d at 261.  "The First Amendment . . . does not prohibit the [government] from insuring that

the stream of commercial information flow cleanly as well as freely."  *Va. State Bd. of*

*Pharmacy*, 425 U.S. at 771-72.  The inquiry into false or misleading commercial speech stops at

the first step of the *Central Hudson* test for commercial speech.  *See Central Hudson*, 447 U.S. at

566 ("In commercial speech cases . . . a four-part analysis has developed.  At the outset, we must

determine whether the expression is protected by the First Amendment.  For commercial speech

to come within that provision, it at least must concern lawful activity and not be misleading.

Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield

positive answers, we must determine whether the regulation directly advances the governmental

interest asserted, and whether it is not more extensive than necessary to serve that interest.").[21]

Courts have further defined what is meant by the term "misleading" as used in *Central*

*Hudson*.  *In re R.M.J.* involved a challenge to a state regulation that permitted  lawyer advertising

---

[21] Thus, the argument at pages 35-36 of plaintiff's motion is off-point.  Even if the remaining steps of the *Central Hudson* test were applicable here, which they clearly are not, the misrepresentation regulations would pass constitutional muster because they directly advance the government's substantial interest in ensuring the integrity of educational programs receiving federal Title IV aid, preventing students from being misled into attending such programs, and protecting the taxpayers' investment in the Title IV program.  *See* 75 Fed. Reg. at 66,913, 66,915.

but restricted it to certain categories of information.  The Supreme Court stated that commercial speech that is "inherently misleading" or actually misleading may be prohibited entirely, but government "may not place an absolute prohibition on certain types of potentially misleading information, e.g., a listing of areas of [a lawyer's] practice, if the information also may be presented in a way that is not deceptive." *In re R.M.J.* 455 U.S. at 203.  The Court further defined "inherently misleading" to mean "inherently likely to deceive." *Id*. at 202.  *See also Peel*, 496 U.S. at 121 (O'Connor, J., dissenting); *Public Citizen, Inc. v. Louisiana Attorney Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 636 (6th Cir. 2010); *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106-07 (9th Cir. 2004); *Joe Conte Toyota, Inc. v. Louisiana Motor Vehicle Comm'n*, 24 F.3d 754, 756 (5th Cir. 1994); *Johnson v. Hall*, Nos. 4:08-cv-2726-TLW-TER, 4:09-cv-0102-TLW-TER, 2010 WL 3724746, at *11-12 (D.S.C. Aug. 23, 2010); *Piazza's Seafood World, LLC v. Odom*, No. Civ. A. 04-690, 2004 WL 2998575, at *4 (E.D. La. Dec. 23, 2004); *N.C. State Bar v. Culbertson*, 177 N.C. App. 89, 94-95, 627 S.E.2d 644, 648-49 (Ct. App. 2006).[22]  *Cf. Peel*, 496 U.S. at 112 (Marshall, J., concurring) (describing "inherently misleading" as "inherently conducive to deception and coercion").

The new misrepresentation regulations—almost verbatim—prohibit commercial speech that is "inherently likely to deceive" and therefore ban inherently misleading speech not protected by the First Amendment.  The regulations define a misleading statement as any statement "that has the likelihood or tendency to deceive or confuse."  Plaintiff contends, without any legal

---

[22]  This definition dovetails with the standard for deceptive or misleading statements under the FTCA and state deceptive practices acts, as discussed above.

support, that statements that merely tend to confuse cannot be inherently misleading and can only be potentially misleading. Pl.'s Mot. at 35. But this argument ignores Supreme Court precedent, which, just like the challenged regulations, has defined "inherently misleading" commercial speech as having the likelihood, or tendency, to deceive.[23] The regulations do not violate plaintiff's First Amendment rights.

