# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES, ) ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. 11-0138 (RMC) |
| ARNE DUNCAN, Secretary, U.S. DEPARTMENT OF EDUCATION, *et al.*, ) ) ) ) | |
| Defendants. ) ) | |

## MEMORANDUM OPINION

Enormous amounts of federal funding for students at colleges, universities and other postsecondary schools allow Uncle Sam to wield a heavy hand in regulating access to such funds. The Secretary of Education, Arne Duncan, has recently adopted a more intrusive approach promulgating regulations under the Higher Education Act of 1965. The Secretary wants to protect student applicants who might be film-flammed into signing up for worthless courses—and using federal monies for tuition which the students cannot then repay. The new regulations became effective on July 1, 2011. Plaintiff Career College Association d/b/a Association of Private Sector Colleges and Universities sues Secretary Duncan and the Department of Education, challenging the new regulations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–706, and the United States Constitution. While the current extent of regulation may not have been entirely foreseen by Congress, a point the Court does not reach, the terms of the Higher Education Act do

not compel a more limited approach and the Secretary has explained his reasoning adequately. However, as to the one aspect of the new regulations that would require distance educators to obtain authorization from every State in which they have students, the Secretary gave no prior notice and its adoption in the final regulations violated the APA. Plaintiff's motion for summary judgment will be denied in part and granted in part, and Defendants' motion for summary judgment will be denied in part and granted in part.

## I. FACTUAL BACKGROUND

Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq*. ("HEA"), established several types of student aid programs administered by the Department of Education ("Department"), each with the aim of fostering access to higher education. Every year Title IV programs provide more than $150 billion in new federal aid to approximately fourteen million post-secondary students and their families. Students are expected to repay their loans. In 2007 and 2008, 93.6% of full-time students at private, for-profit institutions, 56.6% at public institutions, and 70.0% at private, non-profit institutions received federal aid. Plaintiff Career College Association d/b/a Association of Private Sector Colleges and Universities ("APSCU") is an association of for-profit schools in the private sector education industry, representing more than 1,500 such schools. Every year, ASPCU members educate more than one and a half million students.

To participate in Title IV programs, a school must qualify as an "institution of higher education." 20 U.S.C. § 1001 (2011). An "institution of higher education" is an educational institution in any state that "is legally authorized within such State to provide a program of education beyond secondary education" (hereafter mainly referred to as "schools"). *Id*. § 1001(a)(2). The HEA

also establishes that proprietary institutions of higher education and postsecondary vocational institutions qualify as institutions of higher education for purposes of federal student assistance programs. *Id*. § 1002. A qualifying school under the HEA must execute a program participation agreement with the Department to participate in federal financial aid programs. *See id*. § 1094. Through the program participation agreement, the school commits to a variety of statutory, regulatory, and contractual conditions.

Among these conditions is a general statutory ban on schools making incentive payments based on an employee's success in recruiting students and/or in enrolling students in financial aid programs. *See id*. § 1094(a)(20). A school is also precluded from engaging in a "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." *Id*. § 1094(c)(3)(A). Concerned with the expenditure of federal funds that fail to educate students for jobs that allow them to repay their loans, which the Department believed was insufficiently monitored under prior regulations, the Department set out to improve program integrity.

According to his rulemaking authority under 20 U.S.C. § 1221e-3, Secretary Duncan first established a negotiated rulemaking committee in 2009 to garner public involvement in the development of proposed regulations, as he is statutorily required. *See id*. § 1098a. The negotiated rulemaking committee did not reach consensus on all points contained in the proposed regulations. *See* U.S. Department of Education, Program Integrity Issues; Final Rule, 75 Fed. Reg. 66832, 66833 (Oct. 29, 2010) ("Final Rule") [AR 1, 3].[1] On June 18, 2010, the Department issued a notice of

---

[1] The Department was not required to obtain a consensus or adopt a consensus view in order to propose a new rule. *Cf. USA Group Loan Servs. v. Riley*, 82 F.3d 708, 714 (7th Cir. 1996) (concluding that the "hope" of the negotiated rulemaking process "is that these negotiations will

proposed rulemaking on program integrity and commenced a period of notice and comment on the proposed regulations until August 2, 2010. Approximately 1,180 parties submitted comments. *Id.* The Department promulgated final regulations on October 29, 2010. The challenged regulations—including others not before the Court—became effective July 1, 2011. Final Rule at 66832 [AR 2].

APSCU challenges three parts of the Department's recently-promulgated regulations that affect a school's eligibility to receive Title IV financial aid: the compensation regulations, 34 C.F.R. § 668.14 (Final Rule at 66950–51 [AR 120–21]); the misrepresentation regulations, 34 C.F.R. § 668.71 (Final Rule at 66958–59 [AR 128–29]); and the State authorization regulations, 34 C.F.R. § 600.9 (Final Rule at 66946–47 [AR 116–17]).[2]

## A. Compensation Regulations

Under the terms of the program participation agreement, a school agrees not to "provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). Congressional concern behind this provision was the use of financial incentives to enroll students regardless of qualifications or program efficacy—a practice that led to student loan defaults, leaving the taxpayers on the hook.

---

produce a better draft as the basis for the notice and comment proceeding," but that neither the HEA nor the Negotiated Rulemaking Act, 5 U.S.C. § 561 *et seq*., provides a remedy if the Department negotiates in bad faith).

[2] For purposes of this Memorandum Opinion, unless otherwise designated, citations to regulations refer to the current regulations, which came into effect on July 1, 2011.

In 2002, the Department issued "Clarifying Regulations," 34 C.F.R. § 668.14(b)(22)(ii)(A)–(L) (effective until July 1, 2011) ("Clarifying Regulations"), which established twelve "safe harbors" under which a school could pay compensation without it being considered an "incentive" payment and without fear of sanctions. Among other provisions, the Clarifying Regulations allowed biannual salary increases that would not be deemed impermissible incentive payments if the adjustments were "not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." *Id*. § 668.14(b)(22)(ii)(A) (effective until July 1, 2011) (emphasis added). Another safe harbor allowed for incentive compensation based on students' successful completion of an educational program, *id*. § 668.14(b)(22)(ii)(E) (effective until July 1, 2011); yet another permitted incentive compensation to managers who did not directly supervise those employees who were immediately involved in recruiting or admissions activities or the provision of financial aid. *Id*. § 668.14(b)(22)(ii)(G) (effective until July 1, 2011).

But by 2010, the Department decided that the safe harbors were doing "substantially more harm than good." U.S. Department of Education, Program Integrity Issues; Proposed Rule, 75 Fed. Reg. 34806, 34817–18 (June 18, 2010) ("Proposed Rule") [AR 147, 158–59]. This conclusion rested on the Secretary's finding that "unscrupulous actors routinely rely upon these safe harbors to circumvent the intent of section 487(a)(20) [20 U.S.C. § 1094(a)(20)] of the HEA." Final Rule at 66872 [AR 42]. Thus, the Department concluded that "the safe harbors have served to obstruct those objectives [of section 487(a)(20)] and have hampered the Department's ability to efficiently and effectively administer title IV, HEA programs." *Id*. By omitting the safe harbors, the Department intended to "better align [the regulations] with [the] HEA." Proposed Rule at 34818 [AR 159].