    D.    The Misrepresentation Regulations Are Not Unconstitutionally Vague.

    The foregoing argument as to the meaning and legality of the misrepresentation regulations disposes of plaintiff's cursory argument that the regulations are unconstitutionally vague. Pl.'s Mot. at 37-38. Plaintiff contends that the regulations are unconstitutionally vague because they do not provide sufficient guidance on what schools can and cannot say to avoid liability for statements that have a likelihood or tendency to deceive or confuse, and because they provide the Department with unfettered discretion to enforce them. This argument is somewhat

---

[23] The Supreme Court had something different in mind when it said that government "may not place an absolute prohibition on certain types of potentially misleading information, *e.g.*, a listing of areas of [a lawyer's] practice, if the information also may be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. at 203. A prophylactic ban on a certain type of potentially misleading speech would be, for example, a ban on the use of illustrations in advertisements run by attorneys. *See Zauderer*, 471 U.S. at 632-33. Illustrations in attorney ads are not inherently likely to deceive the public; certain illustrations, depending on their content, may be misleading, but that does not justify a prophylactic ban on all of them. Rather, the government's interest in preventing deceptive or misleading illustrations in attorney ads can be accomplished by "means short of a blanket ban," such as a restriction on deceptive or misleading illustrations in attorney ads. *Id*. at 648-49.

    That is, of course, what the Department has done here. Rather than banning all statements by eligible institutions concerning the nature of their educational programs, their financial charges, or the employability of their graduates, the Department banned only such statements that are false, erroneous or misleading, with misleading defined as having the likelihood or tendency to deceive or confuse. Thus, the regulations do not absolutely prohibit certain types of potentially misleading commercial speech, but only prohibit inherently misleading commercial speech.

ironic, given that the new regulations provide more detailed guidance than existed in the

regulations plaintiff favors and certainly more detail than exists in the statute.  In any event, as

the above discussion demonstrates, there is a plethora of law applying and interpreting

prohibitions against statements that have a  likelihood or tendency to deceive or confuse to guide

schools.  Courts have rejected vagueness arguments with respect to similar restrictions.  *See, e.g.,*

*Scott v. Ass'n for Childbirth at Home, Int'l*, 88 Ill. 2d 279, 289-90, 430 N.E.2d 1012, 1017-18, 58

Ill. Dec. 761, 766-67 (1982) (Illinois Deceptive Business Practices Act is not unconstitutionally

vague; businessmen subject to regulation by the Act may be expected to know what a

"misrepresentation" is); *Mother & Unborn Baby Care of N. Tex., Inc. v. Texas*, 749 S.W.2d 533,

541 (Tex. App. 1988) (Texas Deceptive Trade Practices Act, making misleading trade practices

that cause confusion unlawful, is not impermissibly vague).  *Cf. FTC v. Nat'l Urological Grp.,*

*Inc.*, 645 F. Supp. 2d 1167, 1186-87 (N.D. Ga. 2008) (standards FTC uses to determine whether

advertising claims regarding health and/or safety are adequately substantiated are not

unconstitutionally vague).[24]

III.     THE STATE AUTHORIZATION REGULATIONS ARE LAWFUL.

Plaintiff's pre-enforcement challenge to the validity of the state authorizations regulations

under the HEA and the APA must fail.  This Court lacks jurisdiction over these claims because

---

[24]  The Department reasonably and adequately responded to relevant comments on the
misrepresentation regulations.  *See* Pl.'s Mot. at 38-39.  Many of the Department's responses to
these comments are discussed above.  Other responses explained that the regulations are not
vague (75 Fed. Reg. at 66,914); were based in part on undercover testing finding that for-profit
schools made deceptive or questionable statements (*id*. at 66,914); would not be confusing to
students (*id*. at 66,916); and why the regulations did not address affirmative omissions.  *Id*. at
66,917-18.  The Department also modified its proposed misrepresentation regulations in response
to certain comments.  *See, e.g., id.* at 66,916, 66,919.

plaintiff lacks standing and the claims are not yet ripe—injury is by no means certain and, in any event, cannot occur until July 1, 2013, at the earliest.  The challenge also fails on the merits because the regulations accord with the HEA and are not arbitrary or capricious.

A.      Plaintiff Lacks Standing to Challenge the State Authorization
        Regulations, and its Claims Are Not Ripe.

The core of plaintiff's challenge to the state authorization regulations is that the Department is infringing on the rights of the states, *see, e.g.*, Pl.'s Mot. at 39-40, but this is not enough to invoke the jurisdiction of the federal courts, *see Allen v. Wright*, 468 U.S. 737, 754 (1984).  Plaintiff, by claiming the Department alters the balance between the federal government and the states, *see, e.g.*, Compl. ¶ 16 (accusing the Department of "imping[ing] so severely upon State prerogatives"), is essentially mounting a commandeering argument, *see New York v. United States*, 505 U.S. 144, 161 (1992), an argument which traces its origins to the Tenth Amendment, *see* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.").