To change the perceived pattern of regulatory avoidance, the Secretary amended the

compensation regulations, 34 C.F.R. § 668.14(b)(22), so that they now define "[c]ommission, bonus, or other incentive payment" as "a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or an entity for services rendered." *Id*. § 668.14(b)(22)(iii)(A). The compensation regulations expressly permit "[m]erit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid." *Id*. § 668.14(b)(22)(ii)(A). The ban on such incentive payments now extends to "any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds," *id*. § 668.14(b)(22)(iii)(C)(2), and to compensation that is based on retention, course completion, graduation, or placement rates. *See* Final Rule at 66874 [AR 44].

### B. Misrepresentation Regulations

The HEA allows penalties for a school that makes a "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. § 1094(c)(3)(A). If, "after reasonable notice and opportunity for a hearing," the Secretary determines that a school engaged in such a substantial misrepresentation, the Secretary may fine the school, or suspend or terminate the school's eligibility status for Title IV funding until the violative practice has been corrected. *Id*. § 1094(c)(3). The HEA does not define the term "substantial misrepresentation."

Secretary Duncan developed new misrepresentation regulations to protect students from misleading and aggressive advertising that "compromise[s] the ability of students to make informed choices about institutions and the expenditure of their resources on higher education."

Final Rule at 66913 [AR 83]; *see also* 66913–16 [AR 83–86].[3]  The new regulations maintain the basic definition, from the prior regulations, of a misrepresentation as a "false, erroneous or misleading statement."  34 C.F.R. § 668.71(c).  However, the new regulations further provide that a "misleading statement includes any statement that has the likelihood or tendency to deceive or confuse."  *Id*.

Both the prior regulations and the new regulations define a "substantial misrepresentation" as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."  *Id*.  In contrast, while the prior regulatory scheme included an explicit safe harbor for minor misrepresentations,[4] this provision was eliminated by the challenged amendments.

The new regulations also further define the universe of speakers whose misrepresentations may subject an institution to sanctions, from simply "an eligible institution" to "an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services."  34 C.F.R. § 668.71(c).  Similarly, the new regulations expand the persons or entities to whom an enforceable misrepresentative statement may be made – from an enrolled or prospective student, the family of such student, or the Secretary – to add "any member of the public, or to an accrediting agency, [or] to a State agency."  *Id*.

---

[3]  The Court questions whether these specific reasons support federal action under the HEA. It is the use of federal monies for opportunities that were substantially misrepresented that allow federal intervention.

[4]  *See* 34 C.F.R. § 668.75(b) (effective until July 1, 2011) (providing that if "the misrepresentation is minor and can be readily corrected, the designated department official informs the institution and endeavors to obtain an informal, voluntary correction").

### C. State Authorization Regulations

To participate in Title IV programs, a school must first qualify as an "institution of higher education." *See* 20 U.S.C. § 1001. The HEA defines the term "institution of higher education" to mean, *inter alia*, an "educational institution in any State that . . . is legally authorized within such State to provide a program of education beyond secondary education." *Id*. § 1001(a)(2), § 1002. The prior regulations never expanded on the statutory language and only required that an institution be legally authorized, however defined, in the States(s) in which they were physically located.

Under the new regulations, a school is "legally authorized by a State" only "if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws." 34 C.F.R. § 600.9(a)(1). Moreover, the school must be affirmatively "established by name as an educational institution by a State through a charter, statute, constitutional provision, or other action issued by an appropriate State agency or State entity." *Id*. § 600.9(a)(1)(i)(A). Further, schools providing distance education services, such as online courses, must obtain authorization from both the State(s) in which the school is located and the State(s) in which its students reside, but only if such authorization is required by the State(s) in which its students reside. *Id*. § 600.9(c).

## II. LEGAL STANDARD

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia,* 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue

of material fact exists, the court must view all facts and draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have considered relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). The Supreme Court has instructed that

> [a]n agency action will usually be found to be arbitrary or capricious if: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle*, 463 U.S. at 43; *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.") (internal quotation marks and

citation omitted). Failure of an agency to "respond meaningfully" to objections and comments and to "answer objections that on their face seem legitimate" also renders a decision arbitrary and capricious. *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (internal quotation marks and citations omitted).

A court may also set aside agency action if "contrary to constitutional right" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Review of an agency's interpretation of a statute proceeds according to certain principles enunciated in *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). *See Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007). For the first step, a court looks to whether Congress has "directly addressed the precise question at issue" since a court must ensure that an agency gives effect to "the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If Congress did not unambiguously speak to the question at hand, under the second step of the *Chevron* analysis, a court shall not "disturb an agency rule unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011) (quoting *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)).

Under the second step of *Chevron*, a court must determine the level of deference due to the agency's interpretation of the laws it administers. *See Kempthorne*, 477 F.3d at 754. Generally, if an agency promulgates its interpretation through notice-and-comment rulemaking or formal adjudication, a court gives the agency's interpretation *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001). "That is, we determine whether its interpretation is 'permissible' or 'reasonable,' giving 'controlling weight' to the agency's interpretation unless it is

'arbitrary, capricious, or manifestly contrary to the statute.'" *See Kempthorne*, 477 F.3d at 754 (quoting *Chevron*, 467 U.S. at 843–44).

An agency interpretation of its own ambiguous regulation, not subjected to formal rulemaking procedures, does not qualify for *Chevron* deference, but is nonetheless "entitled to a measure of deference because it interprets the agencies' own regulatory scheme." *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 129 S. Ct. 2458, 2473 (2009); *see also Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 345 (D.C. Cir. 2011). Thus, a court must "give substantial deference to an agency's interpretation of its own regulations," unless plainly erroneous or inconsistent with the regulation itself. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011). However, not all agency interpretations are worthy of deference, such as those advanced by an agency as a "post-hoc rationalization" for agency action in litigation, or where there is no reason to suspect the interpretation reflects the agency's "fair and considered judgment on the matter in question." *Chase Bank*, 131 S. Ct. at 881 (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)). When a regulation is not ambiguous, however, no deference ensues because otherwise "adopting the agency's contrary interpretation would 'permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.'" *Chase Bank*, 131 S. Ct. at 882 (*quoting Christensen v. Harris County*, 529 U.S. 576, 588 (2000)).

A district court reviewing agency action sits as an appellate court and the entire case on review is a question of law which the court resolves on the administrative record. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

### III. LEGAL ANALYSIS

APSCU argues that the regulations "prohibit schools from paying merit-based salaries to their employees based on, among other things, success in recruiting students who persevere and obtain college degrees; prohibit college presidents from receiving raises based on improving the graduation rate at their institutions; deter schools from speaking on questions of public interest, debating policy, and informing their students; and impose significant, and in many instances insurmountable, regulatory burdens on online and other innovative learning programs." Pl.'s Mem. in Support of Mot. for Summ. J. [Dkt. # 15] at 1. The Department counters that many of APSCU's concerns are based on hyperbole or speculation of worst-case scenaria, and the new regulations are necessary to ensure the integrity of its federal financial aid programs.