Non-state plaintiffs have no standing to assert that the federal government violates the Tenth Amendment by infringing on states' rights qua states, *see, e.g., Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 144 (1939); *see generally McConnell v. FEC*, 540 U.S. 93, 186 (2003), *overruled in part on other grounds by Citizens United v. FEC*, 130 S. Ct. 876 (2010), and there can be no doubt that plaintiff is alleging that the Department has infringed on states' rights. Plaintiff even acknowledges in its briefing that its statutory claim belongs to the states, quoting a passage about "protect[ing] [S]tates' interests."  Pl.'s Mot. at 40 (second alteration in Pl.'s Mot.). The bulk of plaintiff's HEA argument is a constitutional argument masquerading as a statutory

claim,[25] and this Court ought not consider a statutory claim premised on a constitutional right

plaintiff has no standing to assert.[26]  *See Warth v. Seldin*, 422 U.S. 490, 499-500 (1975).

Plaintiff asserts as well that federal regulation of the states will cause its members to lose

access to federal Title IV funds.  Under one scenario, injury to the institutions might accrue "[i]f

States choose not to institute compliant authorization regimes."  *E.g.*, Compl. ¶ 81.  Under

another scenario, state authorization processes might be so insuperable that plaintiff's members

will be unable to become authorized.  *See* Pl.'s Mot. at 45 ("[T]he State Authorization

regulations impose[] an unjustifiable, impossible burden on online educational programs.").

Under yet another scenario, "there may not be a state official willing or able to provide schools

with the documentation required."  *Id.* at 43.  Each of these "what ifs" assumes that the

institutions will accordingly see a drop in enrollment, and thus revenue, significant enough to

constitute legally cognizable injury, *see* Compl. ¶ 85, but they are insufficient to support standing

---

[25] Moreover, the regulations do not violate the Tenth Amendment.  Congress has "substantial power under the Constitution to encourage the States," *New York v. United States*, 505 U.S. 144, 149 (1992), power which includes the ability to require states to adopt basic measures designed to prevent fraud on the federal government should those states wish their residents to benefit from federal student aid, *see id.* at 168; *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985).  Congress also made "its intention 'clear and manifest'" that the Department require institutions operating within a state's borders to be authorized by the state. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991).  The language of the HEA was "specific[]" and "unequivocal" in this regard.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985).  If anyone altered the balance between the states and the federal government, it was Congress.  *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).  Two states submitted comments in support of the state authorization regulations, *see* AR 1966, 2277, further suggesting that the regulations present them no constitutional insult.

[26] Nor can plaintiff's frequent discussions of the rights of students, *see* Compl. ¶¶ 81, 82, 84, 85, 86, give it standing, *see Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 415 (D.C. Cir. 1994).  Those students are fully capable of protecting their own rights.

or ripeness.

Article III of the U.S. Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992), and to show standing, that is, a live case or controversy, plaintiff must demonstrate three elements: "First, the plaintiff must have suffered an injury in fact . . . . Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (quotation marks and citations omitted). An injury in fact cannot be "conjectural or hypothetical." *Id.* at 560 (quotation marks and citations omitted). Moreover, "standing is 'substantially more difficult to establish' where . . . the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge." *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289-90 (D.C. Cir. 2007) (quoting *Lujan*, 504 U.S. at 562).

Plaintiff's injury, conditioned on "a number of predicate facts," *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004), allegedly flowing from what plaintiff characterizes as federal regulation of states, is the definition of conjecture. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."). It is far from clear that states will fail to comply with these modest procedures, or that they will deny authorization to deserving institutions, or that they will fail to produce documentation of proper authorization where it may be required, resulting in a denial of Title IV funding and a substantial drop in enrollments from students who wished to attend those institutions, *see United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("[W]e may reject as overly speculative

52

those links which are predictions of future events (especially future actions to be taken by third parties).").  Plaintiff's hypothetical concerns amount to nothing more than "unadorned speculation," which "will not suffice to invoke the federal judicial power."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

Plaintiff's state authorization claim is also unripe insofar as the asserted injury cannot occur (if it were to occur at all) for several years.  "Article III requires not only that an alleged injury be concrete and particularized, but also that it be imminent."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (quotation marks and citation omitted); *see also id.* at 1431 (noting that prudential considerations also counsel that courts ought not be "wasting [their] resources by prematurely entangling [them]selves in abstract disagreements," particularly "where, as here, other branches of government are involved").  Although suit can be ripe "even if [government] power has not been exercised to [plaintiff's] detriment," because the threat of its use can hang over a plaintiff "like the sword over Damocles," *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991), there must be more than the mere possibility that the government might take enforcement action under a hypothetical set of circumstances.