The Department argues first that APSCU lacks standing to pursue its claims as, without any enforcement record, they are not ripe. Not so. Once published in final form, the new regulations affected APSCU members immediately, imposing an obligation upon them to re-orient their compensation programs and recruiting and marketing messages by July 1, 2011, as well as to inform and oversee outside contractors for whom the schools may now be liable for any misrepresentative statements. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (finding pre-enforcement challenge to promulgation of substantive regulations ripe for review when regulations required plaintiff to adjust its conduct immediately). Further, distance education providers, such as online schools, must now ensure they are legally authorized in all States in which they provide student services, if those States so require. APSCU challenges the new regulations as contrary to the Department's statutory authority and the Constitution, and as arbitrary and capricious under the APA. These facial challenges present purely legal questions and are fully ripe. *See Reckitt*

*Benckiser Inc. v. EPA*, 613 F.3d 1131, 1137 (D.C. Cir. 2010).

In mounting such a facial challenge, APSCU faces a high hurdle.  At this junction, the Court is

> concerned only with the question whether, on their face, the regulations are both authorized by the Act and can be construed in such a manner that they can be applied to a set of individuals without infringing upon constitutionally protected rights.  Petitioners face a heavy burden in seeking to have the regulations invalidated as facially unconstitutional.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.  The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid."

*Rust v. Sullivan*, 500 U.S. 173, 183 (1991) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Should the Department actually enforce the regulations in the ways forecast by APSCU, and denied by the Department, a further challenge may lie.

### A.  Compensation Regulations

#### 1. Incentive Payments

The HEA prohibits participating schools from paying "persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance" "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid."  20 U.S.C. § 1094(a)(20).  APSCU complains that the new compensation regulations violate the HEA by regulating salaries and merit-based increases to salaries and wages, which are not mentioned in the statute and are beyond the Department's authority.  To be precise, the new compensation regulations define a  commission, bonus or other incentive payment as "a sum of money or something of value, *other than a fixed*

*salary or wages.*" 34 C.F.R. § 668.14(b)(22)(iii)(A) (emphasis added). The new regulations expressly permit merit-based adjustments to employee compensation "provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid." *Id.* § 668.14(b)(22)(ii)(A).

The Department does not assert authority to oversee or regulate the setting of a fixed annual wage, which is the common meaning of "salary," or other wage. Congress did not directly address the precise question before the Court as it neither defined the terms "bonus" and "other incentive payment," nor speak to whether certain kinds of salary increases could be considered incentive payments. *See Mayo Found.*, 131 S. Ct. at 711. Rather than provide tight definitions, Congress prohibited "*any* commission, bonus, or *other* incentive payment" that was "based directly or *indirectly*" on success in enrollments or obtaining financial aid. 20 U.S.C. § 1094(a)(20) (emphasis added). "[S]tatutes written in broad, sweeping language should be given broad, sweeping application," and legislative history shall not be invoked to restrict their scope. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003). Section 1094(a)(20) speaks in broad terms that do not foreclose oversight of bonus or other incentive payments when they are based upon success at recruitment or provision of financial aid, although dressed in the guise of salary increases. The HEA "simply does not speak with the precision necessary to say definitively whether it applies" to such salary increases. *See United States v. Eurodif S.A.*, 555 U.S. 305 (2009).

A court will invalidate agency action if it is arbitrary, capricious or manifestly contrary to the statute. *Mayo Found.*, 131 S. Ct. at 711. No doubt it would be easier to comply with, and enforce, the HEA if the simple distinctions between salaries and incentive payments, as provided by the Clarifying Regulations, were maintained, but a new Secretary is not limited by the regulatory

choices of his predecessor if he adequately states the reasons for any changes. *National Cable & Telecomms. Ass'n. v. Brand X Internet Services*, 545 U.S. 967, 981 (2005) (noting that "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework"). Given the record before the Court, APSCU presses too narrow a reading of the statute, arguing that a "bonus" is typically awarded in addition to an employee's annual "salary," and that "other incentive payments" must be read in a limited fashion to only incorporate schemes like "bonuses" or "commissions," and not any type of adjustment to a "salary."

The Department contends that nothing in the prior regulations "prevent[ed] education institutions from making commission-and-bonus-like payments and calling them salaries or salary adjustments." Defs.' Mem. in Supp. of Mot. For Summ. J. [Dkt. # 17, 18] at 16. It is this sleight-of-hand that its new definitions are meant to prevent. *See, e.g., United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) ("The concern is that recruiters paid by the head are tempted to sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans."); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1169 (9th Cir. 2006) ("The [incentive payment] ban was enacted based on evidence of serious program abuses."). Again, the Court does not make policy choices and can only ensure that the Secretary's choices are reasonable within the record he presents. The Secretary meets this standard here.

The parties part ways in terms of the effects of the compensation regulations. APSCU says the appropriate measure of a recruiter's success is recruitment, so a merit-based salary adjustment to a recruiter must be based at least in part on a quantitative or qualitative measure of how well they secure enrollments—which the new regulations preclude. The Department offers

various benchmarks to measure success, starting from the proposition that a professional recruiter does her job just as well when she discourages an unqualified student from applying. ASPCU finds this small comfort, noting that salary and wage adjustments cannot be based, under the new compensation regulations, "in any part, directly or indirectly, upon success in" performing "activities" engaged in "for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students," 34 C.F.R. § 668.14(b)(22)(i), (iii)(B), and remains baffled as to how to evaluate recruiters and pay them merit-based salaries or wages without taking into account their success at recruiting students.

The Department explains that it is concerned with raw numbers: recruiters who sweet talk unqualified students into applications for courses and federal loans when there is no realistic chance that the student will gain from the coursework or be able to repay the loan. Such a concern does not bar APSCU's members, for instance, from rewarding recruiters' success through other indicia, such as seniority, job knowledge and professionalism, dependability, or student evaluations. *See* Department of Education, Dear Colleague Letter, Implementation of Program Integrity Regulations, at 13 (Mar. 17, 2011) ("Dear Colleague Letter"), available at http://www.ifap.ed.gov/dpcletters/attachments/GEN1105.pdf (last visited July 8, 2011). While APSCU is understandably frustrated at its inability to provide merit-based pay increases to recruiters based on the easiest to measure and, arguably, most logical merit metric – numbers recruited – that does not mean the regulations are themselves impermissible interpretations of the HEA or otherwise unreasonable, especially in light of congressional concerns with recruitment practices and the

administrative record.[5]

APSCU also attacks the Dear Colleague Letter as demonstrative of the flaws in the final rule and the process by which it was adopted. "A substantive regulation must have sufficient content and definitiveness as to be a meaningful exercise in agency lawmaking. It is certainly not open to an agency to promulgate mush and then give it concrete form only through subsequent less formal 'interpretations.'" *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C. Cir. 1997). Despite their imperfections, the new regulations are nonetheless sufficiently definite and substantive to qualify as a meaningful exercise in agency lawmaking. The Department responds that it has often used dear colleague letters to explain, clarify or answer questions relating to its regulations and that there is nothing untoward about this particular letter. The Court agrees: far better for correction or clarification of the Department's enforcement posture for it to issue Dear Colleague Letters than to allow its far-flung bureaucrats to proceed amuck.