Plaintiff claims that some of its member institutions will lose access to federal financial aid dollars when they struggle to obtain authorization from states in which they operate.  Yet the regulations are not effective until July 1, 2011, and institutions may receive extensions of up to two years should "a State . . . be unable to provide appropriate State authorizations to its institutions."  75 Fed. Reg. at 66,833.  Thus, institutions can only be injured by states unable to provide such authorizations on July 1, 2013, at the earliest; the Department cannot sanction them

53

in the interim.  To the extent plaintiff claims its member institutions will be injured by what third

parties—the states—may fail to do, the claim, based on the (imagined) unwillingness of states to

undertake the flexible steps outlined in the regulations, is not now ripe, and "may never be ripe

for" review; "deciding the controversy would be at best a waste of judicial resources, and at

worst a usurpation."  *Nat'l Treasury Emps.*, 101 F.3d at 1432.[27]

 B. The State Authorization Regulations Do Not Violate the HEA.

 Plaintiff's state authorization claims must fail under the HEA.  Plaintiff's argument

largely consists of an assertion that the Department has misinterpreted Congress's use of the

word "in" with respect to what state approvals are needed for an institution, but to the extent that

the scope of such approvals is unclear in the HEA, the regulations represent a reasonable

interpretation of ambiguous language.  *See Chevron*, 467 U.S. at 844.

 Under the HEA, students may receive federal Title IV financial aid only if "enrolled or

accepted for enrollment in a degree, certificate, or other program . . . at an institution of higher

education."  20 U.S.C. § 1091(a)(1).  The HEA defines an institution of higher education to

mean, in part, "an educational institution <u>in</u> any State that . . . is legally authorized within such

---

[27] Plaintiff also cannot establish causation or redressibility.  If an institution fails to comply with state authorization requirements, any injury would be self-inflicted insofar as it could be avoided by simply complying with state law.  *See Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1290 (D.C. Cir. 2007).  Plaintiff further supposes that students wish to spend their Title IV dollars at institutions that could not earn state authorization.  But with congressional acknowledgment that distance education (the delivery of instruction to students who are separated from their instructor) presents a serious potential for fraud and abuse, *see* H.R. Rep. 105-481, at 144 (1998); S. Rep. No. 105-181, at 68 (1998), and with news outlets documenting the same, *see* AR 7365-541, it is far from clear that students would continue to enroll at institutions which could not obtain state authorization.

State to provide a program of education beyond secondary education."[28]  *Id.* § 1001(a)(2)

(emphasis added).  The Department has interpreted this statutory command to mean that

institutions providing distance education must obtain authorization in those states in which they

provide educational services to students (*i.e.*, in states where the student procuring and using the

services of the plaintiff's members resides), if those states require such approval.  *See* Dear

Colleague Letter at 6-7.  A state is not required to have a process to approve institutions offering

distance education within that state, but if a state requires such approval, it becomes a component

of the state authorization the institution must meet for compliance with the HEA.  75 Fed. Reg. at

66,947.

Although the HEA refers to institutions "in any State," 20 U.S.C. § 1001(a), the statute

does not define the meaning of "in," *see id.* § 1003.  The Court, therefore, must find other ways

to interpret its meaning.  One such way is to place the word in context, *see FDA v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000), and at least six separate provisions of

the HEA make clear that an institution is "in" a state when it is "operating" within that state, *see*

20 U.S.C. § 1099c(a) ("[T]he Secretary shall determine the legal authority to operate within a

State . . . of an institution of higher education."); *see also id.* §§ 1094(a)(21), 1099a(a)(1),

1099a(a)(2), 1099a(b), 1099c(c)(6)(B)(iii) (similar).  Clearly, "in" means "operating within."