APSCU also challenges the compensation regulations as arbitrary and capricious on several grounds. Although, as noted, the Departure changed course by eliminating the twelve safe harbors, the Department supplied a "reasoned analysis" and its justification for the change. *Motor Vehicle*, 463 U.S. at 57; *see also Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,* 475 F.3d 319, 326 (D.C. Cir. 2006) (noting agency is free to change course provided a reasoned basis for its

---

[5] "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones." *Chevron*, 467 U.S. at 866.

departure, and not simply through casually ignoring prior policies); *Rust*, 500 U.S. at 187 (affirming as a reasoned analysis for a change in policy the agency's explanation that "prior policy failed to implement properly the statute and . . . that the new regulations are more in keeping with the original intent of the statute, [and] are justified by client experience under the prior policy"). Based on its experience, the Department has explained its conclusion that the safe harbors did "substantially more harm than good" because they allowed schools to evade the objectives of the HEA and the omission of the safe harbors would bring the regulations and conduct into conformity with the statute. Proposed Rule at 34817–18 [AR 158–59]; *see also* Final Rule at 66872–79 [AR 42–49].

The final rule supplies a reasoned explanation for the elimination of the safe harbors that were contained in the Clarifying Regulations.[6] While the Department's policy choices could be different and still be reasonable, APA review does not depend on an agency making the "best" choice possible. The Secretary has articulated a rational connection between the facts before him and the choices he made. *See PPL Wallingford Energy*, 419 F.3d at 1198.[7] That is all that is

_____

[6] The Department further explained why it eliminated the safe harbor for compensation based on a student's successful completion of coursework or graduation. *See* Final Rule at 66874 [AR 44] *see also* Proposed Rule at 34817–18 [AR 158–159]. With the "proliferation of short-time, accelerated programs, the potential exists for shorter and shorter programs" that would allow pay increases/bonuses without real student advancement; and "schools that have devised and operated grading policies that all but ensure that students who enroll will graduate, regardless of their academic performance" allow manipulated graduation rates that lead to pay increases/bonuses based on false student achievement. Proposed Rule at 34818 [AR 159].

[7] The Department also shows it adequately responded to comments. An "agency's response to public comments need only 'enable us to see what major issues of policy were ventilated … and why the agency reacted to them as it did.'" *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 335 (D.C. Cir. 1968)). The Department may not have responded to every issue raised in each of the comments, it nonetheless provided an adequate response to the relevant and significant comments. *See Interstate Natural Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1096 (D.C. Cir. 2007).

required.

## 2. Senior Management Compensation Regulations

APSCU also challenges the new regulations for restrictions on how schools may compensate senior management. The HEA prohibits incentive payments to "any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). The Secretary's new regulations extend that ban to "any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds." 34 C.F.R. § 668.14(b)(22)(iii)(C)(2). The Dear Colleague Letter clarifies that "[p]olicy decisions made by senior executives and managers related to the manner in which recruitment, enrollment, or financial aid will be pursued or provided, such as, e.g., decisions to admit only high school graduates" are not covered by the ban on incentive payments. Dear Colleague Letter at 9.

APSCU contends that the regulations' attempt to cover persons with "responsibility" over recruitment, admissions or financial aid decisions impermissibly expands the Department's authority from the statute's limitation to persons "engaged in" recruiting, admissions or financial aid. However, the HEA contains no statutory exemption for higher level employees and the Plaintiff reads "engaged in" too narrowly. In determining whether the Department overstepped its statutory mooring, the Court first looks to the plain meaning of the words. *See Hamilton v. Lanning*, 130 S. Ct. 2464, 2471 (2010). Someone who is "engaged" in an activity is "involved in activity" or "greatly interested" in such activity. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10 ed. 1999), http://www.merriam-webster.com/dictionary/ (last visited July 7, 2011). "Responsibility" means "the quality or state of being responsible," whereas "responsible" is defined as "liable to be called

on to answer," "able to answer for one's conduct and obligations," and "marked by or involving responsibility or accountability."  *Id.*  These definitions reveal no flaw in the Secretary's regulation.

The Court concludes that the Department did not impermissibly decide that a person with "responsibility" for recruitment, admissions, or financial aid—being accountable for or having decision-making power over such areas—may also be "engaged" in such activities.  While Plaintiff offer a sensible usage, limiting regulatory coverage to those on the "front lines" of recruitment, admissions, and financial aid, who are most clearly "engaged" in such activities, the Secretary's broader concerns are not irrational or insensible.  The Secretary has acknowledged that "policy decisions" concerning recruitment, etc., would not involve being "engaged in" those activities.  *See* Dear Colleague Letter at 9.  On this facial challenge, the Court cannot find that the Secretary's approach is contrary to the statute or arbitrary and capricious.  The Department's rationale for its new compensation regulations, backed by the administrative record, warrants the Court's deference in the context of this facial challenge.

### B.  Misrepresentation Regulations

APSCU attacks the newly implemented misrepresentation regulations which purport to carry out the HEA's command that schools not engage in a "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates."  20 U.S.C. § 1094(c)(3)(A).

### 1. Notice and Opportunity To Be Heard

Before the Secretary may fine or suspend/terminate a school's participation in Title IV program funding for any substantial misrepresentation, the Department must provide "reasonable notice and opportunity for a hearing."  *See* 20 U.S.C. § 1094(c)(3)(A), (B)(i).  APSCU does not

contest that Title 34, part 668, subpart G of the regulations provides such due process. *See* 34 C.F.R. § 668.81–.98 (entitled "Fine, Limitation, Suspension, and Termination Proceedings"). APSCU instead argues that the new misrepresentation regulations, contrary to the statutory command and the prior regulations, make such due process optional at the Secretary's choice. The new regulations state that:

> (a) If the Secretary determines that an eligible institution has engaged in substantial misrepresentation, the Secretary may –
>
> (1) Revoke the eligible institution's program participation agreement;
>
> (2) Impose limitations on the institution's participation in the title IV, HEA programs;
>
> (3) Deny participation applications made on behalf of the institution; *or*
>
> (4) Initiate a proceeding against the eligible institution under subpart G of this part.

34 C.F.R. § 668.71(a) (emphasis added). APSCU argues that the new regulations revoke a school's right to reasonable notice and hearing before the Department suspends or terminates its eligibility or imposes a fine because subsections (1) through (3) of § 668.71(a) now allow the Secretary to revoke, limit, or deny participation without providing subpart G due process and limit such process to the whim of the Secretary under subsection (4).[8]

In its Dear Colleague Letter, the Department has clarified that the new regulations, consistent with prior regulations, are intended to and will provide subpart G due process before the

---

[8] APSCU does not specifically challenge 34 C.F.R. § 668.71(a)(3), which allows the Secretary to deny applications for program eligibility because of a substantial misrepresentation without prior notice or hearing, presumably because the denial of an initial application would not fall under the statutory mandate that due process be provided prior to the termination or suspension of eligibility status (presumably once obtained) and/or the imposition of a fine. *See* 20 U.S.C. § 1094(c)(3).

Department will suspend, terminate or impose a fine on any school that has allegedly engaged in a substantial misrepresentation. *See* Dear Colleague Letter at 14–15. The Department further commits that the new regulations will provide no less due process. *See id*. at 14; *see also* Final Rule at 66915 [AR 85] (noting that "nothing in the proposed regulations diminishes the procedural rights that an institution otherwise possesses to respond to that [enforcement] action").