This interpretation reflects Congress's intent.  *See Bell Atlantic Tel. Cos. v. FCC*, 131

F.3d 1044, 1049 (D.C. Cir. 1997) (looking to "text, history, and purpose" of statute).  Both

---

[28] An institution of higher education is defined under § 1001 to include only "public or
other nonprofit institution[s]."  20 U.S.C. § 1001(a)(4).  Proprietary institutions of higher
education are defined elsewhere in the statute and may not be public or nonprofit.  *See id.* §
1002(b)(1)(C).  In all parts of the HEA relevant to this suit, "the term 'institution of higher
education' . . . includes . . . a proprietary institution of higher education."  *Id.* § 1002(a)(1)(A).

Houses agreed that institutions must be authorized in any state in which they operate.  *See, e.g.*, H.R. Rep. 105-481, at 148 (1998); S. Rep. No. 105-181, at 70 (1998).  This intention accords with the purposes of the statute, which includes both maintaining the quality of higher education in America and safeguarding the expenditure of federal taxpayer funds.  *See, e.g.*, S. Rep. No. 105-181, at 69; *see also Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 778 (1st Cir. 2000) ("This is a federal program, [and] federal dollars are at stake.").

The HEA defines distance education to mean, in part, "deliver[ing] instruction to students who are separated from the instructor."  20 U.S.C. § 1003(7)(A)(i).  An institution providing distance education is indeed operating in any state to which it delivers instruction, that is, any state where its students are located.  *Cf. Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 317 (1945) (on presence in a state).  If this point is not evident from the statute, plaintiff admits as much in its Complaint.  *See* Compl. ¶ 105 (mentioning "States in which [institutions] operate").  Therefore, in light of other provisions of the statute and the legislative history, this Court should hold the Department's interpretation of the word "in" to be reasonable.  *See Bell Atlantic*, 131 F.3d at 1048, 1050 (deferring to agency interpretation of words "through" and "to").[29]

Plaintiff objects as well to other features of the state authorization regulations.  *See* Pl.'s Mot. at 39-40.  Plaintiff asserts that the provision asking states that want to authorize institutions to provide services to their student-residents to receive and act on student complaints has no

---

[29] Conversely, plaintiff's presumed reading of the HEA—that an institution authorized to operate in one state could provide distance education nationwide without regard to whether any other state approvals were needed and obtained—is clearly inconsistent with congressional intent that institutions obtain state approvals where they operate.

basis in the statute.  The HEA, however, contemplates that the states will play an important role in collecting "credible evidence" of and reporting "fraud," *see* 20 U.S.C. § 1099a(a)(3)(A), and the legislative history confirms that the state authorization process has a substantive component, *see, e.g.*, H.R. Rep. 105-481, at 148 ("States have a number of options in overseeing institutions within their boundaries including State Higher Education Boards and State licensing agencies. The Committee expects States to continue to use these entities to ensure the integrity of institutions operating within their boundaries."); S. Rep. No. 105-181, at 70 ("States, through the licensing process, are primarily responsible for consumer protection functions.").  *See also* AR 7351-52 (Congressional testimony by plaintiff's president that it "is the job of the . . . state departments," among others, to investigate schools which "are not playing by the rules").

Plaintiff also complains about the mechanics of the state authorization regulations.  The HEA requires that institutions be "legally authorized within such State to provide a program of education beyond secondary education," 20 U.S.C. §§ 1001(a)(2), 1002(b)(1)(B); the only innovation of the regulations is that an institution be authorized by name and plaintiff somehow finds this criterion to be at odds with the HEA.  Plaintiff never makes clear how a state could meaningfully authorize an institution without employing that institution's name, and there is a clear public purpose served by ensuring that institutions are operating under the names by which they are authorized by a state.  The Department's "by name" requirement is reasonable and falls comfortably within its statutory authority.

C.     The State Authorization Regulations Are Not Arbitrary Or Capricious.

Plaintiff maintains that the regulations represent are arbitrary and capricious and therefore prohibited under 5 U.S.C. § 706(2)(A).  Because the regulations and accompanying guidance are

clear, consistent, well-reasoned, and factually supported, the Court should reject this claim.

First, plaintiff complains that the regulations are internally contradictory because in one place in the preamble discussion of the regulations, the Department states that the regulations "require the creation of a State licensing agency." *See* Pl.'s Mot. at 42; *see also* 75 Fed. Reg. 66,858. But the Department distanced itself from this stray comment repeatedly and decisively, and the statement is transparently an error because it is directly at odds with other preamble discussion and the regulatory text. Specifically, the regulations say that authorization can be accomplished in numerous ways: "[an] institution [must be] established by name as an educational institution by a State through a charter, statute, constitutional provision, or other action issued by an appropriate State agency or State entity." 75 Fed. Reg. at 66,946; *see also id.* at 66,947 (similar). A state need not create an agency in order to comply with this rule.