In its brief, the Department explains that "revocation" in § 668.71(a)(1) is a regulatory term of art referring to the Department's ability to revoke the participation of a school that has only provisional, or probationary, certification status, rather than full certification. *See* Defs.' Reply [Dkt. # 26] at 16; *see also* 20 U.S.C. § 1099c(h) (allowing for provisional certification of institutional eligibility). The Department's Dear Colleague Letter clarified that § 668.71(a)(1) is limited to provisionally-certified institutions, *see* Dear Colleague Letter at 14–15, which are not statutorily entitled to subpart G due process protections prior to losing their provisional status but which are nonetheless provided process by a separate regulation. *See* 34 C.F.R. § 668.13(d); *see also Career College Ass'n v. Riley*, 74 F.3d 1265, 1274 (D.C. Cir. 1996) (noting a provisionally certificated institution is not statutorily entitled to 20 U.S.C. § 1094 procedural protections, although it has some process per 34 C.F.R. § 668.13).

To be sure, the text of § 668.71(a)(1) could have more explicitly limited itself to only provisionally-certified institutions, yet the Department's subsequent interpretation of any ambiguity, proffered in its Dear Colleague Letter, should be accepted as long as not plainly erroneous or inconsistent with the regulation. *Coeur Alaska*, 129 S. Ct. at 2470; *see also Martin v. Occupational Safety and Health Review Commission*, 499 U.S. 144, 157 (1991) (noting that "informal interpretations are still entitled to some weight on judicial review"). Interpreting "revocation" as a

term of art within the ambit of the HEA is well within the Department's expertise, given its experience and authority. With the understanding that "revocation" applies only to schools with provisional certification, the regulation at § 668.71(a)(1) does not deny due process to others.

The Secretary may also "[i]mpose limitations on the institution's participation in the title IV, HEA programs." 34 C.F.R. § 668.71(a)(2). The Department notes that subpart G explicitly applies when the Secretary attempts to limit a school's participation in Title IV, HEA programs. *See* 34 C.F.R. § 668.86; *see also* 20 U.S.C. § 1094(c)(1)(F) (requiring notice and opportunity for hearing prior to the limitation, suspension, or termination of a school's participation in any program). That § 668.71(a)(4) gives the Secretary the *option* of initiating a proceeding under subpart G is not inconsistent with the Department's view that subsection § 668.71(a)(2) inherently includes subpart G process as part and parcel of a limitation proceeding. Any ambiguity in this regard has been adequately explained by the Department. *See Chase Bank*, 131 S. Ct. at 880 (deferring to agency interpretation of its regulation, advanced in a legal brief, which was not plainly erroneous or inconsistent with the regulation).

Thus, the new misrepresentation regulations on their face do not contravene the HEA's command that the Secretary provide notice and opportunity to be heard prior to suspending or terminating a school's eligibility status for Title IV funding or prior to imposing a fine, as feared by Plaintiff and its members. As the Government disclaims any intention to terminate or suspend a school's eligibility or to impose a fine without notice and opportunity to be heard, the Court has no reason to suspect, at this pre-enforcement junction, that the Department would act otherwise. *See Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996) (noting that the "procedural interpretation is what the government itself has put forward in this litigation–and what it must adhere

to in the future, at least unless it clearly announces an alternative reading" and refusing to find that the Government would impose procedural burdens the Government claimed simply did not exist or it would not impose, even if arguably allowed under the terms of an ambiguous regulation).

### 2. Breadth of Misrepresentations Covered by Regulations

APSCU also challenges the new misrepresentation regulations on the grounds that they impermissibly expand the scope and type of statement that could be sanctioned as a substantial misrepresentation.

### a. Kinds of Misrepresentations at Issue

APSCU first argues the new regulations impermissibly enlarge the universe of misrepresentations for which a school may be subject to fine or suspension/termination. The HEA prohibits a school from engaging in a "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. § 1094(c)(3)(A). The new regulation is arguably broader because it states that a school will be found to have engaged in a substantial misrepresentation when it "makes a substantial misrepresentation regarding the eligible institution, *including* about the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71(b) (emphasis added). Accordingly, APSCU claims the Secretary has given itself power to sanction a misrepresentation on any subject "regarding the eligible institution," not simply the three topics enumerated in the statute.

As the record now stands, APSCU puts undue weight on the word "including," although its concerns prior to the issuance of the Dear Colleague Letter were entirely legitimate. One way of reading the new regulations would be to find the term "including" in § 668.71(b) to simply define what constitutes a "misrepresentation regarding the eligible institution" and not an

expansion of enforcement beyond the three statutory categories; this Court would be reticent to accept such a reading since it would bring into question why any new regulatory change was made at all. However, perhaps as a result of Plaintiff's opening brief, the Department clarified, through the Dear Colleague Letter, that its enforcement authority only reaches statements concerning a school's educational program, financial charges, and/or employability of its graduates, as limited by the HEA in explicit statutory language. *See* Dear Colleague Letter at 15. That wisdom may have come late does not make it any less wise. Notably, although the three sections immediately following § 668.71 were supplemented by the 2010 amendments, they continue to provide elaboration only on what the Department considers to be statements concerning educational programs, financial charges, and employability, and nothing broader. *See* 34 C.F.R. § 668.72–.74. The Court defers to the Department's interpretation.

### b. Definition of Substantial Misrepresentation

Second, the Secretary's revised definition of "substantial misrepresentation" is challenged by APSCU, which asserts that the Secretary exceeded his statutory authority by subjecting to regulation statements that are factually correct, immaterial or minor, and made without an intent to deceive or confuse. The HEA prohibits an institution from engaging in a "substantial misrepresentation" but does not further define the term. *See, e.g.,* 20 U.S.C. § 1094(c)(3)(A). The new regulations define "misrepresentation" as a "false, erroneous or misleading statement" but further defines "misleading statement" to mean "any statement that has the likelihood or tendency to deceive or confuse." 34 C.F.R. § 668.71(c). A statement that constitutes a "substantial misrepresentation" is defined as any "misrepresentation on which the person to whom it was made could reasonably be expected to rely, or who has reasonably relied, to that person's detriment." *Id*.

Most of this language is carried over from the prior regulations. APSCU directs its challenge to the new phrase that a misrepresentation includes any statement that "has the likelihood or tendency to deceive or confuse." APSCU argues that the Department's definition would include potentially confusing but factually true statements for which a speaker lacked any intent to deceive or confuse.

The Secretary relies heavily on cases arising under Section 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a)(1), which makes it unlawful to engage in "unfair or deceptive acts or practices." In the context of the FTCA, deceptive acts, misrepresentations, and representations that are likely to mislead, are related—if not frequently interchangeable—concepts. *See, e.g., FTC v. Verity Int'l Ltd.*, 443 F.3d 48, 63–64 (2d Cir. 2006) (referring frequently to "representation [that was] likely to mislead consumers acting reasonably" as "deception" and "the misrepresentation"); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979) ("Misrepresentations are condemned if they possess a tendency to deceive."). A misrepresentation need not be an absolute or literal falsehood to be actionable as a "deceptive act" under the FTCA. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (noting that "even literally true statements can have misleading implications"); *World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ("[T]he omission of material information, even if an advertisement does not contain falsehoods, may cause the advertisement to violate section 5 [of the FTCA]."); *FTC v. Pharmtech Research, Inc.*, 576 F. Supp. 294, 301 (D.D.C. 1983) ("[T]he capacity of an advertisement to deceive consumers is judged by the impression conveyed by the entire advertisement, and not by the impact of isolated words and phrases. An advertisement may be deceptive if it has a tendency to convey a misleading impression, even if an alternative nonmisleading impression might also be conveyed.")