This point was expounded on many times in the preamble. *See id.* at 66,858 ("These final regulations do not mandate that a State create any licensing agency for purposes of Federal program eligibility."); *id.* at 66,861 (noting that the legal means of authorizing an institution "include provisions of a State's constitution or law, State charter, or articles of incorporation that name the institution as established to offer postsecondary education"); *id.* at 66,862 (noting that even a "colonial charter" could suffice); *id.* (including a list of nine hypothetical "Institutions considered legally authorized," of which seven were considered legally authorized without obtaining authorization from a state licensing agency) *id.* at 66,863 (describing five different ways that five different schools could obtain authorization). The Department even amended the proposed rules "to distinguish the type of State approvals that are acceptable." *Id.* at 66,861. The Department thus made it clear that states need not create state licensing agencies, and the

comment highlighted by plaintiff in the preamble discussion was in error; what is unclear is why plaintiff has chosen to pursue this non-issue.

This is not a situation where an agency is attempting to push an interpretation that has been rejected early and often. *See Am. Tel. & Tel. Co. v. FCC*, 836 F.2d 1386, 1391 (D.C. Cir. 1988). Rather, the Department offered a single dissonant line in what is otherwise uniform guidance in the regulation's preamble, and plaintiff is seizing on that line and ignoring the rest of the Department's statements. While the Department's inadvertent slip in the preamble discussion "may offend certain attorneys and copyeditors," it "does not offend the APA." *N. Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 95 (D.C. Cir. 1999); *cf. U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (rejecting reliance on "a single sentence or member of a sentence").

Second, plaintiff complains that its institutions cannot become authorized if states do not comply with the federal regulations, thus subjecting the institutions to harm flowing from requirements over which they "have no control." *See* Pl.'s Mot. at 42. But the HEA itself demands that states authorize institutions before those institutions may receive Title IV funds. *See* 20 U.S.C. §§ 1001(a)(2), 1091(a)(1). These, too, are requirements over which plaintiff might complain its institutions "have no control," but it is Congress that imposed them.

The regulations also require states to have in place a process to review and act on student complaints. States need not create an agency to comply with this provision; "a State may fulfill this role through a State agency or the State Attorney General as well as other appropriate State officials." 75 Fed. Reg. at 66,865-66. Given the role that states are to play in combating fraud in higher education, *see* 20 U.S.C. § 1099a(a)(3)(A), and the expectation of Congress that states

59

would take the lead in consumer protection in higher education, *see, e.g.*, S. Rep. No. 105-181, at 70, it is not arbitrary or capricious for the Department to require that a state be equipped to respond to student complaints about institutions it authorizes.

Third, plaintiff complains about the requirement, 75 Fed. Reg. at 66,947, that an institution offering distance education in a state that requires an approval to do so "be able to document to the Secretary the State's approval [of an institution's request for authorization] upon request." *See* Pl.'s Mot. at 43. Yet the HEA requires an institution to "provide evidence to the Secretary that the institution has the authority to operate within a State." 20 U.S.C. § 1094(a)(21); *see also id.* § 1099a(b) (similar); *Career College Ass'n v. Riley*, 74 F.3d 1265, 1272 (D.C. Cir. 1996). An agency does not violate the APA when its decisionmaking hews so closely to the words of a statute it implements. *See Marwais Steel Co. v. Dep't of Air Force*, 871 F. Supp. 1448, 1454-55 (D.D.C. 1994).