(internal citations omitted).[9]  Nor does a violation of section 5(a) of the FTCA require an intent to deceive; "it is enough that the representations or practices were likely to mislead consumers acting reasonably."  *Verity Int'l*, 443 F.3d at 63; *see also Pharmatech Research*, 576 F. Supp. at 301 ("The advertiser's good faith or absence of intent to deceive is irrelevant.").

The language of the HEA – "substantial misrepresentation" about limited, specified topics – and the FTCA –  "unfair or deceptive acts or practices" and "false advertising" – is significantly different and cross citations from one statutory scheme to another cannot be adopted or followed lock, stock and barrel.  To this extent, the Department's analogy is misplaced and overbroad.  The fundamental question here, however, is whether the definitions that the Secretary adopted, not the analogy argued by his lawyers, is subject to successful challenge.

It is important to remember that the Department's definition of "substantial misrepresentation" was enunciated through formal rule-making.[10]  Therefore, the Court determines whether the Department's interpretation of "misrepresentation" is "'permissible' or 'reasonable,' giving 'controlling weight' to the agency's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Kempthorne*, 477 F.3d at 754 (quoting *Chevron*, 467 U.S. at 843–44) (internal citations omitted).

---

[9]  Section 12 of the FTCA, 15 U.S.C. § 52, bans false advertising, defined as an advertisement which is "misleading in a material respect."  15 U.S.C. § 55(a)(1).  Similarly, to be considered false advertisement, the advertisement need not be untrue, an "advertisement is false if it fails to disclose sufficient facts to counter any false assumptions created by the advertisement."  *See Pharmtech Research*, 576 F. Supp. at 300.

[10]  The Plaintiff complains about the haste with which the Secretary announced his intention to engage in rulemaking, issued a proposed rule, collected comments, and announced a final rule.  None of these complaints shows more than that Plaintiff disagrees with the Secretary's policy choices, and wishes the Secretary had listened harder to APSCU's points of view.  There is no suggestion of substantive wrong-doing.

The Court decides that the Secretary did not act in a manner that was arbitrary and capricious or *ultra vires* in his definition of substantial misrepresentation within the context of the HEA. It cannot be gainsaid that a factually correct statement may be misleading, in context, to the detriment of its listener and that many of the "listeners" at issue are young adults. *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining misrepresentation as "[t]he act of making a false or misleading assertion about something, usually with the intent to deceive").[11] Similarly, since the Department's focus is on worthwhile education and the funding and repayment of federal monies, the Court cannot say the Secretary acted unreasonably by omitting an intention to deceive or confuse from its definition of misrepresentation, nor is an intent to deceive strictly required to comply with the statutory terms of the HEA. Given the nature of a facial challenge to regulations, APSCU must demonstrate either that there is no way the Secretary could enforce his new regulations in a reasonable manner or that they are not within his authority to adopt. Just because it may be possible for the Department to run amuck in unreasonable and punitive enforcement does not mean that the regulations, as drafted, will ineluctably lead to such a loss of balance and reason.[12] The Court defers to the Secretary's reasonable definition of substantial misrepresentation.

---

[11]  *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED, Merriam-Webster 2002, http://unabridged.merriam-webster.com (defining misrepresentation as "an untrue, incorrect, or misleading representation (as of a fact, event, or person); specifically: a representation by words or other means that under the existing circumstances amounts to an assertion not in accordance with the facts") (last visited July 5, 2011).

[12]  While not dispositive for purposes here, the Department has explained that in "determining whether an institution has engaged in substantial misrepresentation and the appropriate sanctions to impose if substantial misrepresentation has occurred, the Department considers a variety of factors, including whether the misrepresentation was intentional or inadvertent." Final Rule at 66915 [AR 85].

### c. Materiality of Misrepresentation

APSCU alleges that the new misrepresentation regulations eliminate any materiality component, so that even simple or minor representations could be subject to sanctions, contrary to the HEA's more limited prohibition against "substantial" misrepresentations. In large measure, the new misrepresentation regulations continue the definition of a "substantial misrepresentation" from the prior regulations as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." 34 C.F.R. § 668.71(c). However, as APSCU notes, the prior regulations also specified that if "the misrepresentation is minor and can be readily corrected, the designated department official informs the institution and endeavors to obtain an informal, voluntary correction," 34 C.F.R. § 668.75(b) (effective until July 1, 2011), and this provision has now been removed. Accordingly, APSCU contends that any misrepresentation, not merely one of substance, could lead to fines or loss of participation in the program.

The Department counters that its definition of a substantial misrepresentation essentially contains a materiality requirement because it only holds schools accountable for misrepresentations about (a) the three subject-matter categories (b) on which a person could reasonably be expected to rely, or has reasonably relied, (c) to his or her detriment. Accordingly, only statements about a school's programs, charges, and the employability of its graduates upon which a person could, or did, reasonably rely to his detriment are sanctionable. Further, the Secretary has committed—as the APA otherwise requires—that his enforcement will continue to

reasonably consider the full facts and circumstances behind any alleged misrepresentation.[13]  There

is no reason or basis on this record to question this commitment, made formally in the rulemaking

record.  In this facial challenge to the new regulations, the Court finds that the Secretary's definition

of "substantial misrepresentation" is neither unreasonable nor contrary to the HEA.[14]

_____

[13]  The Department responded to worried comments that the new regulation lacked any intent, harm or materiality component:

> We disagree with commenters who claim the regulations are legally deficient because they fail to establish the need for specific intent as an element of misrepresentation or do not define a requisite degree of harm before the Department may initiate an enforcement action.
>
> The Department has always possessed the legal authority to initiate a sanction under part 668, subpart G for any violation of the title IV, HEA program regulations. However, the Department has also always operated within a rule of reasonableness and has not pursued sanctions without evaluating the available evidence in extenuation and mitigation as well as in aggravation.  The Department intends to continue to properly consider the circumstance surrounding any misrepresentation before determining an appropriate response.  Depending on the facts presented, an appropriate response could run the gamut from no action at all to termination of an institution's title IV, HEA eligibility depending upon all of the facts that are present. . . .
>
> In determining whether an institution has engaged in substantial misrepresentation and whether to impose penalties, the Department uses a rule of reasonableness and considers various factors.

Final Rule at 66914 [AR 84].

[14]  Nor can it be said that the Department failed to respond meaningfully to relevant and significant public comment on the new misrepresentation regulations.  As it explained, the Department changed its definition of "misrepresentation," in part, due to an undercover investigation by the Government Accountability Office that reported significant institutional engagement in deceptive practices, which included institutions "failing to provide clear information about the institution's program duration, costs, and graduation rate."  *See* Final Rule at 66914 [AR 84].  The Department left no doubt that it would continue to consider all the circumstances involving an alleged misrepresentation prior to taking action, including whether the misrepresentation was intentional.  The Department further explained that it had removed the safe harbor for minor misrepresentations because it found that the provision had proven formulaic but it assured all

### 3. First Amendment Arguments

APSCU contends that the above-mentioned flaws, taken together, create a chilling effect on a school's free speech rights. However, the speech targeted by the Department is limited to substantial misrepresentations about the nature of an institution's educational program, its financial charges, or the employability of its graduates, all limited to legitimate concerns with the integrity of a massive government program of financial loans for which repayment is expected. The Department adopted its new misrepresentation regulations out of a documented concern that some schools could (and did) deceive or mislead students about, *inter alia*, program duration, costs, graduation rates, and employability after graduation, which affected the efficacy of federal education loans and the prospects for their repayment. *See* Final Rule at 66913–15 [AR 83–85].