Finally, plaintiff argues that the Department "has not offered any reason" to justify the requirement that institutions be authorized in the states where their students reside. *See* Pl.'s Mot. at 44. This simply is not true. The record demonstrates that states employ very different mechanisms of oversight. *See* AR 281, 544, 1601, 1636, 1993, 3911, 4386, 5172, 5664, 6661, 6781, 6822; *see also* Pl.'s Mot. at 43 n.12 (citing AR 6363). In some states, the "very real possibility" persists of "regulating offices not being operational," AR 3716, and the Department had reason to believe that a regulatory void in one or more states could be problematic.[30]

---

[30] This danger has already materialized. When the California legislature recently allowed the authority for its agency overseeing institutions to lapse, institutions went without state oversight for two years. *See, e.g.*, AR 767, 3197. Plaintiff claims that "no harm resulted from the California incident," Pl.'s Mot. at 45, but the record reveals that the lapse was "disastrous for California students," AR 4800. One commenter noted, "We also are beginning to hear reports

The Department was also concerned that institutions, particularly those that provide distance education as a significant (or sole) component of their educational services, might seek authorization only in a state with the most lenient authorization review and consumer protection enforcement to the detriment of students obtaining services outside that state.  The Department has evidence that some institutions have been shopping for states with the most lax oversight, setting up operations, collecting Title IV funds from students and then moving on to a more favorable state once the state regulatory landscape has shifted.  *See* AR 767; 75 Fed. Reg. at 34,813.  Other evidence reveals that some state authorizing agencies, even when they exist, fail to provide meaningful oversight, whether deferring their statutory responsibilities to accreditation agencies, *see* AR 4266, or failing to follow up on student complaints.  *See id.* 3111.  Moreover, the Department had evidence before it that regional accreditation is susceptible to compromise. *See id.* 1050, 1170-71, 1417-18, 1710-11, 7410, 7415, 7429; *see also* 75 Fed. Reg. at 34,813. That the accreditation process was flagging underscores the legitimacy of regulations giving teeth to what Congress intended to be a substantive requirement.

The Department, when confronted with a "rising crisis . . . due to the declining level of state oversight," AR 4794, did not act arbitrarily by promulgating the state authorization

---

about schools that began operating in the gap period, and which are allowed to continue to operate without state approval until the new agency is up and running.  At least one of those schools closed abruptly, leaving many students with debts owed and no credential to show for it." *Id.* 4801; *see also* AR 7429.  Another commenter described one example in detail: "A Nevada approved School with a branch in California failed.  This Nevada approved and licensed Institution did close without notice.  Nevada's oversight Agency was in full force and effect during this time."  AR 5840.  In other words, while the California agency responsible for oversight of institutions was nonoperational, students in California accrued debt and lost credits when an institution authorized in Nevada but operating in California closed without notice.  This is harm to students and to taxpayer funds, notwithstanding plaintiff's assertions to the contrary.

regulations.  Congress intended the Department to ensure quality education and safeguard federal taxpayer money.  There is nothing arbitrary or capricious about the Department's attempts to do so more consistently across state lines, so that a student in Michigan who uses Title IV funds to take online courses from an institution in Oregon has the protection provided by Michigan's law, just as a student in Oregon who uses Title IV funds to study in that same institution's Oregon classrooms receives her state's protection.  The regulations also establish uniform, national, "minimum standards" to ensure that states are indeed authorizing institutions and that they are prepared to respond to student complaints.  *E.g.*, 75 Fed. Reg. at 66,858.

Plaintiff also overstates the burdens of the regulations.  Insofar as some of the changes are to "discrete areas of existing regulations," institutions "have already absorbed many of the administrative costs related to implementing these final regulations."  *Id.* at 66,835.  Plaintiff also fails to acknowledge that the Department "would consider [an] institution legally authorized in [two] States" should those states enter into a reciprocity agreement by which they recognize each other's authorizations.[31]  *Id.* at 66,867.  So in the end, institutions might not have to obtain authorization from each state in which they operate, further reducing costs.

---

[31] Indeed, some commenters urged that the allowance of reciprocity agreements among states was too lenient and would seriously hinder the efficacy of the regulations.  *See* AR 2257-58, 4266, 4794.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss plaintiff's complaint challenging the Department of Education's recently-promulgated Title IV program integrity regulations concerning incentive compensation, misrepresentations, and state authorizations, or in the alternative, grant summary judgment to defendant on all of plaintiff's claims.

Respectfully Submitted,

TONY WEST
Assistant Attorney General


RONALD C. MACHEN JR.
United States Attorney

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch


 /s/ Marcia Berman
MARCIA BERMAN
Senior Trial Counsel
MICHELLE BENNETT
Trial Attorney
GREGORY P. DWORKOWITZ
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7132
Washington, D.C.  20530
Tel.: (202) 514-2205
Fax: (202) 616-8470
Email:  marcia.berman@usdoj.gov

Attorneys for Defendants.