The new misrepresentation regulations impose restrictions on commercial speech, defined as "expression related solely to the economic interests of the speaker and its audience" or speech proposing a certain commercial transaction. *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980). "In addition to information related to proposing a particular transaction, such as price, it can include material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product." *United States v. Philip Morris USA, Inc*., 566 F.3d 1095, 1143 (D.C. Cir. 2009). Thus, even when the format is not one that explicitly proposes a particular commercial transaction, if the speech is designed to persuade the public to purchase a speaker's

---

participating schools that they would enjoy the same procedural protections as before if any enforcement action were to be brought. *See* Final Rule 66915 [AR 85]. While one could reasonably make different policy and enforcement choices than those adopted by Secretary Duncan, it cannot be said that he has not explained his rationale for the choices he made.

products, it can be considered commercial speech. *See id*. at 1444. The new misrepresentation regulations are limited to an institution's representations about facts inextricably linked with the commercial transaction with students for its services—the nature of such services, the costs of such services, and the results (employability) its services supposedly engender.[15]

"[C]ommercial speech enjoys First Amendment protection only if it concerns a lawful activity and is not misleading." *Whitaker v. Thompson*, 353 F.3d 947, 952 (D.C. Cir. 2004). "The First Amendment's concern for commercial speech is based on the informational function of advertising." *Cent. Hudson*, 447 U.S. at 563; *see id*. at 561–62 ("Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."). "Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Id*. at 563. Accordingly, the "government may ban forms of communication more likely to deceive the public than to inform it." *Id*; *see also Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation,* 512 U.S. 136, 142 (1994) ("Because disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment

---

[15] Despite APSCU's arguments that the regulations cover almost all statements made to the public by a school, the types of statements covered by the regulations are limited to the three statutory categories identified by the HEA. "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916). The same rule applies to the interpretation of regulations. *See Weaver*, 87 F.3d at 1436 (citing *Rust*, 500 U.S. at 191). "This rule is subject, of course, to the proviso that the interpretation adopted must be a plausible one." *Id*. The Department has provided its reasonable interpretation that the misrepresentation regulations solely apply to the three categories. "[I]n light of the constitutional difficulties entailed by reading [a regulation] more broadly than suggested by the government, we adopt its interpretation." *Weaver*, 87 F.3d at 1438. "We are, quite simply, reluctant to find burdens on speech that the government eschews any intention to impose." *Id*.

of such information, only false, deceptive, or misleading commercial speech may be banned.") (internal quotation marks omitted). Accordingly, "inherently misleading" advertising or statements may be banned absolutely. *In re R. M. J.*, 455 U.S. 191, 203 (1982); *see also Public Citizen, Inc. v. La. Atty. Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011) ("Advertising that 'is inherently likely to deceive or where the record indicates that a particular form or method . . . of advertising has in fact been deceptive' receives no protection and the State may prohibit it entirely.") (quoting *R.M.J.*, 455 U.S. at 218).

The misrepresentation regulations specifically target "false, erroneous or misleading" statements, 34 C.F.R. § 668.71(c), which squarely fall within the ambit of commercial speech not protected by the First Amendment. However, the regulation further defines misleading statements as "any statement that has the likelihood or tendency to deceive *or confuse*." *Id*. (emphasis added). The Court agrees with the Plaintiff that a likelihood or tendency to confuse is a weaker expression, and perhaps more worthy of constitutional protection, than one that is "inherently likely to deceive" or "inherently likely to mislead," the latter two of which get no First Amendment protection when presented as part of commercial speech. Again, however, this argument is premature because Plaintiff's complaint presents a facial, not an as applied, challenge. Plaintiff presents no persuasive argument that its constitutional rights will be curtailed or chilled because the Secretary might find some future commercial statement so materially confusing and without mitigation that it is substantially misleading. Ultimately, because all statements here constitute commercial speech and Plaintiff presents an argument about one form of commercial speech yet to be articulated by it or condemned by the Secretary, the Court concludes that Plaintiff's First Amendment arguments fail.

APSCU's last argument is equally unavailing. It asserts that the regulations are

subject to heightened scrutiny because they are content-based bans directed only at schools. While content-based regulations are usually anathema to the First Amendment, such disapproval does not extend to commercial speech. "Two features of commercial speech permit regulation of its content." *Cent. Hudson*, 447 U.S. at 564 n.6. "First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity." *Id*. Secondly, "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not" particularly vulnerable to being suppressed by an overbroad regulation. *Id*. Accordingly, "commercial speech is generally considered less susceptible to the chilling effect of regulation than other, more traditionally recognized forms of speech, such as political discourse." *Kraft*, 970 F.2d at 321; *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 504 n.22 (1984) (noting there is a "minimal 'danger that governmental regulation of false or misleading [commercial speech] will chill accurate and nondeceptive commercial expression'") (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 777 (1976) (Stewart, J., concurring)).

Nor do the regulations target non-commercial speech simply because an institution may touch upon an important public issue in connection with its commercial speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67–68 (1983). "A company has the full panoply of [First Amendment] protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Id*. at 68. "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id*.; *see also Phillip Morris*, 566 F.3d at 1144 ("A burden on commercial speech, whether

34

it be suppression or mandatory disclosure, only triggers a higher level of scrutiny if the commercial speech is 'inextricably intertwined' with fully protected speech."). These cases teach that the discussion of public issues by a school participating in HEA funding will not extend full constitutional protections to a commercial statement fundamentally concerned with the nature of its educational program, its financial charges, or the employability of its graduates. APSCU's challenge to the contrary must be dismissed.

### C. State Authorization Regulations

APSCU finally argues that the State authorization regulations both exceed the HEA's commands and are arbitrary and capricious. Pursuant to the HEA, a covered school is an "educational institution in any State that . . . is legally authorized within such State to provide a program of education beyond secondary education." 20 U.S.C. § 1001(a)(2). Proprietary schools qualify as institutions of higher education if they are legally authorized within the States per § 1001(a)(2). *See id*. § 1002(a), (b)(1)(B). If a State does not legally authorize a school as an institution of higher education, then a student may not apply federal aid towards her academic or vocational program at that institution. *See id*. § 1091(a)(1).

Per the new State authorization regulations, a school can be "legally authorized by a State" only "if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws." 34 C.F.R. § 600.9(a)(1). The school must also be affirmatively "established *by name* as an educational institution by a State through a charter, statute, constitutional provision, or other action issued by an appropriate State agency or State entity." *Id*. § 600.9(a)(1)(i)(A) (emphasis added). ASPCU argues these regulations may serve to compel the States to change, or implement from scratch, an authorization process that is (a) capable

of authorizing each school by name, rather than, for example, simply authorizing schools as a class

to do business within the State, and (b) capable of reviewing and responding to complaints about any

school. Accordingly, APSCU attacks the fact that the regulations impose certain affirmative duties

on the States to implement particular authorization regimes. Most of the Plaintiff's arguments go

to the authority of the Secretary to impose such a mandate on the States, which the Court declines

to address.[16]

APSCU legitimately challenges a provision of the new State authorization regulations

that affect its members that provide on-line or distance education. Per the HEA, a school of higher

education is an "education institution *in* any State that . . . is legally authorized *within such* State to

provide a program of education beyond secondary education." 20 U.S.C. § 1001(a)(2) (emphasis

added). The new State authorization regulation includes a provision that expands upon this

requirement:

> If an institution is offering postsecondary education through distance
> or correspondence education to students in a State in which it is not
> physically located or in which it is otherwise subject to State
> jurisdiction as determined by the State, the institution must meet any
> State requirements for it to be legally offering postsecondary distance
> or correspondence education in that State. An institution must be

---

[16] ASPCU has standing to challenge those parts of the new regulations which require its
members to obtain licenses from one or more States and respond to State enforcement. Whether a
State can properly be required to designate an agency or person to authorize postsecondary education
institutions, affirmatively authorize an institution by name, and operate a complaint process is not
an argument ASPCU has standing to make and not one on which this Court offers any opinion. *See,
e.g., Lujan,* 504 U.S. at 562 (holding standing is substantially more difficult to establish when
plaintiff is not the object of the challenged government action); *Allen v. Wright,* 468 U.S. 737, 759
(1984) (noting a lack of standing when the "links in the chain of causation between the challenged
Government conduct and the asserted injury are far too weak"); *Public Citizen, Inc. v. Nat'l Highway
Traffic Safety Admin.*, 489 F.3d 1279, 1293 (D.C. Cir. 2007) (affirming that "the asserted injury must
be actual or imminent – which the Court has also described as certainly impending and immediate
– not remote, speculative, conjectural, or hypothetical").

able to document to the Secretary the State's approval upon request.

34 C.F.R. § 600.9(c). The new regulations thus require those schools providing distance or online education programs to obtain authorization from the State(s) in which they are physically located as well as those State(s) in which their students are located if such latter State(s) require approval. "A state is not required to have a process to approve institutions offering distance education within that state, but if a state requires such approval, it becomes a component of the state authorization the institution must meet for compliance with the HEA." Defs.' Mem. at 55.

APSCU challenges § 600.9(c) on various grounds, but the Court need only address the argument that the Department failed to provide notice and opportunity for comment on subsection (c) of the State authorization regulations, as this subsection, or any variation thereof, was not included in the notice of proposed rulemaking. "Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, UMWA v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). An agency may promulgate a final rule that is different from a proposed rule, but only if the final rule is a "logical outgrowth" of the proposed rule, *i.e.*, only if "interested parties 'should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *Id.* (quoting *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004)). Thus, neither a brand-new rule nor one built on vague insinuations for which an interested party would have had to "divine [the Agency's] unspoken thoughts" qualify as a "logical outgrowth." *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000); *Int'l Union, UMWA*, 407 F.3d

at 1260.

The Department asserts that interested parties were given fair notice of the requirement for multiple State authorizations for distance-learning programs because the proposed rules stated that the "HEA requires institutions to have approval from the States *where they operate* to provide postsecondary educational programs." Proposed Rule at 34812 [AR 153] (emphasis added). The new regulations require online and distance education providers to obtain authorization from States in which their students are located and studying, and not simply from the State(s) in which the schools have physical campuses or conduct classes. This lies in contrast to the Department's prior regulations. *See* 34 C.F.R. § 600.4(a)(3), (b) (defining an institution of higher education as one that is "legally authorized to provide an educational program beyond secondary education in the State in which the institution is physically located," and stipulating that "[a]n institution is physically located in a State if it has a campus or other instructional site in that State") (effective until July 1, 2011); *see also* 34 C.F.R. § 600.5(a)(4), (c) (effective until July 1, 2011) (same for proprietary institutions). Despite the rationale for this aspect of the new regulations, it cannot be said to be a "logical outgrowth" of, or provide prior notice for comment from, this single sentence on which the Department relies.

Indeed, the Department neither "expressly asked for comments on [this] particular issue [n]or otherwise made clear that the agency was contemplating a particular change" to the authorization obligations of distance educators. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). Although several comments were received requesting clarification of a school's authorization obligations when a school is physically located in more than one State, *see* Final Rule at 66866–67 [AR 36–37], these comments alone by interested parties did not provide

adequate prior notice so that APSCU, and other similarly situated, should have commented on the possibility of a rule on topic; the notice obligation remained that of the Department itself. *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) (per curiam) (noting that "ambiguous comments and weak signals from the agency gave petitioners no such opportunity to anticipate and criticize the rules or to offer alternatives"); *Int'l Union, UMWA*, 407 F.3d at 1261 (noting that even when relevant comments are received, an agency should still provide notice of intent to alter or adopt new rules, however abbreviated, prior to promulgating final rules). This matter simply falls within those "cases finding that a rule was not a logical outgrowth [which] have often involved situations where the proposed rule gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had completely changed its position." *CSX Transp.*, 584 F.3d at 1081; *see also Shell Oil*, 950 F.2d at 747 ("If the deviation from the proposal is too sharp, the affected parties will not have had adequate notice and opportunity for comment.").

Here, APSCU and its members were undoubtedly prejudiced by their inability to attempt to persuade the Department prior to its adoption of final regulations concerning added authorization requirements for distance and internet education institutions. *See CSX Transp.*, 584 F.3d at 1082–83. Accordingly, the Department failed to comply with the APA's notice requirement on this aspect of its new regulations. *See* 5 U.S.C. § 553(b)(3).

The Court will vacate 34 C.F.R. § 600.9(c).

### D. Injunctive Relief Pending Appeal

APSCU orally moved for an injunction pending appeal during a telephone conference with the Court on July 1, 2011. "While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or

grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed.

R. Civ. P. 62(c). The court analyzes requests for relief pending appeal under the same factors that

it considers in deciding motions for preliminary injunctions. *See Mylan Labs., Inc. v. Leavitt*, 495

F. Supp. 2d 43, 46 (D.D.C. 2007); *Apotex, Inc., v. FDA*, 508 F. Supp. 2d 78, 89 (D.D.C. 2007); *see*

*also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir.

1977) (noting that the factors applicable to a motion to stay an administrative order also apply to

motions for preliminary injunctions and motions for stays of district court orders pending appeal).

An injunction is an equitable remedy so its issuance is one which falls within the

sound discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). A court

may issue a stay pending appeal or an order granting interim injunctive relief only when the movant

demonstrates: (a) he is likely to succeed on the merits; (b) that he is likely to suffer irreparable harm

in the absence of preliminary relief; (c) that the balance of equities tips in his favor; and (d) that an

injunction is in the public interest. *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 374 (2008). The "movant

has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension*

*Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

Given its disposition on the merits, the Court finds that there is too little likelihood

of success and too much harm to the public good to issue such an injunction, even if the harm to

APSCU's members could be said to be great. Thus, the balance tips decidedly in the Department's

favor. The motion will be denied.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [Dkt. # 17]

will be granted in part and denied in part and Plaintiff's motion for summary judgment [Dkt. # 15]

will be granted in part and denied in part.  The Court will vacate 34 C.F.R. § 600.9(c) of the

challenged regulations.  A memorializing Order accompanies this Memorandum Opinion.


Date: July 12, 2011                                    _____/s/_____
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge